**GIBBONS P.C.**
Dale E. Barney, Esq.
David N. Crapo, Esq.
One Gateway Center
Newark, New Jersey 07102
Telephone: (973) 596-4500
Facsimile: (973) 596-0545
E-mail: dbarney@gibbonslaw.com
      dcrapo@gibbonslaw.com
*Attorneys for Plaintiff*
*Discover Growth Fund, LLC.*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| DISCOVER GROWTH FUND, LLC,<br><br>      Plaintiff,<br><br>vs.<br><br>GARY H. RABIN; ANTHONY FIORINO, M.D.,; DANIEL KAZADO; DANIEL TEPER, M.D.; JEFFREY PALEY, M.D.; JOHN NECZESNY; and JOHN DOE 1-10 and JANE DOE 1-10,<br><br>      Defendants. | *Document Electronically Filed*<br><br>Civil Action No. _____<br><br><br>**COMPLAINT FOR FRAUD, NEGLIGENT MISREPRESENTATION, TORTIOUS INTERFERENCE AND RELATED CLAIMS AND JURY DEMAND** |

## COMPLAINT

Discover Growth Fund, LLC ("Discover" or "Plaintiff") by way of Complaint against Gary H. Rabin ("Rabin"), Anthony Fiorino, M.D. ("Fiorino"), Daniel Kazado ("Kazado"), Daniel Teper, M.D. ("Teper"), Jeffrey Paley, M.D. ("Paley"), John Neczesny ("Neczesny") and John Doe 1-10 and Jane Doe 1-10 (collectively, "Defendants"), alleges as follows:

### Nature of the Action

1.      This is an action by Discover against the Defendants for, as applicable, common law fraud, fraud in the inducement, negligent misrepresentation, breach of fiduciary duty, tortious interference with contract, and/or, in the alternative, securities fraud. The action arises as a result of the various Defendants' intentional and negligent misrepresentations regarding the collateral pledged to Discover to secure its $14.85 million secured claim against chapter 11 debtor and debtor in possession Immune Pharmaceuticals, Inc. ("Immune"), and related claims resulting in damage to Discover.

### Jurisdiction and Venue

2.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) because this is an action between Discover, a limited liability company ("LLC") organized under the laws of the Virgin Islands of the United States ("USVI"), and citizens of the United States and of a foreign state, and the amount in controversy exceeds $75,000.00. In addition, this Court has subject matter and original jurisdiction pursuant to 15 U.S.C. § 78aa because this action alleges, in the alternative, a violation of the Securities Exchange Act of 1934, and, specifically, 15 U.S.C. § 78j.

3.      Venue properly lies in the District of New Jersey pursuant to 28 U.S.C. § 1391(b)(2) or (3).

4.     This Court has personal jurisdiction over Defendants because Defendants have transacted and are transacting business in the State of New Jersey and in this judicial district.

## The Parties

5.     Plaintiff, Discover, a USVI LLC, is the sole secured lender to Immune, with a principal place of business located at 5330 Yacht Haven Grande, Suite 206 | St. Thomas, VI 00802-5013.   Discover is a citizen of the USVI.   The sole member of Discover is Discover Fund Management, LLLP ("DFM"), a USVI limited liability limited partnership, whose general partner is Discover Fund Management, Inc., a USVI corporation with a principal place of business in the USVI, and whose limited partners are all natural persons who permanently reside in the USVI.

6.     On information and belief, defendant Rabin is the President and Interim Chief Executive Officer ("CEO") CEO and a former member of the Board of Directors of Immune maintaining a residence located at 421 18th Street, Santa Monica, CA 90402-2429 and is a citizen of California.

7.     On information and belief, defendant Fiorino is the former President and former Interim CEO and a member of the Board of Directors of Immune maintaining a residence located at 308 Churchill Road, Teaneck, NJ 07666 and is a citizen of New Jersey.

8.     On information and belief, defendant Kazado is a member of the Board of Directors of Immune and is a citizen of Israel.

9.     On information and belief, defendant Teper is a former President, CEO, founder and member of the Board of Directors of Immune and is a citizen of Israel.

10.    On information and belief, defendant Paley is a member of the Board of Directors of Immune having a principal place of business located at Access Medical Associates, PC, 177 North Dean St., Ste. 203, Englewood, NJ 07631 and is a citizen of New Jersey.

2

11. On information and belief, defendant Neczesny is a member of the Board of Directors of Immune having a principal place of business located at Blue Ox Healthcare Partners, 135 East 57th St., 23rd Floor, New York, NY 10022 and is a citizen of New York.

12. Immune is a Delaware corporation and a debtor and debtor in possession in a chapter 11 case pending in the United States Bankruptcy Court for the District of New Jersey ("Bankruptcy Court"), having an address c/o Morris Bauer, Esq., Norris McLaughlin P.C., 400 Crossing Blvd., Bridgewater, NJ 08807.

### Background

**A. Immune's Directors and Officers**

13. At all times relevant hereto, Immune's board of directors was comprised of defendants Fiorino, Kazado, Paley and Neczesny (collectively, the "Directors").

14. At various times relevant hereto, Fiorino was also Immune's President and Chief Executive Officer, and Rabin was a restructuring advisor/officer to Immune and its affiliates and later their President and acting CEO. Hereafter, Fiorino and Rabin may collectively be referred to as the "Officers".

**B. Immune's Bankruptcy Filing**

15. On February 17, 2019 (the "Petition Date"), Immune filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"), commencing a case captioned *Immune Pharmaceuticals, Inc.*, Case No. 19-13273 (VSP). Certain of Immune's affiliates filed chapter 11 petitions in the days following the Petition Date, including Immune Pharmaceuticals, Ltd. ("Ltd."). Those chapter 11 cases are referred to herein as the "Bankruptcy Cases." These debtors remain in possession and control of their assets and businesses as debtors-in-possession, pursuant to Sections 1107 and 1108 of the Bankruptcy Code, and their cases are being jointly administered.

3

16.     Ltd. is an Israeli corporation, and, in order to protect its assets in Israel, filed an liquidation proceeding in Israel on March 19, 2019, commencing a case captioned Immune Pharmaceuticals, Ltd., Liquidation 67317-03-19 ("Israeli Proceeding").

**C.     Indebtedness**

17.     Discover is Immune's senior secured lender, pursuant to the terms of a $5,500,000.00 face amount Senior Secured Redeemable Convertible Debenture (the "Debenture") issued by Immune to Discover on October 9, 2018 and a Securities Purchase Agreement by and between Discover and Immune dated October 9, 2018 (the "Agreement"), pursuant to which the Debenture was issued (the Debenture Agreement and related documents together, the "Debt Documents"). A copy of the Debenture is attached hereto as Exhibit A. A copy of the Agreement (without voluminous exhibits) is attached hereto as Exhibit B.

18.     On October 9, 2018, Immune and Discover entered into the Agreement, and Immune issued the Debenture in the "Face Amount" of $5,500,000.00.[1] The Debenture originally bore compounded interest at a rate of 10% per annum, subject to adjustment as specified in the Debenture, with non-default maturity of five years. Upon the issuance of the Debenture, Immune advanced $2 million in cash to Immune, and issued a Promissory Note for the $3 million balance of the Debenture. The preconditions for Discover's funding the $3 million under the Note have never occurred.

19.     To secure repayment of the indebtedness and its other "Obligations"[2] to Discover, Immune granted Discover a first lien on and security interest in all assets of Immune (other than assets associated with "Ceplene" unless such assets were not disposed of by March 31, 2019),

---

[1] The Debenture bears an original issue discount of $500,000.
[2] Capitalized terms used herein shall have the meaning ascribed in the Debt Documents unless otherwise defined herein.

4

including without limitation, all inventory, chattel paper, accounts, equipment, general intangibles, and all other types of "Collateral," including all after-acquired property.  Agreement, Ex. 1, p. 1 (definition of <u>Collateral</u>) and p. 3 (definition of Obligations).

20.    Discover perfected its security interest in the Collateral.  On October 9, 2018, Discover filed (a) UCC-1 Financing Statement No. 2018 6983973 with the Department of State of the State of Delaware, where Immune is incorporated, and (b) UCC-1 Financing Statement No. 53034144 with the Department of the Treasury of the State of New Jersey, where Immune had its principal place of business.  On October 1, 2018, Discover and Immune also entered into an "IP Security Agreement – Grant of Security Interest in United States Patents and Trademarks" ("<u>IP Security Agreement</u>") (copy attached hereto as Exhibit C) which Discover filed in the United States Patents and Trademarks with the United States Patent and Trademark Office.  Thus, all of Immune's Obligations under the Agreement, the Debenture and the other Debt Documents are fully secured by a perfected, first-position lien on the Collateral, which includes substantially all assets of Immune.

21.    On October 10, 2018, Immune filed a "<u>Current Report</u>" on Form 8-K with the SEC. The Current Report states in pertinent part:

> On October 9, 2018, Immune Pharmaceuticals, Inc. ("Immune" or the "Company") entered into a Securities Purchase Agreement (the "Securities Purchase Agreement") with an institutional investor pursuant to which it <u>sold to the investor $5.5 million in principal amount of its Senior Secured Redeemable Convertible Debentures</u> (the "Debentures") for $2 million in cash and a $3 million promissory note (the "Investor Note") payable upon the earlier of the effectiveness of a registration statement covering the resale of the shares issuable upon conversion of the Debentures or one year....
>
> <u>The Debentures are secured by first priority security interests on all of the Company's assets</u>, other than all tangible and intangible assets associated with Ceplene (histamine dihydrochloride) unless such assets are not disposed of by March 31, 2019.  The Debentures are

5

convertible into shares of Immune common stock at a conversion price of $0.075 per share, subject to certain adjustments, at the option of the holder thereof or, in certain circumstances, at the option of the Company.  In the event of a conversion, any accrued interest and any interest make-whole amount will be paid in cash or, in certain circumstances, shares of common stock valued on a formula basis specified in the Debentures. ...

In the Securities Purchase Agreement, the <u>Company has agreed to file a registration statement covering the resale of the shares of common stock issuable upon the conversion of the Debentures and the exercise of the Warrants</u>.

<u>The Company does not currently have sufficient shares of common stock authorized for issuance in the event that the Debentures are converted in full and the Warrants are fully exercised</u>.  In the Securities Purchase Agreement, the Company has agreed to call a special meeting of stockholders within 90 days <u>to obtain stockholder approval for an increase in the Company's authorized common stock to enable the Company to fulfill its obligations under the Debentures and the Warrants</u> . . . .

Form 8-K dated Oct. 10, 2018 (emphasis added).

22.     On October 9, 2018, the date the Debenture was issued, Immune's closing stock price was $0.08 per share.  On October 29, 2018, Immune filed a preliminary prospectus to increase its authorized shares of common stock from 225,000,000 to 600,000,000 shares.  On November 18, 2018, $3.9 million in convertible debentures that Immune had issued to third parties in May 2018 became past due.  On November 21, 2018, Immune filed a "<u>Registration Statement</u>" to register 123,333,333 shares of common stock for issuance to Discover upon conversion of the Debenture.  On November 28, 2018, the closing price of Immune's stock was $0.02 per share.

23.     On December 18, 2018, Immune announced it had engaged Extera Partners to lead its effort to secure a partnership for bertilimumab ("<u>Bert</u>"), a phase 2 human anti-eotaxin-1 monoclonal antibody.  On December 19, 2018, the stockholders approved the share increase, and Immune increased its authorized shares to 600,000,000.

6

24.     Immune filed two amendments to the Registration Statement, but never increased the number of shares it sought to register to enable Discover to convert the Debenture in full ("Conversion Shares"). The Registration Statement was never declared effective by the SEC.

25.     On February 7, 2019, Immune's closing stock price was $0.008 per share, a decline of 90% in less than four months. The Debenture's formula provides that, as the stock price falls, the number of Conversion Shares increases.

**D.     Equity Condition Failures, Trigger Events, and Events of Default.**

26.     On February 7, 2019, Immune filed a final prospectus ("Prospectus") which states in pertinent part:

> On May 18, 2018, we issued $2.8 million in aggregate principal amount of our Original Issue Discount Convertible Debentures (the "May Debentures"). Pursuant to Waiver Amendment and Exchange Agreements entered into with certain holders of the May Debentures in connection with the sale of the October Debentures, the aggregate face amount of the May Debentures was increased to $3.9 million. By their terms, the May Debentures matured and became due and payable on November 18, 2018.   We did not repay the May Debentures on the maturity date.
>
> Our failure to repay the May Debentures when due resulted in a "Trigger Event" under the October Debentures. As a result of the Trigger Event, we no longer have the right to redeem the October Debentures prior to their maturity, the interest rate on the October Debentures has increased to 20% and interest is now payable in shares of our common stock valued at 80.0% of the average of the 3 lowest sale prices during the relevant measurement period, less $0.02 per share of Common Stock, but in no event less than the par value of our common stock.  As of February 5, 2019, a total of 3,709,634,703 shares of common stock would be issuable in respect of the October Debentures and the October Debenture Warrants, which is significantly more shares than we are authorized to issue.
>
> The Selling Stockholder [i.e. Discover] is not obligated to fund the remaining $3.0 million of its investment in the October Debentures until the earlier of the date on which all of the shares of common stock issuable in respect of the October Debentures and the October Debenture Warrants are registered and the first anniversary of the issuance of the October Debentures.  Because we are not able

7

<u>to register all of the shares required under the securities purchase agreement, the Selling Stockholder has advised us that it believes we are in default of our obligations under the October Debentures and that it does not intend to fund its remaining $3 million investment in the October Debentures.</u> We are negotiating with the Selling Stockholder regarding terms under which it would be willing to fund its remaining investment. However, no agreement has been reached as of the date hereof and we cannot assure you that we will reach any agreement with the Selling Stockholder or as to the terms of any such agreement. If the Selling Stockholder does not fund a substantial portion of its remaining $3 million investment, we may be required to find alternative sources of financing. If we are unable to do so, we may need to cease operations and file for protection under applicable bankruptcy law.

Prospectus dated Feb. 6, 2019 (emphasis added).

27. On February 8, 2019, Discover served Immune with a Notice of Default and Notice of Sale of Collateral ("<u>Notice of Default</u>"). Discover notified Immune that it was in default under the terms of the Debt Documents due to Immune's failure to maintain the required "<u>Reserved Amount</u>" (*i.e.* five times the number of Conversion Shares) and the occurrence of certain Trigger Events, including, but not limited to, (i) Immune's failure to repay the "<u>May Debentures</u>" (*i.e.* Debentures issued by Immune to third party holders in May 2018) when due, (ii) Immune's failure to register for sale all of the Conversion Shares, and (iii) the failure of one or more of the equity conditions specified in the Debenture because Immune was not in compliance with all provisions, covenants, representations and warranties of the Debt Documents. In the Notice of Default, Discover declared all of Immune's Obligations under the Debenture, Agreement, and other Debt Documents immediately due and payable.

### i.       <u>Termination of iCo License</u>

28. On February 15, 2019, iCo Therapeutics Inc. ("<u>Licensor</u>") served Immune with a Termination of Product Sublicense Agreement ("<u>Termination</u>"). Immune failed to timely file a

2771378.1 115785-100485

Current Report to disclose the Termination, as required by Item 1.02 of the General Instructions to Form 8-K.

29.     Included in the Collateral securing the Obligations under the Debt Documents is a Product Sublicense Agreement between Immune and Licensor dated December 7, 2010 (the "License").[3]  The License was filed with the SEC on April 9, 2014 as Exhibit 10.30 to Immune's Annual Report on Form 10-K, and has been incorporated by reference in every subsequent Annual Report.  The License includes non-exclusive patent licenses for the intellectual property underlying Bert.

30.     In the Agreement, Immune represented and warranted as follows:

> No Conflicts.  The execution, delivery and performance of the Transaction [i.e. Debt] Documents by Company, . . . and the consummation by Company of the . . . transactions contemplated thereby do not and will not . . . conflict with, or constitute a default (or an event that with notice or lapse of time or both would become a default) under, . . . or give to others any rights of termination, amendment, acceleration or cancellation (with or without notice, lapse of time or both) of, any material agreement . . . or other understanding to which Company . . . is a party or by which any property or asset of Company . . . is bound or affected, or . . . conflict with or violate the terms of any material agreement by which Company . . . is bound or to which any property or asset of Company . . . is bound or affected.

Agreement, Section III.A.3 (referred to below as the "No Conflict Representation").

31.     Immune also represented and warranted to Discover:

> Patents and Trademarks.  Company and each Subsidiary have, or have rights to use, all patents, patent applications, . . . licenses and other similar rights that are necessary or material for use in connection with their respective businesses as described in the Public Reports and which the failure to so have would have a Material Adverse Effect (collectively, "Intellectual Property Rights"). . . . To the knowledge of Company, all such Intellectual Property Rights are enforceable . . .

---

[3] Immune paid iCo $500,000 plus now-worthless stock and warrants for the License.

2771378.1 115785-100485

Agreement, Section III.B.11.

32.    In the Termination, the Licensor stated that it was terminating the License immediately, "due to Immune having subjected the intellectual property and Information covered by the [License] Agreement to be subject to one or more security interests and/or has otherwise encumbered such intellectual property and Information, in breach of the obligations under the CAT 213 Product License Agreement between iCo and CAT, the provisions of which are applicable to Immune under the terms of the [License] Agreement." The Termination also gave notice that, "Immune is in material breach of its obligations under the [License] Agreement; to wit, (1) Immune has subjected the intellectual property covered by the [License] Agreement to one or more security interests, and/or has otherwise encumbered such intellectual property and Information, in breach of its obligations under Section 10.1(d) of the [License] Agreement." In addition, the Termination states that the Debtor "failed to establish a Joint Development Committee, as required in Section 4.2 of the [License] Agreement" and "failed to provide to iCo timely progress and other reports, as required in Sections 4.8 and 5.5."

33.    Accordingly, there is an Event of Default under Section IV.G(c) of the Agreement, due to the "falsity, inaccuracy or material breach by Company of any written warranty, representation or statement made or furnished to Investor by or on behalf of Company," in that the security interest granted to Discover in the Agreement conflicted with both the License and the underlying agreement between the Licensor and CAT, in violation of the representations and warranties the Debtor made in Sections III.A.3 and III.B.11 of the Agreement

34.    In addition, the Termination itself constitutes a further Event of Default under Section IV.G(d) of the Agreement, as a material loss of any of the Collateral. It is also a further

10

Event of Default under Section IV.G(e) for Discover to fail to have a perfected first-priority security interest in the Collateral as a result of the Termination.

### ii. **Failure to Reserve Required Shares**

35.     In 2015, Discover Growth Fund, a Cayman Islands LLC ("Discover Cayman"), a fund for which DFM served as investment advisor, invested $9 million in cash in Immune. From the date of Discover Cayman's first investment in the Debtor in 2015 until the present, the market price of Immune's stock has dropped by more than 99.99%. Accordingly, to provide some level of protection for Discover, the Agreement obligates Immune to increase its authorized shares and maintain an adequate reserve of shares for issuance upon conversion of the Debenture. Section IV.H of the Agreement provides as follows:

> Reservation of Shares. Company has reserved from its duly authorized Common Stock for issuance pursuant to the Transaction [*i.e.* Debt] Documents authorized shares of Common Stock in the amount required by the Transaction Documents, and from and after the Capital Increase Date Company will at all times maintain a reserve equal to 5 times the number of shares sufficient to immediately issue all Conversion Shares potentially issuable at such time, free from preemptive rights (the "Reserved Amount"). The Reserved Amount will, if necessary, be increased from time to time in accordance with the Company's obligations hereunder.

Agreement, Section IV.H (emphasis added).

36.     As of November 28, 2018, because of the occurrence of multiple Trigger Events and the 75% decline in Immune's stock price from the date of the Agreement, the Debenture was convertible into over 88,000,000,000 Conversion Shares. However, Immune did not seek to amend its proxy statement or obtain a larger increase, and instead on December 19, 2018 obtained approval to increase its authorized shares to only 600,000,000. Despite the acknowledgement in the Prospectus that the number of Conversion Shares issuable upon conversion of the Debenture

11

"is significantly more shares than we are authorized to issue," Immune never took any action to further increase its authorized shares as required.

37.     In addition, upon the increase in authorized shares to 600,000,000 shares, Immune failed to reserve all of the newly authorized shares for Discover, as required by the Transfer Agent Instructions (Agreement, Ex. 3) (copy attached hereto as Exhibit D) (Immune shall "(a) immediately reserve 135,000,000 Shares for issuance to Investor, (b) immediately upon an increase in authorized shares, reserve such additional number of shares as Investor may request, (c) upon receipt of written notice, from either Company or from Investor with a copy to Company, reserve any additional Shares requested to be reserved"). Instead, Immune reserved millions of shares for other debenture holders, other warrant holders, preferred stockholders, and its own employee stock option plan.

38.     Discover repeatedly advised Immune of its failure to reserve sufficient shares for Discover. In the Notice of Default, Discover provided Immune with formal notice of its failure to comply with Section IV.H of the Agreement. Immune has never taken any action to perform its obligations to provide adequate reserved shares

39.     Accordingly, there is an Event of Default under Section IV.G(b) of the Agreement, due to the failure by Immune to perform its obligations to reserve shares within 10 business days of notice from Discover of the same.

### iii.     Failure to Register and Issue Conversion Shares

40.     On February 12, 2019, Discover issued a Conversion Notice with respect to a conversion of $530.00 of the Debenture into 9,017,067 Conversion Shares. Immune acknowledged the calculation was correct and issued the requested shares

2771378.1 115785-100485

41.     On February 14, 2019, Immune filed a Current Report on Form 8-K with the SEC, without first providing it to Discover for review, in violation of Section IV.D of the Agreement. Discover notified Immune that this was an additional Default under the Agreement.

42.     On February 15, 2019, Discover issued another Conversion Notice.   Immune instructed its transfer agent not to comply with the notice, and falsely advised the transfer agent that the Registration Statement was no longer effective.

43.     Immune did not amend the Registration Statement to reflect the Notice of Default, the Termination, or its filing of bankruptcy, which appear to have been deliberate acts by Immune to prevent Discover from obtaining the issuance of Conversion Shares.  Regardless, as a result of Immune's failure to comply with its obligations under the Debt Documents, Discover has not timely obtained the Conversion Shares to which it is entitled.  On February 19, 2019, Immune's stock was delisted by the OTCQB.

**iv.     <u>Multiple Trigger Events</u>**

44.     Under Section IV.G(g) of the Agreement, "<u>the occurrence of any 3 or more Trigger Events under the Debenture</u>" constitutes an Event of Default.   Section I.H.1 of the Debenture provides that the following constitute Trigger Events:

> a.      Holder [*i.e.* Discover] does not timely receive the number of Conversion Shares stated in any Conversion Notice, time being of the essence;
>
> . . .
>
> c.      Any violation of or failure to timely perform any covenant or provision of this Debenture, the Securities Purchase Agreement, or any Transaction [*i.e.* Debt] Document, related to payment of cash, registration, authorization, reservation, issuance or delivery of Conversion Shares, time being of the essence;
>
> d.      Any violation of or failure to perform any covenant or provision of this Debenture, the Securities Purchase Agreement, or any Transaction Document, which in the case of a default that is

13

curable, is not related to payment of cash, registration, reservation or delivery of Conversion Shares, and has not occurred before, is not cured within 5 Trading Days of written notice thereof;

e.     Any representation or warranty made in the Securities Purchase Agreement or any Transaction Document is untrue or incorrect in any respect as of the date when made or deemed made;

f.     The occurrence of any default or event of default under any material agreement, lease, document or instrument to which the Corporation [*i.e.* Immune] or any subsidiary is obligated, including without limitation of an aggregate of at least $250,000 of indebtedness, not disclosed in the Disclosure Schedules;

g.     While any Registration Statement is required to be maintained effective, the effectiveness of the Registration Statement lapses for any reason, including, without limitation, the issuance of a stop order, or the Registration Statement, or the prospectus contained therein, is unavailable to Holder sale of all Conversion Shares for any 5 or more Trading Days, which may be non-consecutive;

h.     The suspension from trading or the failure of the Common Stock to be trading or listed on the Trading Market, or failure to meet the requirements for continued listing on the Trading Market;

i.     The Corporation's notice, written or oral, to Holder, including without limitation, by way of public announcement or through any of its attorneys, agents, or representatives, of its intention not to comply, as required, with a Conversion Notice at any time, including without limitation any objection or instruction to its transfer agent not to comply with any notice from Holder;

j.     Bankruptcy, insolvency, reorganization or liquidation proceedings or other proceedings for the relief of debtors shall be instituted by or against the Corporation or any subsidiary and, if instituted against the Corporation or any subsidiary by a third party, an order for relief is entered or the proceedings are not dismissed within 30 days of their initiation;

. . .

p.     The failure of one or more Equity Conditions.

45.     The following Trigger Events under the Debenture have occurred:

(i)     Discover did not timely receive the number of Conversion Shares stated in its February 15, 2019 Conversion Notice, and indeed never received any

14

shares for such conversion. Immune failed to comply with its obligation to register enough Conversion Shares. Section I.H.1.a;

(ii)    Immune failed to comply with its obligation to authorize sufficient Conversion Shares. Section I.H.1.c;

(iii)    Immune failed to comply with its obligation to reserve sufficient Conversion Shares. Section I.H.1.d;

(iv)    Immune failed to comply with its obligation to deliver Conversion Shares. Section I.H.1.d;

(v)    Immune failed to comply with its obligation to provide the February 14, 2019 Current Report to Discover for review prior to filing. Section I.H.1.a;

(vi)    The representations and warranties in the Agreement concerning the License and Intellectual Property were incorrect when made. Section I.H.1.e;

(vii)    Nine separate defaults occurred under nine different debentures, each in excess of $250,000. Section I.H.1.f;

(viii)    The Registration Statement has been unavailable to Discover for more than five Trading Days. Section I.H.1.g;

(ix)    Immune's stock was delisted from the OTCQB and now trades only on the "Pink Sheets." Section I.H.1.h;

(x)    Immune's lawyer instructed Immune's transfer agent not to comply with Discover's Conversion Notice, and Immune's agent failed to do so. Section I.H.1.i; and

(xi)    Immune voluntarily initiated bankruptcy proceedings. Section I.H.1.j.

46.    The following are Equity Conditions under the Debenture:

(i)    the Common Stock is designated for trading on OTCQB or higher stock market . . .

(ii)    the Corporation has delivered Conversion Shares upon all conversions or redemptions of this Debenture in accordance with their terms to the Holder on a timely basis;

(iii)    the Corporation will have no knowledge of any fact that would cause both of the following (A) a registration statement not to be effective and available for the resale of all Conversion Shares, and (B) Section 3(a)(9) under the Securities Act of 1933, as amended, not to be available for the

15

issuance of all Conversion Shares, or Securities Act Rule 144 not to be available for the resale of all the Conversion Shares without restriction; . . .

(iv)   all shares of Common Stock to which Holder is entitled have been timely received into Holder's designated account in electronic form fully cleared for trading; and

(v)    the Corporation otherwise shall have been in compliance with and shall not have breached any provision, covenant, representation or warranty of any Transaction Document.

47.    The following five Equity Conditions (Debenture, Section I.G.6.f) have failed, causing a Trigger Event under Section I.H.1.p:

(i)    Immune was delisted from the OTCQB.  Section I.G.6.f.i;

(ii)   Immune failed to timely deliver Conversion Shares to Discover pursuant to its February 15, 2019 Conversion Notice.  Section I.G.6.f.ii;

(iii)  Immune's counsel has stated that it failed to amend the Registration Statement and it is therefore no longer available for resale of the Conversion Shares.  Section I.G.6.f.iii;

(iv)   The Conversion Shares for the February 15, 2019 conversion notice have not been received into Discover's account and have not been cleared for trading.  Section I.G.6.f.iv; and

(v)    Immune has breached its representations and warranties concerning the License, and has breached the provisions of the Agreement requiring it to authorize, reserve, and register sufficient common shares for Discover. Section I.G.6.f.v.

48.    Accordingly, there is an Event of Default under Section IV.G(g) of the Agreement, for "the occurrence of any 3 or more Trigger Events."

**E.    The Calculation and Valuation of Discover's Claim.**

49.    The base Interest Rate on the Face Amount of the Debenture was 10%, subject to adjustment as set forth therein.  The Interest Rate increased to 20% upon the occurrence of a Trigger Event.  In addition, Section I.F.4.b of the "Credit Risk Adjustment" provision of the Debenture mandates that the "Interest Rate [here, 20%] will adjust upward by an amount equal to the Spread Adjustment [defined as 2% in Section I.G.6.m of the Debenture, p. 9] for each amount,

16

in any, equal to the Adjustment Factor [defined as "1% per share of Common Stock in Section I.G.6.a of the Debenture, p. 7] that the Measuring Metric [defined as "the volume weighted average price of the Common Stock on any Trading Day" in Section I.G.6.h of the Debenture, p. 8] falls starting at the Minimum Trading Level [defined as "$0.07 per share of Common Stock" in Section I.G.6.k of the Debenture, p.8]. In other words, for each one cent drop in the price of the Common Stock, the Interest Rate increases by 2%. As the Common Stock dropped from above $0.07 as of the issuance of the Debenture to less than a penny as of the date of the Notice of Default, or a drop of over seven cents, the Interest Rate increased another 14% (*i.e.* 7 x 2=14%). Accordingly, the Interest Rate as of the date of the Notice of Default was 20% plus 14%, or 34%.

50.     As a result of Immune's Events of Default and Discover's acceleration of all amounts due under the Debt Documents, Immune is indebted to Discover in the principal amount or Face Amount of $5,499,470. Through February 25, 2019, accrued interest is $670,182, for total principal and interest of $6,169,652 before additional interest.

51.     The Debenture provides a mechanism whereby Discover will immediately receive the full amount of principal and interest due for the five-year term of the Debenture upon the occurrence of any contractually-defined "Deemed Liquidation Event," such as (i) Immune's failure to issue Conversion Shares pursuant to Discover's Conversion Notice and (ii) the delisting of Immune's stock.  Debenture, Section I.D.2.c and d.  Accordingly, under the "Mandatory Redemption" provision of the Debenture, Discover is immediately entitled to be paid the "Early Redemption Price" in cash.

52.     The Debenture provides that upon a contractually-defined Deemed Liquidation Event, Discover will be entitled to immediately receive repayment of the full amount of its principal plus all interest that would otherwise accrue over the five-year term of the loan.  This

payment is defined as the Early Redemption Price, which consists of the $5,499,470.00 face value, plus that amount multiplied by the 34% annual interest rate, multiplied by the five-year term of the Debenture, which totals $14,848,569. The Early Redemption Price is calculated as follows:

     (i)     $5,499,470 Face Value of Debenture x 34% Interest Rate = $1,869,820.

     (ii)     $1,869,819.80 Annual Interest x 5 Year term of Debenture = $9,349,099.

     (iii)     $5,499,470 Face Value of Debenture + $9,349,099 Interest = **$14,848,569**

**F.     Representations, Warranties and Covenants**

53.     Exhibit 1 to the Agreement defines Discover's Collateral, in part, as follows: "'Collateral' means all assets of the Company, including without limitation all personal property wherever located, both now owned and hereafter acquired, including, but not limited to, all … general intangibles, … license agreements …, patents, … ***and all proceeds*** … of the foregoing…." Discover's liens were perfected by the filing of UCC-1 statements in New Jersey and Delaware, where Immune represented it had its principal place of business and was incorporated, respectively. Discover also filed the IP Security Agreement with the United States Patent and Trademark Office.

54.     The IP Security Agreement lists certain of the patents and related assets that Immune pledged to Discover to secure the debt under the Debenture.

55.     Section V.C(d) of the Agreement provides, in part, as follows:

> Representations and Warranties. Company represents, warrants and covenants to Investor that: (a) Company has good, marketable and indefeasible title to the Collateral, except as disclosed in the Disclosure Schedules, has not made any prior sale, pledge, encumbrance, assignment or other disposition of any of the Collateral, and except as disclosed in the Disclosure Schedules, the Collateral is free from all encumbrances and rights of setoff of any kind except the lien in favor of Investor created by this Agreement; . . . and (d) Exhibit 9 [IP Security Agreement] attached hereto contains a true, complete, and current listing of all patents, trademarks, tradestyles, copyrights, and other intellectual property

18

> rights (including all registrations and applications therefor) owned by Company as of the date hereof that are registered with any governmental authority. . . ..

The "Officer's Certificate" dated October 9, 2018 executed and delivered by Fiorino on behalf of Immune (copy attached hereto as Exhibit E) sets forth Fiorino's certification as follows: "The representations and warranties of the Company [i.e. Immune] set forth in the Agreement are true and correct in all material respects. . . ."

**F.     Misrepresentations and Breach of Fiduciary Duty**

56.     As set forth above, Immune and its officers and directors represented to Discover that Immune had good, marketable and indefeasible title to all of the Collateral, including the Bert family of assets identified in the IP Security Agreement, and that Immune could pledge the Collateral to Discover to secure amounts due under the Debt Documents.

57.     Moreover, Immune and its officers and directors represented to Discover that the pledge of the Collateral under the Debt Documents would not violate or cause a default under Immune's obligations to third parties.

**i.     The Asset Sale to Alexion and the Israeli Trustee's Adverse Claim.**

58.     In July 2019, Immune filed a motion in the Bankruptcy Court to sell certain of its Anti-Eotaxin assets ("Sale Assets"), inclusive of the Bert assets, to Alexion Pharmaceuticals, Inc. ("Alexion") for $6 million. All of the Sale Assets constitute Discover's Collateral under the Debt Documents. The Sale Assets were to be sold free and clear of Discover's lien, with that lien to attach to the proceeds, in accordance with applicable bankruptcy law.

2771378.1 115785-100485

59.     Notwithstanding that fact, the trustee in the Israeli Proceeding ("Israeli Trustee")[4] asserted the position that half or more of the assets to be sold belonged to Ltd., and that the Israeli Trustee was entitled to half or more of the proceeds of the proposed sale.  Discover does not have a lien on and security interest in the assets of Ltd. under the Debt Documents.  Accordingly, the Israeli Trustee was essentially asserting that Discover's lien did not attach to that portion of the Sale Assets that was owned by Ltd.

60.     Immune and the Israeli Trustee entered into negotiations, and arrived at a settlement whereby 50% of the sale proceeds would be escrowed with the Israeli Trustee and 50% would be escrowed with Immune's bankruptcy counsel.  No other bidders appeared to bid on the Sale Assets, and the Bankruptcy Court approved the asset sale and the split of the proceeds, over Discover's objections, in October 2019.

61.     The sale of the Sale Assets to Alexion closed in December 2019, and Immune's bankruptcy counsel promptly wired $3 million, or 50%, of the sale proceeds to the Israeli Trustee. As a result, $3 million of what should have been Discover's cash Collateral has been alienated to a foreign country, and is likely unavailable to satisfy Discover's secured claim.

62.     Based upon the foregoing, Immune's representations in the Debt Documents that it had good, marketable and indefeasible title to all of the Collateral were false when made, and Immune's directors and officers knew or should have known of that falsity.

63.     The fact that Ltd. could claim ownership of a portion of the Collateral was not disclosed to Discover at the time that it entered into the Debt Documents and advanced $2 million to Immune in October 2018.  Discover only learned of Ltd.'s claim to a portion of the Collateral when the Israeli Trustee asserted such a claim during 2019 and during certain Fed. R. Bankr. P.

_____

[4] Initially, the Israeli Trustee was Baruch Hakim, Adv., who was ultimately dismissed by the Israeli Court due to conflicts of interest.  The successor Israeli Trustee is Eitan Erez, Adv.

2771378.1 115785-100485

2004 examinations of director and officer Fiorino, former director acting officer Rabin, and directors Paley and Neczesny between August and December 2019.

64.     When the Debt Documents were being negotiated, Immune's directors and officers knew that Ltd. owned certain of the Collateral.  In approving the pledge of the Collateral to Discover and the Debt Documents' representations regarding its ownership, the directors and officers, including Fiorino, Rabin, Kazado, Paley and/or Neczesny (the "Director and Officer Defendants"), relied upon emails from Teper from some years earlier to the effect that, because Immune owned all of the stock of Ltd., Immune could pledge the Ltd.-owned Collateral to a secured lender.

65.     Assuming that they were not aware of the falsity of Immune's representations and warranties, at a minimum, the Director and Officer Defendants did not conduct any due diligence in 2018 to determine if Teper's representations that Immune could pledge Ltd.'s assets as collateral were true or accurate, nor did they consider whether the fact that Ltd. claimed title to certain of the Collateral caused a breach of Immune's representations and warranties in the Agreement.

66.     Because Immune's directors and officers did not disclose Ltd.'s putative ownership of part of the Collateral to Discover, Discover was unaware of the need to perfect its security interest in Israel.

67.     Based upon all available financial information regarding Immune's financial condition in the months before and after the Petition Date, Immune was insolvent and had severely impaired cash flow.

68.     At all times relevant hereto, since at least mid-2018, the Director and Officer Defendants were deeply involved in the management, operations, direction and business planning of Immune.

69.     Contrary to Immune's representations in the Debt Documents that Immune had good, marketable and indefeasible title to the Collateral and was free to pledge the same to Discover, the Director and Officer Defendants failed to disclose that certain of the Collateral was claimed to be owned by Ltd. until after the Petition Date, when the issue arose due to the assertions of the Israeli Trustee as aforesaid.  The Director and Officer Defendants knew that certain of the assets were titled in Ltd., and failed to disclose that fact to Discover.  The Director and Officer Defendants made said representations in the Debt Document with the intent that Discover rely thereon in advancing funds to Immune.

70.     Immune's Directors and Officers failed to exercise the appropriate level of care in making said representations to Discover in the Debt Documents.

71.     Discover was and remains Immune's sole secured lender to whom Immune's the Directors and Officer Defendants owed an enhanced duty of care as Immune entered the "zone of insolvency" in early 2018 or before, and ultimately filed for relief under the Bankruptcy Code on February 17, 2019.

72.     By failing to act in Discover's best interests (negligently and fraudulently misrepresenting the ownership of Discover's Collateral) while Immune was insolvent, the Directors and Officer Defendants violated their fiduciary duties to Discover, further damaging Discover.

**ii.     Immune's Breach of the No Conflict Representation and the iCo License.**

73.     As set forth above, Immune represented in the No Conflict Representation that its entry into the Debt Documents and grant of the security interest in the Collateral to Discover constituted no breach of any other contractual undertaking or covenant with any third party or give

22

rise to the right of such a third party to terminate any contract and exercise remedies thereunder. Agreement, Section III.A.3.

74.   The License issued to Immune by iCo was an integral part of the Collateral, and in particular the Bert assets, and constituted part of the Intellectual Property Rights to which Immune warranted it had good title.  Agreement, Section III.B.11.

75.   iCo terminated the License, and thus diminished the value of the Collateral, in part because Immune's grant to Discover of a security interest in the License constituted a breach of the License and a related license that iCo had with a third party.

76.   Accordingly, in the No Conflict Representation, Immune misrepresented to Discover that the grant of the security agreement set forth in the Debt Documents would not cause defaults under third party contracts that were an integral part of the Collateral, causing Discover damage.  The Director and Officer Defendants knew or should have known that the No Conflict Representation was false when made, and they caused Immune to make that misrepresentation in order to induce Discover to advance funding to Immune.

77.   The Director and Officer Defendants failed to exercise the appropriate level of care in making said representations to Discover in the Debt Documents.

78.   The Director and Officer Defendants did not conduct any due diligence to determine if Immune's entry into the Debt Documents constituted a breach of the License, or, if they did, they negligently and fraudulently concealed the same from Discover.

79.   Discover was and remains Immune's sole secured lender to whom Immune's the Directors and Officer Defendants owed an enhanced duty of care as Immune entered the "zone of insolvency" in early 2018 or before, and ultimately filed for relief under the Bankruptcy Code on February 17, 2019.

80.     By failing to act in Discover's best interests (negligently and fraudulently misrepresenting the ownership of Discover's Collateral) while Immune was insolvent, the Directors and Officer Defendants violated their fiduciary duties to Discover, further damaging Discover.

## G.     **Reliance**

81.     Pursuant to the Debt Documents, Discover was entitled to rely and, in fact, it was the expectation of the parties that Discover would rely on Immune's representations as to its good, marketable and indefeasible title to the Collateral and the No Conflict Representation before advancing funds to Immune.

82.     Article V.E of the Agreement provides that Immune "will not sell or otherwise transfer or grant or allow the imposition of lien, encumbrance or security interest of any kind upon the Collateral or use any portion thereof in any manner inconsistent with this Agreement. . . . The Company [Immune] shall warrant and defend the Collateral against any claims and demands of all persons at any time claiming the same or any interest in the Collateral adverse to" Discover.  As such, not only did Immune warrant that it owned the Collateral outright and that the Debt Documents would not violate other contracts, but it also agreed to defend, on behalf of Discover, adverse claims to the Collateral such as that asserted by the Israeli Trustee and iCo's Termination.

83.     Discover justifiably relied on Immune's representations and warranties regarding its ownership and defense of the Collateral and the No Conflict Representation in making advances under the Debt Documents.

84.     Immune (by and through its Directors and Officers) failed to properly perform due diligence to ascertain Immune's true ability to pledge and defend the Collateral as security under the Debt Documents or to pledge the Collateral without causing iCo's Termination, to Discover's express detriment.

## Demand for Damages

85.     As of the Petition Date, Immune was indebted to Discover in an amount not less than **$14,848,569**, plus such additional and accrued interest, legal fees, costs and charges as they accrue under the Debt Documents and applicable law ("Indebtedness").

86.     Immune and its Directors and Officers negligently and fraudulently misrepresented that Immune had good, marketable and indefeasible title to all of the Collateral and that Immune would defend the Collateral against adverse claims such as that of the Israeli Trustee, thus wrongly inducing Immune to advance $2 million in principal under the Debt Documents.

87.     Immune and its Directors and Officers negligently and fraudulently misrepresented in the No Conflict Representation that Immune's entry into the Debt Documents would not impair the iCo License, thus wrongly inducing Immune to advance $2 million in principal under the Debt Documents

88.     Due to Immune's, and thus the Directors' and Officers' misrepresentations and failure to perform adequate due diligence, and the Director and Officer Defendants' other wrongful acts, Discover unlikely to realize any material recovery from the proceeds of its Collateral that have been paid to the Israeli Trustee, and the value of Bert was impaired due to iCo's Termination of the License.

89.     WHEREFORE, Discover demands payment in full of the Indebtedness, plus compensatory and punitive damages, attorneys' fees and costs, and such other additional relief as the Court deems appropriate.

## Count I
## (Common Law Fraud)

90.     Plaintiff repeats and realleges the allegations contained in each of the preceding paragraphs as if fully set forth herein

2771378.1 115785-100485

91.    The Director and Officer Defendants misrepresented and/or failed to disclose accurately to Discover material facts concerning the ownership of the Collateral, Immune's true ability to pledge the same, Immune's intent to defend Discover's interests, and the fact that the pledge of the Collateral under the Debt Documents would trigger iCo's Termination of the License.

92.    The Director and Officer Defendants knew or should have known that these representations were false when made, with the intent that Discover rely thereon.

93.    By entering into the Debt Documents with Immune, and pursuant to the representations and warranties contained therein, Discover justifiably and reasonably relied on the misrepresentations made by and the omissions of the Director and Officer Defendants.

94.    The misrepresentations and omissions were made with the intent that Discover rely thereon, the intent that Discover not discover Ltd.'s ownership and adverse claims to certain of the Collateral, and the intent that Discover not discover that iCo would terminate the License, in order to induce Discover to advance funding under the Debt Documents.

95.    As a result of the fraudulent conduct of the Director and Officer Defendants, Discover has been caused to suffer substantial damages.

WHEREFORE, Plaintiff demands judgment against Defendants, individually, jointly and severally, for compensatory and punitive damages, interest, attorneys' fees, costs of suit and such other and further relief as is equitable and just.

### Count II
### (Fraud in the Inducement)

96.    Plaintiff repeats and realleges the allegations contained in each of the preceding paragraphs as if fully set forth herein

97.    The Director and Officer Defendants misrepresented and/or failed to disclose accurately to Discover material facts concerning the true ownership of the Collateral, Immune's

26

true ability to pledge the same, Immune's true intent regarding defending Discover's secured interests, and the fact that the Collateral pledge would trigger the Termination of the License.

98.     The Director and Officer Defendants knew or should have known that these representations were false when made, with the intent that Discover rely thereon

99.     By entering into the Debt Documents with Immune, and pursuant to the representations and warranties contained therein, Discover justifiably and reasonably relied on the misrepresentations made by and the omissions of the Director and Officer Defendants.

100.    The misrepresentations and omissions were made with the intent that Discover rely thereon and the intent that Discover not discover the falsity thereof prior to advancing funds under the Debt Documents, in order to induce Discover to advance funding to Immune.

101.    As a result of the fraudulent conduct of the Director and Officer Defendants, Discover has been caused to suffer substantial damages.

WHEREFORE, Plaintiff demands judgment against Defendants, individually, jointly and severally, for compensatory and punitive damages, interest, attorneys' fees, costs of suit and such other and further relief as is equitable and just.

### Count III
### (Negligent Misrepresentation)

102.    Plaintiff repeats and realleges the allegations contained in each of the preceding paragraphs as if fully set forth herein.

103.    The Director and Officer Defendants misrepresented and/or failed to disclose accurately to Discover material facts concerning the ownership of the Collateral, Immune's true ability to pledge the same to secure the Indebtedness, Immune's intent to defend Discover's rights, and the adverse effect of the pledge of the Collateral in causing the Termination of the iCo License.

2771378.1 115785-100485

104.    By failing to conduct independent due diligence on each of these topics, and instead relying upon, *inter alia*, Teper's years' old advice, the Director and Officer Defendants negligently and/or knowingly disregarded their duties and engaged in irrational decision making in order to induce Discover to advance funding to Immune.

105.    By entering into the Debt Documents with Immune, Discover justifiably and reasonably relied on the misrepresentations made by and the omissions of the Director and Officer Defendants.

106.    As a result of the misrepresentations and omissions on the part of the Director and Officer Defendants, Discover did not discover the adverse claims to the Collateral asserted by Ltd. and the Israeli Trustee, or the fact that pledge of the Collateral would trigger iCo's Termination of the License, prior to advancing funds under the Debenture or the Petition Date and, thus, has been caused to suffer substantial damages.

WHEREFORE, Plaintiff demands judgment against the Director and Officer Defendants, individually, jointly and severally, for compensatory and punitive damages, interest, attorneys' fees, costs of suit and such other and further relief as is equitable and just.

### Count IV
### (Breach of Fiduciary Duty)

107.    Plaintiff repeats and realleges the allegations contained in each of the preceding paragraphs as if fully set forth herein.

108.    By virtue of its position of control over Immune, the Director and Officer Defendants owned Discover fiduciary duties of care, good faith and fair dealing.

109.    By virtue of his position as President and CEO Immune, defendant Fiorino owed Discover fiduciary duties of care, good faith and fair dealing.

28

110.    By engaging in the conduct described above, the Director and Officer Defendants each breached their respective fiduciary duties to Discover.

111.    By failing to conduct independent due diligence on each of these topics, and instead relying upon, *inter alia*, Teper's years' old advice, the Director and Officer Defendants negligently and/or knowingly disregarded their duties and engaged in irrational decision making in order to induce Discover to advance funding to Immune

112.    As a direct and proximate result of the Director and Officer Defendants breaches of their fiduciary duties to Discover, Discover suffered substantial damages.

WHEREFORE, Plaintiff demands judgment against the Director and Officer Defendants, individually, jointly and severally, for compensatory and punitive damages, interest, attorneys' fees, costs of suit and such other and further relief as is equitable and just.

### Count V
### (Tortious Interference with Contract Rights – Teper and Rabin)

113.    Plaintiff repeats and realleges the allegations contained in each of the preceding paragraphs as if fully set forth herein.

114.    Teper, the former President and CEO, an a founder, of Immune, has for years been attempting to strip out one of Immune's valuable assets, a group of patents and related rights used to develop a pharmaceutical known as "Ceplene" (together, the "Ceplene Assets").

115.    Teper resigned from Immune in 2017 to pursue the acquisition of the Ceplene Assets.  Prior that resignation, Teper had unsuccessfully attempted to spin-off the Ceplene Assets to a subsidiary known as Cytovia, Inc., which is also a debtor in the Bankruptcy Cases.

116.    During the negotiation of the Debt Documents, Rabin and Fiorino advised Discover that Immune was in negotiations to sell the Ceplene Assets, and requested that Discover carve out the Ceplene Assets from the Collateral for a period of time to facilitate that sale.  Discover agreed

to the request, and the definition of Collateral in Exhibit 1 to the Agreement accordingly provides that "the Ceplene assets . . . shall not be deemed to constitute 'Collateral' unless the Company [Immune] has not closed a transaction involving the sale, license, divestment or partnering of the Ceplene assets (a 'Ceplene Transaction') on or before March 31, 2019 (the 'Ceplene Transaction Deadline')."

117.   That definition also provides that "in the event that a Ceplene Transaction is not closed by the Ceplene Transaction Deadline, the Ceplene assets shall become and be deemed to be 'Collateral' hereunder."

118.   As it turned out, the party with whom Immune was negotiating the sale of the Ceplene Assets in October 2018 and thereafter was Teper and his new company, Vector Therapeutics, Inc. ("Vector").  Immune and Vector signed an Asset Purchase Agreement with a sale price of $2.25 million in cash and the assumption of some millions of dollars of what were characterized as "Ceplene Liabilities."  In March 2019, Immune filed a motion on shortened notice in the Bankruptcy Court seeking authority to close the sale of the Ceplene Assets prior to the Ceplene Transaction Deadline, March 31, 2019.

119.   The Bankruptcy Court held a hearing on that motion on March 29, 2019, but Teper and Vector appeared and announced that they did not have the funds to close the deal before the deadline.  Instead, Teper, Vector, Rabin as Immune's President and CEO, and Immune concocted a sham one-month "license" for a $100,000 "license fee", specifically to defeat Discover's expectancy rights in a lien on the Ceplene Assets on April 1, 2019 as aforesaid.  Teper and Vector represented to the Court that they would have the funding to close the sale within that one month.

2771378.1 115785-100485

120.   As of the date of this Complaint, nine months later, Teper and Vector have not come up with funding to close the sale, and the transaction appears to be dead.  The so-called "license" appears to have expired, proving the sham that it was.

121.   At the time that the "license" was executed, Teper and Rabin knew or should have known that Vector would never fund the purchase of Ceplene, and/or failed to perform adequate due diligence to ascertain Vector's inability to close.

122.   Notwithstanding the sham nature of the one-month "license", the Bankruptcy Court ruled that the "license" constituted a valid Ceplene Transaction by the Ceplene Transaction Deadline, thus defeating Discover's rights in the Ceplene Assets.

123.   At the time of the concoction of this "license," valid contracts, the Debt Documents, existed between Discover and Immune, and Discover had a legitimate expectancy that it would gain a lien on and security interest in the Ceplene Assets as of April 1, 2019.

124.   Teper and Rabin knew or should have known of Discover's contractual and expectancy rights in the Ceplene Assets, for, among other reasons, Discover filed a strenuous objection to the motion for approval of the Ceplene sale, pointing out Teper's and thus Vector's insider status and the need for the Bankruptcy Court to closely scrutinize the proposed sale.

125.   As is evidenced by Teper's and Vector's inability to close the transaction and the sham "license", the entire transaction scheme was intended by Teper and Rabin to interfere with Discover's contractual and expectancy rights in the Ceplene Assets under the Debt Documents.

126.   As is evidenced by the facts above, Teper and Rabin actually interfered with Discover's contractual and expectancy rights.

127.   That interference was and continues to be improper.

128.   As a result, Discover has been damaged.

WHEREFORE, Plaintiff demands judgment against Defendants Teper and Rabin, individually, jointly and severally, for compensatory and punitive damages, interest, attorneys' fees, costs of suit and such other and further relief as is equitable and just.

### Count VI
### (Securities Fraud – Director and Officer Defendants)

129.    Plaintiff repeats and realleges the allegations contained in each of the preceding paragraphs as if fully set forth herein.

130.    Pleading in the alternative, and to the extent that the Debenture is found to be a security, Discover asserts securities fraud claims against defendants Rabin, Fiorino and the other Director and Officer Defendants.  .

131.    In the Bankruptcy Case, Immune, the other debtors, and the Official Committee of Unsecured Creditors as plaintiffs filed an adversary proceeding captioned *Immune Pharmaceuticals, Inc. et al. Discover Growth Fund, LLC*, Adv. Pro. No. 19-02033-VFP (the "Adversary Proceeding").

132.    In the Adversary Proceeding, the plaintiffs assert, *inter alia*, that Discover's debt claims under the Debt Documents should be subordinated under 11 U.S.C. § 510(b) as claims "arising from the purchase and sale" of a "security of the debtor," in this case, Immune.  In short, the plaintiffs assert that, because the Debenture was convertible into stock of Immune, and the Agreement defines to Discover as the "Investor", all of the debt features of the Debt Documents, such as the fact that, until Conversion Shares are issued and the Debenture converts, it is a debt instrument, should be disregarded.

133.    The Adversary Proceeding plaintiffs' theory ignores the terms of Debt Documents, controlling law, Rabin's and Fiorino's deposition testimony in which they admit that the Debenture is debt until it converts, and reality.

32

134.    Nonetheless, in the event that the Bankruptcy Court sustains this flawed theory and recharacterizes Discover's debt claims as equity interests, the Director and Officer Defendants will have committed securities fraud in entering into the Debt Documents and inducing Discover to advance funding thereunder using a "manipulative or deceptive device or contrivance" in violation of 15 U.S.C. § 78j.

135.    If Discover's debt claims against Immune are recharacterized as equity, then Discover will be a purchaser of a security and have standing to assert a SEC Rule 10b-5 claim.

136.    In such event, the Director and Officer Defendants shall have committed deception in that they misrepresented and/or failed to disclose accurately to Discover material facts concerning the true ownership of the Collateral, Immune's true ability to pledge the same, Immune's true intent regarding defending Discover's secured interests, and the fact that the Collateral pledge would trigger the Termination of the License.

137.    In such event, that deception will be material, in that it induced Discover to enter into the Debt Documents and advance $2 million to Immune thereunder, and was made in connection with the purchase and sale of a security, *i.e.* equity in Immune, as the plaintiffs seek to recharacterize Discover's debt claims.

138.    In such event, the Director and Officer Defendants knew or should have known that the foregoing misrepresentations were false when made.

139.    As set forth above, Discover relied upon these misrepresentations in entering into the Debt Documents and advancing funding to Immune thereunder.  As a result, the Director and Officer Defendants' misrepresentations have caused Discover to sustain a loss and resulting damages, including but not limited to the Early Redemption Price of approximately $14.85 million.

WHEREFORE, Plaintiff demands judgment against the Director and Officer Defendants, individually, jointly and severally, for compensatory and punitive damages, interest, attorneys' fees, costs of suit and such other and further relief as is equitable and just.

## JURY DEMAND

Plaintiff demands a trial by jury.

## Prayer for Relief

Discover respectfully requests that the Court enter judgment in its favor and against Defendants for compensatory and punitive damages, plus attorneys' fees and costs, costs of suit and such other relief as the Court deems appropriate.

Dated:  January 9, 2020

**GIBBONS P.C.**

By: /s/ Dale E. Barney
Dale E. Barney, Esq.
David N. Crapo
One Gateway Center
Newark, New Jersey 07102-5310
Tel:  (973) 596-7474
Fax:  (973) 639-6244
dbarney@gibbonslaw.com
dcrapo@gibbonslaw.com

*Counsel for Plaintiff Discover Growth Fund, LLC*