# EXHIBIT A

**Debenture**

NEITHER THE ISSUANCE NOR SALE OF THE SECURITIES REPRESENTED BY THIS INSTRUMENT NOR THE SECURITIES INTO WHICH THESE SECURITIES ARE CONVERTIBLE HAVE BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR APPLICABLE STATE SECURITIES LAWS. THE SECURITIES MAY NOT BE OFFERED FOR SALE, SOLD, TRANSFERRED OR ASSIGNED (I) IN THE ABSENCE OF (A) AN EFFECTIVE REGISTRATION STATEMENT FOR THE SECURITIES UNDER THE SECURITIES ACT, OR (B) AN OPINION OF COUNSEL (WHICH COUNSEL SHALL BE SELECTED BY THE HOLDER), THAT REGISTRATION IS NOT REQUIRED UNDER SAID ACT OR (II) UNLESS SOLD PURSUANT TO RULE 144 UNDER SAID ACT.

**IMMUNE PHARMACEUTICALS INC.**

**SENIOR SECURED REDEEMABLE CONVERTIBLE DEBENTURE**

**I.     Terms of Debenture.**

    **A.     Designation and Amount.** This Senior Secured Redeemable Convertible Debenture ("**Debenture**") is issued and delivered to the holder of this Debenture (each, a "**Holder**" and collectively, the "**Holders**") by Immune Pharmaceuticals Inc., a Delaware corporation ("**Corporation**"), in the face value of $5,500,000.00 ("**Face Value**") on October 9, 2018 ("**Issuance Date**"). The Corporation will pay the Face Value to Investor in full on the Maturity Date.

    **B.     Reserved.**

    **C.     Interest.**

        **1.** Commencing on the Issuance Date, this Debenture will accrue compound interest ("**Interest**") at a rate equal to 10.0% per annum, subject to adjustment as provided in this Debenture ("**Interest Rate**"), of the Face Value. The Interest Rate will retroactively increase to 20% upon the occurrence of any Trigger Event. Interest will be payable with respect to any portion of the Face Value of the Debenture upon any of the following: (a) upon redemption of the Debenture in accordance with **Section I.F**; (b) upon conversion of all or any portion of the Debenture in accordance with **Section I.G**, only with respect to that portion which is converted; (c) when, as and if otherwise declared by the board of directors of the Corporation; and (d) the Interest Maturity Date. The Interest Rate used for calculation of the Liquidation Value, Early Redemption Price and Accrual, as applicable, and the amount of Interest owed will be calculated and determined based upon the Measuring Metric at close of the Trading Market immediately prior to the Notice Time.

1



EXHIBIT

2. Interest, as well as any applicable Liquidation Value and Conversion Premium payable hereunder, will be paid: (a) provided no Trigger Event has occurred, in the Corporation's sole and absolute discretion, immediately in cash; or (b) following the occurrence of a Trigger Event, or if Corporation does not for any reason whatsoever timely notify and pay Holder as provided in **Section I.G.1.c** below, in shares of Common Stock valued at a price per share ("**Market Price**") equal to: (i) if there has never been a Trigger Event, (A) 90.0% of the average of the 5 lowest individual daily volume weighted average prices during the applicable Measurement Period, which may be non-consecutive, less $0.01 per share of Common Stock, not to exceed (B) 95% of the average of the 3 lowest sale prices on the last day of such Measurement Period, less $0.01 per share of Common Stock; or (ii) following any Trigger Event, (A) 80.0% of the average of the 3 lowest sale prices during any Measurement Period for any conversion by Holder, less $0.02 per share of Common Stock. In no event will the Market Price be below the par value per share. All amounts that are required or permitted to be paid in cash pursuant to this Debenture will be paid by wire transfer of immediately available funds to an account designated by Holder.

3. So long as any portion of this Debenture is outstanding, the Company will not repurchase shares of Common Stock other than as payment of the exercise or conversion price of a convertible security or payment of withholding tax, and no dividends or other distributions will be paid, declared or set apart with respect to any Common Stock, except for Purchase Rights.

**D.** **Protective Provision.**

1. So long as any portion of this Debenture is outstanding, the Corporation will not, without written approval of the Holders of a majority of the Debenture then outstanding, alter or amend this Debenture.

2. A "**Deemed Liquidation Event**" will mean: (a) a merger or consolidation in which the Corporation is a constituent party or a subsidiary of the Corporation is a constituent party and the Corporation issues shares of its capital stock pursuant to such merger or consolidation, except any such merger or consolidation involving the Corporation or a subsidiary in which the shares of capital stock of the Corporation outstanding immediately prior to such merger or consolidation continue to represent, or are converted into or exchanged for shares of capital stock that represent, immediately following such merger or consolidation, at least a majority, by voting power, of the capital stock of the surviving or resulting corporation or if the surviving or resulting corporation is a wholly owned subsidiary of another corporation immediately following such merger or consolidation, the parent corporation of such surviving or resulting corporation; (b) Corporation issues securities that are senior to the Debenture in any respect, (c) Holder does not receive the number of Conversion Shares stated in a Conversion Notice with 5 Trading Days of the Notice Time; (d) trading of the Common Stock is halted or suspended by the Trading Market or any U.S. governmental agency for 5 or more consecutive trading days; or (e) the sale, lease, transfer, exclusive license or other disposition, in a single transaction or series of related transactions, by the Corporation or any subsidiary of the Corporation of all or substantially all the assets of the Corporation and its subsidiaries taken as a whole, or the sale or disposition (whether by merger or otherwise) of one or more subsidiaries of the Corporation if substantially all of the assets of the Corporation and its subsidiaries taken as a

2

whole are held by such subsidiary or subsidiaries A Deemed Liquidation Event does not include the disposition by the Corporation of its Ceplene assets and all related liabilities to a third party

      **3.**    The Corporation will not have the power to close or effect a voluntary Deemed Liquidation Event unless the agreement or plan of merger or consolidation for such transaction provides that the consideration payable to the stockholders of the Corporation will be allocated among the holders of capital stock of the Corporation in accordance with **Section I.E**, and the required amount is paid to Holder prior to or upon closing, effectuation, or occurrence of the Deemed Liquidation Event.

### E.    Liquidation.

      **1.**    Upon any liquidation, dissolution or winding up of the Corporation, whether voluntary or involuntary, after payment or provision for payment of debts and other liabilities of the Corporation, prior to any distribution or payment made to any other creditors or the holders of any Preferred Stock or Common Stock by reason of their ownership thereof, the Holders of this Debenture will be entitled to be paid out of the assets of the Corporation available for distribution to its creditors an amount with respect to the then outstanding Face Value, plus an amount equal to any accrued but unpaid Interest thereon (collectively with the Face Value, the **"Liquidation Value"**). If, upon any liquidation, dissolution or winding up of the Corporation, whether voluntary or involuntary, the amounts payable with respect to the Debenture are not paid in full, the Holders will share equally and ratably in any distribution of assets of the Corporation in proportion to the liquidation preference and an amount equal to all accumulated and unpaid Interest, if any, to which each such Holder is entitled.

      **2.**    If, upon any liquidation, dissolution or winding up of the Corporation, the assets of the Corporation will be insufficient to make payment in full to all Holders, then the assets distributable to the Holders will be distributed among the Holders at the time outstanding, ratably in proportion to the full amounts to which they would otherwise be respectively entitled.

### F.    Redemption.

      **1.**    **Corporation's Redemption Option.** On the Interest Maturity Date, the Corporation may redeem paying Holder in cash an amount per share equal to 100% of the Liquidation Value for the shares redeemed.

      **2.**    **Early Redemption.** Prior to the Interest Maturity Date, provided that no Trigger Event has occurred, the Corporation will have the right at any time upon 30 Trading Days' prior written notice, in its sole and absolute discretion, to redeem all or any portion of the Debenture then outstanding by paying Holder in cash an amount (the **"Early Redemption Price"**) equal to the sum of the following: (a) 100% of the Face Value, plus (b) the Conversion Premium, minus (c) any Interest that has been paid, with respect to that portion of the Debenture that is redeemed.

      **3.**    **Full Redemption.** Prior to the Interest Maturity Date, provided that no Trigger Event has occurred, the Corporation will have the right at any time, in its sole and absolute discretion, to redeem all, but not less than all, of the Debenture then outstanding by

paying Holder in cash by wire transfer of immediately available funds an amount equal to 125% of the Face Value, with no Conversion Premium.

    4.    **Credit Risk Adjustment**.

        **a.**    The Interest Rate will adjust downward by an amount equal to the Spread Adjustment for each amount, if any, equal to the Adjustment Factor that the Measuring Metric rises above the Maximum Triggering Level.

        **b.**    The Interest Rate will adjust upward by an amount equal to the Spread Adjustment for each amount, if any, equal to the Adjustment Factor that the Measuring Metric falls starting at the Minimum Triggering Level.

        **c.**    The adjusted Interest Rate used for calculation of the Liquidation Value, Conversion Premium, Early Redemption Price or Interest, as applicable, will be determined based upon the volume weighted average price of the Common Stock for the Trading Day prior to the Notice Date.

    4.    **Mandatory Redemption.**  If the Corporation determines to liquidate, dissolve or wind-up its business and affairs, or effect any Deemed Liquidation Event, the Corporation will, within three Trading Days of such determination and prior to effectuating any such action, redeem this Debenture for cash, by wire transfer of immediately available funds to an account designated by Holder, at the Early Redemption Price set forth in **Section I.F.2** if the event is prior to the Interest Maturity Date, or at the Liquidation Value if the event is on or after the Interest Maturity Date.

**5.**    **Mechanics of Redemption.**  In order to redeem any portion of this Debenture then outstanding, 30 Trading Days prior to payment the Corporation must deliver written notice (each, a "**Redemption Notice**") to Holder setting forth (a) the Face Amount the Corporation is redeeming, (b) the applicable Interest Rate, Liquidation Value and Early Redemption Price, and (c) the calculation of the amount paid.  Upon receipt of full payment in cash for the entire Debenture, each Holder will promptly submit to the Corporation such Holder's Debenture.  For the avoidance of doubt, the delivery of a Redemption Notice shall not affect Holder's rights under **Section I.G** until after receipt of cash payment by Holder.

**G.**    **Conversion.**

    **1.**    **Mechanics of Conversion.**

        **a.**    All or any portion of the Face Amount of the Debenture may be converted, in part or in whole, into shares of Common Stock, at any time or times after the Issuance Date, in the sole and absolute discretion of Holder or, subject to the terms and conditions hereof, the Corporation; (i) if at the option of Holder, by delivery of one or more written notices to the Corporation or its transfer agent (each, a "**Holder Conversion Notice**"), of the Holder's election to convert any or all of the Debenture or (ii) if at the option of the Corporation, if the Equity Conditions are met, delivery of written notice to Holder (each, a "**Corporation Conversion Notice**" and, with the Holder Conversion Notice, each a

4

"**Conversion Notice**"), of the Corporation's election to convert all of any portion of the Debenture.

      **b.**     Each Delivery Notice (as defined below) will set forth the amount of Face Value of Debenture being converted, the Liquidation Value and the minimum number of Conversion Shares and the amount of Interest and any applicable Conversion Premium due as of the time the Delivery Notice is given (the "**Notice Time**"), and the calculation thereof.

      **c.**     Notwithstanding **Section I.G.1.d**, if the Corporation pays in cash no later than close of the 2nd Trading Day after the Notice Date, time being of the essence, the full amount of Dividends and Conversion Premium due as of the Notice Date, no further amount will be due with respect to Dividends and Conversion Premium for the shares in the Conversion Notice.

**d.**     As soon as practicable, and in any event within 1 Trading Day after the Notice Date, time being of the essence, the Corporation will do all of the following: (i) transmit the Delivery Notice by facsimile or electronic mail to the Corporation's transfer agent (the "**Transfer Agent**"), copying Holder, with instructions to immediately comply with the Delivery Notice and deliver the number of Conversion Shares stated in the Delivery Notice forthwith; (ii) either (A) if the Corporation is approved through The Depository Trust Corporation ("**DTC**"), authorize and instruct the credit by the Transfer Agent of the number of Conversion Shares set forth in the Delivery Notice, to Holder's or its designee's balance account with the DTC Fast Automated Securities Transfer (FAST) Program, through its Deposit/Withdrawal at Custodian (DWAC) system, or (B) only if the Corporation is not approved through DTC, issue and surrender to a common carrier for overnight delivery to the address as specified in the Delivery Notice a certificate bearing no restrictive legend, registered in the name of Holder or its designee, for the number of Conversion Shares set forth in the Delivery Notice; and (iii) if it contends that the Delivery Notice is in any way incorrect, so notify Holder and provide a thorough written explanation and its own calculation, or the Delivery Notice and the calculations therein will conclusively be deemed correct for all purposes.  The Corporation will at all times diligently take or cause to be taken all actions necessary to cause the Conversion Shares to be issued forthwith.  If the Conversion Shares are not registered for resale, Investor will provide a legal opinion that they are exempt from registration.  Under no circumstances will the Corporation issue a share certificate bearing a restrictive legend.

      **e.**     If during or at the end of the Measurement Period the Holder is entitled to receive additional Conversion Shares with regard to an Initial Notice, Holder may at any time deliver one or more additional written notices to the Corporation or its transfer agent (each, an "**Additional Notice**" and with the Initial Notice, each a "**Delivery Notice**") setting forth the additional number of Conversion Shares to be delivered, and the calculation thereof.

      **f.**     If the Corporation for any reason does not issue or cause to be issued to the Holder within 2 Trading Days (T+2) after the date of a Delivery Notice, the number of Conversion Shares stated in the Delivery Notice, then, in addition to all other remedies available to the Holder, as liquidated damages and not as a penalty, the Corporation will pay in cash to the Holder on each day after such 2nd Trading Day that the issuance of such Conversion Shares is not timely effected an amount equal to 2% of the product of (i) the aggregate number of

Conversion Shares not issued to the Holder on a timely basis and to which the Holder is entitled and (ii) the highest Closing Price of the Common Stock between the date on which the Corporation should have issued such shares to the Holder and the actual date of receipt of Conversion Shares by Holder. It is intended that the foregoing will serve to reasonably compensate Holder for any delay in delivery of Conversion Shares, and not as punishment for any breach by the Corporation. The Corporation acknowledges that the actual damages likely to result from delay in delivery are difficult to estimate and would be difficult for Holder to prove.

   **g.**  Notwithstanding any other provision: all of the requirements of **Section I.F** and this **Section I.G** are each independent covenants; the Corporation's obligations to issue and deliver Conversion Shares upon any Delivery Notice are absolute, unconditional and irrevocable; any breach or alleged breach of any representation or agreement, or any violation or alleged violation of any law or regulation, by any party or any other person will not excuse full and timely performance of any of the Corporation's obligations under these sections; and under no circumstances may the Corporation seek or obtain any temporary, interim or preliminary injunctive or equitable relief to prevent or interfere with any issuance of Conversion Shares to Holder.

   **h.**  Company acknowledges and agrees that monetary damages would be difficult to quantify and prove, and that Holder would not have an adequate remedy at law for any failure to fully perform under this **Section G**. If for any reason whatsoever Holder does not timely receive the number of Conversion Shares stated in any Delivery Notice, Holder will be entitled to a compulsory remedy of immediate specific performance, temporary, interim and, preliminary and final injunctive relief requiring Corporation and its transfer agent, attorneys, officers and directors to immediately issue and deliver the number of Conversion Shares stated by Holder, which requirement will not be stayed for any reason, without the necessity of posting any bond, and which Corporation may not seek to stay or appeal.

   **i.**  No fractional shares of Common Stock are to be issued upon conversion of this Debenture, but rather the Corporation will round up to the nearest full share. The Holder will not be required to deliver the original of this Debenture in order to effect a conversion hereunder. The Corporation will pay any and all taxes which may be payable with respect to the issuance and delivery of any Conversion Shares.

   **2.**  **Holder Conversion.** In the event of a conversion of any portion of this Debenture pursuant to a Holder Conversion Notice, the Corporation will (a) satisfy the payment of Interest and Conversion Premium as provided in **Section I.C.2**, and (b) issue to the Holder of this Debenture a number of Conversion Shares equal to the Face Value divided by the applicable Conversion Price with respect to the amount of Debenture converted; all in accordance with the procedures set forth in **Section I.G.1**.

   **3.**  **Corporation Conversion.** The Corporation will have the right to send the Holder a Corporation Conversion Notice at any time in its sole and absolute discretion, if the Equity Conditions are met as of the time such Corporation Conversion Notice is given. Upon any conversion of any portion of this Debenture pursuant to a Corporation Conversion Notice, the Corporation will on the date of such notice (a) satisfy the payment of Interest and Conversion Premium as provided in **Section I.C.2**, and (b) issue to the Holder of this Debenture a number of

Conversion Shares equal to the Face Value divided by the applicable Conversion Price with respect to the amount of Debenture converted; all in accordance with the procedures set forth in **Section I.G.1**.

        4.    **Stock Splits**. If the Corporation at any time on or after the issuance of this Debenture subdivides (by any stock split, stock dividend, recapitalization or otherwise) one or more classes of its outstanding shares of Common Stock into a greater number of shares, the applicable Conversion Price, Adjustment Factor, Maximum Triggering Level, Minimum Triggering Level, and other share based metrics in effect immediately prior to such subdivision will be proportionately reduced and the number of shares of Common Stock issuable will be proportionately increased. If the Corporation at any time on or after such Issuance Date combines (by combination, reverse stock split or otherwise) one or more classes of its outstanding shares of Common Stock into a smaller number of shares, the applicable Conversion Price, Adjustment Factor, Maximum Triggering Level, Minimum Triggering Level, and other share based metrics in effect immediately prior to such combination will be proportionately increased and the number of Conversion Shares will be proportionately decreased. Any adjustment under this Section will become effective at the close of business on the date the subdivision or combination becomes effective.

        5.    **Rights**. In addition to any other adjustments, if at any time the Corporation grants, issues or sells any options, convertible securities or rights to purchase stock, warrants, securities or other property pro rata to the record holders of any class of shares of Common Stock (the "**Purchase Rights**"), then Holder will be entitled to acquire, upon the terms applicable to such Purchase Rights, the aggregate Purchase Rights which Holder could have acquired if Holder had held the number of shares of Common Stock acquirable upon conversion of the entire Debenture held by Holder immediately before the date on which a record is taken for the grant, issuance or sale of such Purchase Rights, or, if no such record is taken, the date as of which the record holders of shares of Common Stock are to be determined for the grant, issue or sale of such Purchase Rights.

        6.    **Definitions.** The following terms will have the following meanings:

        a.    "**Adjustment Factor**" means $0.01 per share of Common Stock.

        b.    "**Closing Price**" means, for any security as of any date, the last closing bid price for such security on the Trading Market, or, if the Trading Market begins to operate on an extended hours basis and does not designate the closing bid price, then the last bid price of such security prior to 4:00 p.m., Eastern time, or, if the Trading Market is not the principal securities exchange or trading market for such security, the last closing bid price of such security on the principal securities exchange or trading market where such security is listed or traded, or if the foregoing do not apply, the last closing bid price of such security in the over-the-counter market on the electronic bulletin board for such security, or, if no closing bid price is reported for such security, the average of the bid prices of any market makers for such security as reported in the "pink sheets" by Pink Sheets LLC (formerly the National Quotation Bureau, Inc.).

     **c.**     "**Conversion Premium**" for any portion of the Debenture means the Face Value, multiplied by the product of (i) the applicable Interest Rate, and (ii) the number of whole years between the Issuance Date and the Interest Maturity Date.

     **d.**     "**Conversion Price**" means a price per share of Common Stock equal to $0.075 per share of Common Stock, subject to adjustment as otherwise provided herein.

     **e.**     "**Conversion Shares**" means all shares of Common Stock that are required to be or may be issued upon conversion of this Debenture.

     **f.**     "**Equity Conditions**" means on each day during the Measuring Period, (i) the Common Stock is not under chill or freeze from DTC, (ii) the Common Stock is designated for trading on a OTCQB or higher stock market and shall not have been suspended from trading on such market, and delisting or suspension by the Trading Market has not been threatened or pending, either in writing by such market or because Company has fallen below the then effective minimum listing maintenance requirements of such market; (iii) the Corporation has delivered Conversion Shares upon all conversions or redemptions of this Debenture in accordance with their terms to the Holder on a timely basis; (iv) the Corporation will have no knowledge of any fact that would cause both of the following (A) a registration statement not to be effective and available for the resale of all Conversion Shares, and (B) Section 3(a)(9) under the Securities Act of 1933, as amended, not to be available for the issuance of all Conversion Shares, or Securities Act Rule 144 not to be available for the resale of all the Conversion Shares without restriction; (v) there has been a minimum of 5 times the amount of Face Value of the Debenture then being converted in aggregate trading volume in the prior 20 Trading Days; (v) all shares of Common Stock to which Holder is entitled have been timely received into Holder's designated account in electronic form fully cleared for trading; (vi) the Corporation otherwise shall have been in compliance with and shall not have breached any provision, covenant, representation or warranty of any Transaction Document; and (vii) not more than 3 Trigger Events shall have occurred.

     **g.**     "**Interest Maturity Date**" means the date that is 5 years after the Issuance Date.

     **h.**     "**Measuring Metric**" means the volume weighted average price of the Common Stock on any Trading Day following the Issuance Date of the Debenture.

     **i.**     "**Measuring Period**" means the period beginning on the Issuance Date and ending 3 Trading Days after all applicable Conversion Shares have actually been received into Holder's designated brokerage account in electronic form and fully cleared for trading; provided that for each day during the Measurement Period on which less than all of the conditions set forth in **Section I.G.6.h** exist, 1 Trading Day will be added to what otherwise would have been the end of the Measurement Period.

     **j.**     "**Maximum Triggering Level**" means $0.08 per share of Common Stock.

     **k.**     "**Minimum Triggering Level**" means $0.07 per share of Common Stock.

l.    **"Securities Purchase Agreement"** means the Securities Purchase Agreement or other agreement pursuant to which the Debenture is issued, including all exhibits thereto and all related Transaction Documents as defined therein.

m.    **"Spread Adjustment"** means 2 percentage points.

n.    **"Trading Day"** means any day on which the Common Stock is traded on the Trading Market.

o.    **"Trading Market"** means OTCQB or whatever higher market is at the applicable time, the principal U.S. trading exchange or market for the Common Stock.  All Trading Market data will be measured as provided by the appropriate function of the Bloomberg Professional service of Bloomberg Financial Markets or its successor performing similar functions.

7.    **Issuance Limitation**.  Notwithstanding any other provision, at no time may the Corporation issue shares of Common Stock to Holder which, when aggregated with all other shares of Common Stock then deemed beneficially owned by Holder, will result in Holder owning more than 4.99% of all Common Stock outstanding immediately after giving effect to such issuance, as determined in accordance with Section 13(d) of the Exchange Act and the rules and regulations promulgated thereunder; provided, however, that Holder may increase such amount to 9.99% upon not less than 61 days' prior notice to the Corporation.  Corporation and its transfer agent will immediately provide Holder with the then total number of outstanding shares of Common Stock at any time upon request.  No provision of this paragraph may be waived by Holder or the Corporation.

8.    **Conversion at Maturity**.  On the Interest Maturity Date, all remaining outstanding Debenture will be automatically converted into shares of Common Stock.

**H.    Trigger Event.**

1.    Any occurrence of any one or more of the following, at any time and for any reason whatsoever, will constitute a **"Trigger Event"**:

a.    Holder does not timely receive the number of Conversion Shares stated in any Conversion Notice, time being of the essence;

b.    The issuance of restricted shares if Holder provides a legal opinion that shares may be issued without restrictive legend, or the issuance of a certificate if Holder requests electronic delivery via DTC;

c.    Any violation of or failure to timely perform any covenant or provision of this Debenture, the Securities Purchase Agreement, or any Transaction Document, related to payment of cash, registration, authorization, reservation, issuance or delivery of Conversion Shares, time being of the essence;

d.    Any violation of or failure to perform any covenant or provision of this Debenture, the Securities Purchase Agreement, or any Transaction Document, which in the case

of a default that is curable, is not related to payment of cash, registration, reservation or delivery of Conversion Shares, and has not occurred before, is not cured within 5 Trading Days of written notice thereof;

   **e.** Any representation or warranty made in the Securities Purchase Agreement or any Transaction Document is untrue or incorrect in any respect as of the date when made or deemed made;

   **f.** The occurrence of any default or event of default under any material agreement, lease, document or instrument to which the Corporation or any subsidiary is obligated, including without limitation of an aggregate of at least $250,000 of indebtedness, not disclosed in the Disclosure Schedules;

   **g.** While any Registration Statement is required to be maintained effective, the effectiveness of the Registration Statement lapses for any reason, including, without limitation, the issuance of a stop order, or the Registration Statement, or the prospectus contained therein, is unavailable to Holder sale of all Conversion Shares for any 5 or more Trading Days, which may be non-consecutive;

   **h.** The suspension from trading or the failure of the Common Stock to be trading or listed on the Trading Market, or failure to meet the requirements for continued listing on the Trading Market;

   **i.** The Corporation's notice, written or oral, to Holder, including without limitation, by way of public announcement or through any of its attorneys, agents, or representatives, of its intention not to comply, as required, with a Conversion Notice at any time, including without limitation any objection or instruction to its transfer agent not to comply with any notice from Holder;

   **j.** Bankruptcy, insolvency, reorganization or liquidation proceedings or other proceedings for the relief of debtors shall be instituted by or against the Corporation or any subsidiary and, if instituted against the Corporation or any subsidiary by a third party, an order for relief is entered or the proceedings are not dismissed within 30 days of their initiation;

   **k.** The appointment of or taking possession by a custodian, receiver, liquidator, assignee, trustee, or other similar official of the Corporation or any subsidiary or of any substantial part of its property, or the making by it of an assignment for the benefit of creditors, or the execution of a composition of debts, or the occurrence of any other similar federal, state or foreign proceeding, or the admission by it in writing of its inability to pay its debts generally as they become due, the taking of corporate action by the Corporation or any Subsidiary in furtherance of any such action or the taking of any action by any person to commence a foreclosure sale or any other similar action under any applicable law;

   **l.** A judgment or judgments for the payment of money aggregating in excess of $250,000 are rendered against the Corporation or any of its subsidiaries and are not stayed or satisfied within 30 days of entry;

**m.** The Corporation does not for any reason timely comply with any applicable reporting requirement of the Securities Exchange Act of 1934, as amended, and the regulations promulgated thereunder, including without limitation timely filing when first due all public reports and filings;

**n.** Any regulatory, administrative or enforcement proceeding is initiated against Corporation or any subsidiary (except to the extent an adverse determination would not have a material adverse effect on the Company's business, properties, assets, financial condition or results of operations or prevent the performance by the Company of any material obligation under the Transaction Documents); or

**o.** Any material provision of this Debenture is at any time for any reason, other than pursuant to the express terms thereof, cease to be valid and binding on or enforceable against the parties thereto, or the validity or enforceability thereof shall be contested by any party thereto, or a proceeding shall be commenced by the Corporation or any subsidiary or any governmental authority having jurisdiction over any of them, seeking to establish the invalidity or unenforceability thereof, or the Corporation or any subsidiary denies that it has any liability or obligation purported to be created under this Debenture.

**p.** The failure of one or more Equity Conditions.

2. It is intended that all adjustments made following a Trigger Event will serve to reasonably compensate Holder for the change in circumstances, potential consequences and increased risk in light of the occurrence of a Trigger Event, and not as a penalty or punishment for any breach by the Corporation. The Corporation acknowledges that the actual damages likely to result from a Trigger Event are difficult to estimate and would be difficult for Holder to prove.

## II.    **Miscellaneous.**

**A.    Notices.** Any and all notices to the Corporation will be addressed to the Corporation's Chief Executive Officer at the Corporation's principal place of business on file with the Secretary of State of the State of Delaware. Any and all notices or other communications or deliveries to be provided by the Corporation to any Holder hereunder will be in writing and delivered personally, by electronic mail or facsimile, sent by a nationally recognized overnight courier service addressed to each Holder at the electronic mail, facsimile telephone number or address of such Holder appearing on the books of the Corporation, or if no such electronic mail, facsimile telephone number or address appears, at the principal place of business of the Holder. Any notice or other communication or deliveries hereunder will be deemed given and effective on the earliest of (1) the date of transmission, if such notice or communication is delivered via facsimile or electronic mail prior to 5:30 p.m. Eastern time, (2) the date after the date of transmission, if such notice or communication is delivered via facsimile or electronic mail later than 5:30 p.m. but prior to 11:59 p.m. Eastern time on such date, (3) the second business day following the date of mailing, if sent by nationally recognized overnight courier service, or (4) upon actual receipt by the party to whom such notice is required to be given, regardless of how sent.

11

**B.** **Lost or Mutilated Debenture.** Upon receipt of evidence reasonably satisfactory to the Corporation (an affidavit of the registered Holder will be satisfactory) of the ownership and the loss, theft, destruction or mutilation of any certificate evidencing this Debenture, and in the case of any such loss, theft or destruction upon receipt of indemnity reasonably satisfactory to the Corporation (provided that if the Holder is a financial institution or other institutional investor its own agreement will be satisfactory) or in the case of any such mutilation upon surrender of such certificate, the Corporation will, at its expense, execute and deliver in lieu of such certificate a new certificate of like kind representing the Face Value represented by such lost, stolen, destroyed or mutilated certificate and dated the date of such lost, stolen, destroyed or mutilated certificate.

**C.** **Headings.** The headings contained herein are for convenience only, do not constitute a part of this Debenture and will not be deemed to limit or affect any of the provisions hereof.

IN WITNESS WHEREOF, the undersigned have executed this Debenture on October 9, 2018.

Signed: _____
Name: Anthony "Tony" Fiorino
Title: President and Interim Chief Executive Officer

12

# EXHIBIT B

## SECURITIES PURCHASE AGREEMENT

This Securities Purchase Agreement ("**Agreement**") is made and entered into on October 9, 2018 ("**Effective Date**"), by and between Immune Pharmaceuticals, Inc., a Delaware corporation ("**Company**"), and the investor whose name appears on the signature page hereto ("**Investor**").

### Recitals

**A.** The parties desire that, upon the terms and subject to the conditions herein, Investor will purchase for $5 million a Debenture of the Company which is convertible into Common Stock at $0.075 per share, as well as a Warrant exercisable at $0.10 per share; and

**B.** The offer and sale of the securities provided for herein are being made pursuant to the exemptions from registration under Section 4(a)(2) of the Act as a transaction by an issuer not involving any public offering, and as a private placement of restricted securities pursuant to Regulation S and Rule 506 of Regulation D.

### Agreement

In consideration of the foregoing, the receipt and adequacy of which are hereby acknowledged, Company and Investor agree as follows:

**I.**    **Definitions.**   In addition to the terms defined elsewhere in this Agreement and the Transaction Documents, capitalized terms that are not otherwise defined have the meanings set forth in the Glossary of Defined Terms attached hereto as **Exhibit 1**.

**II.**    **Purchase and Sale.**

   **A.**    **Purchase Amount.**   Subject to the terms and conditions herein and the satisfaction of the conditions to Closing set forth below, Investor hereby irrevocably agrees to purchase a $5,500,000.00 Face Amount Debenture with a 10.0% original issue discount (OID) for the aggregate sum of $5,000,000.00 ("**Purchase Amount**").

   **B.**    **Deliveries.**   The following documents will be fully executed and delivered at the Closing:

   **1.**    Debenture, in the form attached hereto as **Exhibit 2**;

   **2.**    Transfer Agent Instructions, in the form attached hereto as **Exhibit 3**;

   **3.**    Legal Opinion, in the form attached hereto as **Exhibit 4**;

   **4.**    Officer's Certificate, in the form attached hereto as **Exhibit 5**;

   **5.**    Secretary's Certificate, in the form attached hereto as **Exhibit 6**;

   **6.**    Warrant, in the form attached hereto as **Exhibit 7**;



7.   IP Security Agreement, in the form attached hereto as **Exhibit 8**; and

8.   Investor Note, in the form attached hereto as **Exhibit 9**.

C.   <u>**Closing Conditions**</u>. The consummation of the transactions contemplated by this Agreement ("**Closing**") is subject to the satisfaction of each of the following conditions:

1.   All documents, instruments and other writings required to be delivered by Company to Investor pursuant to any provision of this Agreement or in order to implement and effect the transactions contemplated herein have been fully executed and delivered, including without limitation those enumerated in **Section II.B** above;

2.   The Common Stock is listed for and currently trading on the same or higher Trading Market and Company is in compliance with all requirements to maintain listing on the Trading Market, the Company has received no notice of any suspension or delisting with respect to the trading of the shares of Common Stock on such Trading Market, and Company is not aware of any current facts or circumstances that, with the passage of time, would reasonably be expected to cause such disqualification;

3.   The representations and warranties of Company and Investor set forth in this Agreement are true and correct in all material respects as if made on such date (except for representations and warranties expressly made as of a specified date, which will be true as of such date);

4.   No material breach or default has occurred under any Transaction Document or any other agreement between Company and Investor;

5.   Company has the number of duly authorized shares of Common Stock reserved for issuance as required pursuant to the terms of this Agreement;

6.   There is not then in effect any law, rule or regulation prohibiting or restricting the transactions contemplated in any Transaction Document, or requiring any consent or approval which will not have been obtained, nor is there any completed, ongoing, pending, threatened or, to Company's knowledge, contemplated proceeding or investigation which may have the effect of prohibiting or adversely affecting any of the transactions contemplated by this Agreement, including without limitation the sale, issuance, listing, trading or resale of any Shares on the Trading Market; no statute, rule, regulation, executive order, decree, ruling or injunction will have been enacted, entered, promulgated or adopted by any court or governmental authority of competent jurisdiction that prohibits the transactions contemplated by this Agreement, and no actions, suits or proceedings will be completed, ongoing, pending, threatened or, to Company's knowledge, contemplated by any person other than Investor or any Affiliate of Investor, that seek to enjoin or prohibit the transactions contemplated by this Agreement; and

7.   Any rights of first refusal, preemptive rights, rights of participation, or any similar right to participate in the transactions contemplated by this Agreement, if any, have been waived in writing.

2

**D.     Closing.** Immediately when all conditions set forth in **Section II.C** have been fully satisfied, Company will issue and sell to Investor and Investor will purchase the Debenture by payment to Company of $2,000,000.00 in cash, by wire transfer of immediately available funds to an account designated by Company, and delivery of the Investor Note in the amount of $3,000,000.00.

## III.     Representations and Warranties.

**A.     Representations Regarding Transaction.** Except as set forth under the corresponding section of the Disclosure Schedules, if any, Company hereby represents and warrants to, and as applicable covenants with, Investor as of the Closing:

**1.     Organization and Qualification.** Company and each Subsidiary is an entity duly incorporated or otherwise organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation or organization, as applicable, with the requisite power and authority to own and use its properties and assets and to carry on its business as currently conducted. Neither Company nor any Subsidiary is in violation or default of any of the provisions of its respective certificate or articles of incorporation, bylaws or other organizational or charter documents, except as would not reasonably be expected to result in a Material Adverse Effect. Each of Company and each Subsidiary is duly qualified to conduct business and is in good standing as a foreign corporation or other entity in each jurisdiction in which the nature of the business conducted or property owned by it makes such qualification necessary, except where the failure to be so qualified or in good standing, as the case may be, would not reasonably be expected to result in a Material Adverse Effect and there is no completed, pending, threatened or, to the knowledge of Company, contemplated proceeding in any such jurisdiction revoking, limiting or curtailing or seeking to revoke, limit or curtail such power and authority or qualification.

**2.     Authorization: Enforcement.** Company has the requisite corporate power and authority to enter into and to consummate the transactions contemplated by each of the Transaction Documents and otherwise to carry out its obligations hereunder or thereunder. The execution and delivery of each of the Transaction Documents by Company and the consummation by it of the transactions contemplated hereby or thereby have been duly authorized by all necessary action on the part of Company and no further consent or action is required by Company. Each of the Transaction Documents has been, or upon delivery will be, duly executed by Company and, when delivered in accordance with the terms hereof, will constitute the valid and binding obligation of Company, enforceable against Company in accordance with its terms, except (a) as limited by general equitable principles and applicable bankruptcy, insolvency, reorganization, moratorium and other laws of general application affecting enforcement of creditors' rights generally, (b) as limited by laws relating to the availability of specific performance, injunctive relief or other equitable remedies and (c) insofar as indemnification and contribution provisions may be limited by applicable law.

**3.     No Conflicts.** The execution, delivery and performance of the Transaction Documents by Company, the issuance and sale of the Securities and the consummation by Company of the other transactions contemplated thereby do not and will not (a) conflict with or violate any provision of Company's or any Subsidiary's certificate or articles

3

of incorporation, bylaws or other organizational or charter documents, (b) after giving effect to the Waiver Agreements, conflict with, or constitute a default (or an event that with notice or lapse of time or both would become a default) under, result in the creation of any Lien upon any of the properties or assets of Company or any Subsidiary, or give to others any rights of termination, amendment, acceleration or cancellation (with or without notice, lapse of time or both) of, any material agreement, credit facility, debt or other instrument (evidencing Company or Subsidiary debt or otherwise) or other understanding to which Company or any Subsidiary is a party or by which any property or asset of Company or any Subsidiary is bound or affected, (c) conflict with or result in a violation of any material law, rule, regulation, order, judgment, injunction, decree or other restriction of any court or governmental authority to which Company or a Subsidiary is subject (including U.S. federal and state securities laws and regulations), or by which any property or asset of Company or a Subsidiary is bound or affected, or (d) conflict with or violate the terms of any material agreement by which Company or any Subsidiary is bound or to which any property or asset of Company or any Subsidiary is bound or affected; except in the case of each of clauses (b), (c) and (d), such as would not reasonably be expected to result in a Material Adverse Effect.

4.      **Litigation.**  There is no action, suit, inquiry, notice of violation, proceeding or investigation completed, ongoing, pending, threatened or, to the knowledge of Company, contemplated against or affecting Company, any Subsidiary or any of their respective properties before or by any court, arbitrator, governmental or administrative agency or regulatory authority (federal, state, county, local or foreign) (collectively, an "**Action**"), which would reasonably be expected to have a Material Adverse Effect or challenge the legality, validity or enforceability of any of the Transaction Documents. The Commission has not issued any stop order or other order suspending the effectiveness of any registration statement filed by Company or any Subsidiary under the Exchange Act or the Act.

5.      **Filings, Consents and Approvals.**  Except for the Waiver Agreement, neither Company nor any Subsidiary is required to obtain any consent, waiver, authorization or order of, give any notice to, or make any filing or registration with, any court or other federal, state, local or other governmental authority or other Person in connection with the execution, delivery and performance by Company of the Transaction Documents, other than required federal and state securities filings, and such filings and approvals as are required to be made or obtained under the applicable Trading Market rules in connection with the transactions contemplated hereby, each of which has been, or if not yet required to be filed will be, timely filed.

6.      **Issuance of Shares.**  The Conversion Shares and Warrant Shares will be duly authorized and, when issued upon the conversion of the Debenture or the exercise of the Warrant, respectively, in accordance with their respective terms, will be duly and validly issued, fully paid and nonassessable, free and clear of all Liens except those created by the Investor. Company has reserved 145 million shares of Common Stock and upon consummation of the Capital Increase will reserve from its duly authorized capital stock sufficient shares of its Common Stock for issuance pursuant to the Transaction Documents.

7.      **Disclosure: Non-Public Information.**  Company will timely file a current report on Form 8-K ("**Current Report**") describing the material terms and conditions of this Agreement, a

copy of which has been provided to Investor prior to the Effective Date. There is no adverse material information regarding Company that has not been disclosed to Investor prior to the Effective Date. All information that Company has provided to Investor that constitutes or might constitute material, non-public information will be included in the Current Report. Notwithstanding any other provision, except with respect to information that will be, and only to the extent that it actually is, timely publicly disclosed by Company pursuant to the foregoing sentence, neither Company nor any other Person acting on its behalf has provided Investor or its representatives, agents or attorneys with any information that constitutes or might constitute material, non-public information, including without limitation this Agreement and the Exhibits and Disclosure Schedules hereto. No information contained in the Disclosure Schedules constitutes material non-public information. Company understands and confirms that Investor will rely on the foregoing representations and covenants in effecting transactions in securities of Company.

8.     **No Integrated Offering.** Neither Company, nor any of its Affiliates, nor any Person acting on its or their behalf has, directly or indirectly, made any offers or sales of any security or solicited any offers to buy any security, under circumstances that would cause this offering to be integrated with prior offerings by Company that cause a violation of the Act or any applicable stockholder approval provisions, including, without limitation, under the rules and regulations of the Trading Market.

9.     **Financial Condition.** The Public Reports set forth as of the dates thereof all outstanding secured and unsecured Indebtedness of Company or any Subsidiary, or for which Company or any Subsidiary has commitments, and any material default with respect to any Indebtedness. Company does not intend to incur debts beyond its ability to pay such debts as they mature, taking into account the timing and amounts of cash to be payable on or in respect of its debt, and represents that it will not do so.

10.     **Regulation D.** Neither the Company or any Person acting on its behalf has engaged in any general advertising or general solicitation within the meaning of Rule 502 of Regulation D. Assuming the accuracy of the Investor's representations and warranties contained herein, the offering of the Debenture, Warrants, Conversion Shares and Warrant Shares to the Investor as contemplated hereby is exempt from registration under the Act pursuant to Section 4(a)(2) thereof and Rule 506(b) of Regulation D thereunder.

10.     **Section 5 Compliance.** All information provided to Investor regarding Company, its business and the transactions contemplated hereby, including without limitation the Disclosure Schedules and the representations and warranties in this Agreement, and the other statements made by Company in the Transaction Documents, do not contain any untrue statement or omit to state a material fact necessary to make any of them, in light of the circumstances in which it was made, not misleading. Company is not aware of any facts or circumstances that would cause the transactions contemplated by the Transaction Documents, when consummated, to violate Section 5 of the Act or other federal or state securities laws or regulations.

11.     **Investment Company.** Company is not, and is not an Affiliate of, and immediately after receipt of payment for the Debenture, will not be or be an Affiliate of, an

5

"investment company" within the meaning of the Investment Company Act of 1940, as amended. Company will conduct its business in a manner so that it will not become subject to the Investment Company Act.

12.    **Acknowledgments Regarding Investor.**  Company's decision to enter into this Agreement has been based solely on the independent evaluation by Company and its representatives, and Company acknowledges and agrees that:

a.    Investor is not, has never been, and as a result of the transactions contemplated by the Transaction Documents will not become an officer, director, insider or control person of Company, or to Company's knowledge 10% or greater shareholder or otherwise an affiliate of Company as defined under Rule 12b-2 of the Exchange Act;

b.    Investor and its representatives have not made and do not make any representations, warranties or agreements with respect to the Securities, this Agreement, or the transactions contemplated hereby other than those specifically set forth in **Section III.C** below; Company has not relied upon, and expressly disclaims reliance upon, any and all written or oral statements or representations made by any persons prior to this Agreement;

c.    The conversion of Debenture and resale of Conversion Shares will result in dilution, which may be substantial; the number of Conversion Shares will increase in certain circumstances; and Company's obligation to issue and deliver Conversion Shares in accordance with this Agreement and the Debenture is absolute and unconditional regardless of the dilutive effect that such issuances may have; and

d.    Investor is acting solely in the capacity of arm's length purchaser with respect to this Agreement and the transactions contemplated hereby; neither Investor nor any of its Affiliates, agents or representatives has or is acting as a legal, financial, investment, accounting, tax or other advisor to Company, or fiduciary of Company, or in any similar capacity; neither Investor nor any of its Affiliates, agents or representatives has provided any legal, financial, investment, accounting, tax or other advice to Company; any statement made in connection with this Agreement or the transactions contemplated hereby is not advice or a recommendation, and is merely incidental to Investor's purchase of the Shares.

13.    **No Bad Actor Disqualification.**  Neither Company, any predecessor of Company, any affiliate of Company, any director, executive officer, other officer of Company participating in the offering, or any beneficial owner of 20% or more of Company's outstanding voting equity securities is subject to any bad actor disqualification as provided in Rule 506(d) of Regulation D, and Company is not aware of any current facts or circumstances that, with the passage of time, would reasonably be expected to cause such disqualification.

14.    **Offshore Transaction.**  Company has not, and will not, engage in any directed selling efforts, as defined in Regulation S, in the United States in respect of any of the Debenture. Company is offering and selling the Debenture only in offshore transactions, in accordance with Regulation S. Company and its Affiliates have complied, and will comply, with the offering restrictions requirements of Regulation S. Company has only offered, and will only offer, the Debenture to Investor.

**15.**   **Not a Shell.**  Company is not now, and has never been, a shell company as defined in Rule 12b-2 of the Exchange Act.

**B.**   **Representations Regarding Company.**   Except as set forth in any Public Reports and attached exhibits, or under the corresponding section of the Disclosure Schedules, if any, Company hereby represents and warrants to, and as applicable covenants with, Investor as of the Closing:

**1.**   **Capitalization.**  The capitalization of the Company as of the Effective Date is as described in the Public Reports or Disclosure Schedules.  No Person has any right of first refusal, preemptive right, right of participation, or any similar right to participate in the transactions contemplated by the Transaction Documents which has not been waived or satisfied. Except as a result of the purchase and sale of the Securities, there are no outstanding options, warrants, script rights to subscribe to, calls or commitments of any character whatsoever relating to, or securities, rights or obligations convertible into or exchangeable for, or giving any Person any right to subscribe for or acquire, any shares of Common Stock, or contracts, commitments, understandings or arrangements by which Company or any Subsidiary is or may become bound to issue additional shares of Common Stock or securities convertible into or exercisable for shares of Common Stock.  The issuance and sale of the Shares will not obligate Company to issue shares of Common Stock or other securities to any Person, other than Investor, and will not result in a right of any holder of Company securities to adjust the exercise, conversion, exchange, or reset price under such securities.  All of the outstanding shares of capital stock of Company are validly issued, fully paid and nonassessable, have been issued in material compliance with all federal and state securities laws, and none of such outstanding shares was issued in violation of any preemptive rights or similar rights to subscribe for or purchase securities.  No further approval or authorization of any stockholder, the Board of Directors of Company or others is required for the issuance and sale of the Shares.  There are no existing or contemplated subscription or investment agreements, stockholder agreements, voting agreements or other similar agreements with respect to Company's capital stock to which Company is a party or, to the knowledge of Company, between or among any of Company's stockholders.

**2.**   **Subsidiaries.**  All of the direct and indirect subsidiaries of Company are set forth in the Public Reports or the corresponding section of the Disclosure Schedules. Company owns, directly or indirectly, all of the capital stock or other equity interests of each Subsidiary, and all of such directly or indirectly owned capital stock or other equity interests are owned free and clear of any Liens.  All the issued and outstanding shares of capital stock of each Subsidiary are duly authorized, validly issued, fully paid, nonassessable and free of preemptive and similar rights to subscribe for or purchase securities.

**3.**   **Public Reports; Financial Statements.**  Company has filed all required Public Reports for the one year preceding the Effective Date.  As of their respective dates or as subsequently amended, the Public Reports complied in all material respects with the requirements of the Act and the Exchange Act and the rules and regulations of the Commission promulgated thereunder, as applicable, and none of the Public Reports, when filed and, as applicable, amended, contained any untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading.  The financial

statements of Company included in the Public Reports, as amended, comply in all material respects with applicable accounting requirements and the rules and regulations of the Commission with respect thereto as in effect at the time of filing. Such financial statements have been prepared in accordance with GAAP, except as may be otherwise specified in such financial statements or the notes thereto and except that unaudited financial statements may not contain all footnotes required by GAAP, and fairly present in all material respects the financial position of Company and its consolidated subsidiaries as of and for the dates thereof and the results of operations and cash flows for the periods then ended, subject, in the case of unaudited statements, to normal, immaterial, year-end audit adjustments.

4. **Material Changes.** Since the end of the most recent year for which an Annual Report on Form 10-K has been filed with the Commission, (a) there has been no event, occurrence or development that has had, or that would reasonably be expected to result in, a Material Adverse Effect, (b) Company has not incurred any liabilities (contingent or otherwise) other than (i) trade payables and accrued expenses incurred in the ordinary course of business consistent with past practice, and (ii) liabilities not required to be reflected in Company's financial statements pursuant to GAAP or required to be disclosed in filings made with the Commission, (c) Company has not altered its method of accounting, (d) Company has not declared or made any dividend or distribution of cash or other property to its stockholders or purchased, redeemed or made any agreements to purchase or redeem any shares of its capital stock, and (e) Company has not issued any equity securities to any officer, director or Affiliate, except pursuant to existing Company equity incentive plans. Company does not have pending before the Commission any request for confidential treatment of information.

5. **Litigation.** There is no Action completed, ongoing, pending, threatened or, to the knowledge of Company, contemplated, that would reasonably be expected to result in a Material Adverse Effect. Neither Company nor any Subsidiary, nor any current director or officer thereof, nor to the knowledge of Company any former director or officer of Company, and greater than 5% shareholder of Company, or any director or officer thereof, is or has been the subject of any Action involving a claim of violation of or liability under federal or state securities laws or a claim of breach of fiduciary duty. There has not been, is not ongoing, pending or threatened, and to the knowledge of Company is not contemplated, any investigation by the Commission or any law enforcement agency involving Company or any current director or officer of Company, or to the knowledge of Company any former director or officer of Company, and greater than 5% shareholder of Company, or any director or officer thereof.

6. **No Bankruptcy.** The Company has not filed and, to the Company's knowledge no other Person has filed or commenced, any petition or application, or any judicial or administrative proceeding commenced which has not been discharged, with respect to the Company or any Subsidiary or with respect to any of the properties or assets of Company or any Subsidiary under any applicable law relating to bankruptcy, insolvency, reorganization, fraudulent transfer, compromise, arrangement of debt, creditors' rights and no general assignment has been made by the Company or any Subsidiary for the benefit of creditors.

7. **Labor Relations.** No material labor dispute exists or, to the knowledge of Company, is imminent with respect to any of the employees of Company, which would reasonably be expected to result in a Material Adverse Effect.

8

**8.    Compliance.** Except as waived pursuant to the Waiver Agreement, neither Company nor any Subsidiary (a) is in material default under or in material violation of (and no event has occurred that has not been waived that, with notice or lapse of time or both, would result in a default by Company or any Subsidiary under), nor has Company or any Subsidiary received notice of a claim that it is in material default under or that it is in material violation of, any indenture, loan or credit agreement or any other similar agreement or instrument to which it is a party or by which it or any of its properties is bound (whether or not such default or violation has been waived), (b) is in violation of any order of any court, arbitrator or governmental body, or (c) is or has been in violation of any statute, rule or regulation of any governmental authority, including without limitation all foreign, federal, state and local laws applicable to its business, except in each case as would not reasonably be expected to have a Material Adverse Effect.

**9.    Regulatory Permits.** Company and each Subsidiary possess all certificates, authorizations and permits issued by the appropriate federal, state, local or foreign regulatory authorities necessary to conduct their respective businesses as described in the Public Reports, except where the failure to possess such permits would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect ("**Material Permits**"), and neither Company nor any Subsidiary has received any notice of proceedings relating to the revocation or modification of any Material Permit.

**10.    Title to Assets.** Company and each Subsidiary have good and marketable title in fee simple to all real property owned by them that is material to the business of Company and each Subsidiary and good and marketable title in all personal property owned by them that is material to the business of Company and each Subsidiary, in each case free and clear of all Liens, except for Liens that do not materially affect the value of such property and do not materially interfere with the use made and proposed to be made of such property by Company and each Subsidiary and Liens for the payment of federal, state or other taxes, the payment of which is neither delinquent nor subject to penalties. Any real property and facilities held under lease by Company and each Subsidiary are held by them under leases which, to the Company's knowledge, are valid, subsisting and enforceable leases and as to which Company and each Subsidiary are in compliance, except where such noncompliance could not reasonably be expected to have a Material Adverse Effect.

**11.    Patents and Trademarks.** Company and each Subsidiary have, or have rights to use, all patents, patent applications, trademarks, trademark applications, service marks, trade names, copyrights, licenses and other similar rights that are necessary or material for use in connection with their respective businesses as described in the Public Reports and which the failure to so have would have a Material Adverse Effect (collectively, "**Intellectual Property Rights**"). Neither Company nor any Subsidiary has received a written notice that the Intellectual Property Rights used by Company or any Subsidiary violates or infringes upon the rights of any Person. To the knowledge of Company, all such Intellectual Property Rights are enforceable and there is no existing infringement by another Person of any of the Intellectual Property Rights of Company or each Subsidiary.

**12.    Insurance.** Company and each Subsidiary are insured by insurers of recognized financial responsibility against such losses and risks and in such amounts as are

9

prudent and customary in the businesses in which Company and each Subsidiary are engaged, including but not limited to directors and officers insurance coverage at least equal to the Purchase Amount. To Company's knowledge, such insurance contracts and policies are in full force and complete in all material respects. Neither Company nor any Subsidiary has any reason to believe that it will not be able to renew its existing insurance coverage as and when such coverage expires or to obtain similar coverage from similar insurers as may be necessary to continue its business without an increase in cost that would constitute a Material Adverse Effect.

　　　　13.　　**Transactions with Affiliates and Employees.** None of the officers or directors of Company and, to the knowledge of Company, none of the employees of Company is presently a party to any transaction with Company or any Subsidiary (other than for services as employees, officers and directors), including any contract, agreement or other arrangement providing for the furnishing of services to or by, providing for rental of real or personal property to or from, or otherwise requiring payments to or from any officer, director or such employee or, to the knowledge of Company, any entity in which any officer, director, or any such employee has a substantial interest or is an officer, director, trustee or partner, in each case in excess of $120,000 other than (i) for payment of salary or consulting fees for services rendered, (ii) reimbursement for expenses incurred on behalf of Company and (iii) for other employee benefits, including stock option agreements under any equity incentive plan of Company.

　　　　14.　　**Sarbanes-Oxley; Internal Accounting Controls.** Company is in material compliance with all provisions of the Sarbanes-Oxley Act of 2002, which are applicable to it as of the date of the Closing. Company presented in its most recently filed periodic report under the Exchange Act the conclusions of the certifying officers about the effectiveness of Company's disclosure controls and procedures based on their evaluations as of the evaluation date. Since the date of the most recently filed Public Report, there have been no significant changes in Company's internal accounting controls or its disclosure controls and procedures or, to Company's knowledge, in other factors that could materially affect Company's internal accounting controls or its disclosure controls and procedures.

　　　　15.　　**Certain Fees.** No brokerage or finder's fees or commissions are or will be payable to any broker, financial advisor or consultant, finder, placement agent, investment banker, bank or other Person with respect to the transactions contemplated by this Agreement as a result of any action by the Company or any Person acting on its behalf. Notwithstanding any other provision, Investor will have no obligation with respect to any fees or with respect to any claims made by or on behalf of other Persons for fees of a type contemplated in this section that may be due in connection with the transactions contemplated by this Agreement or the other Transaction Documents.

　　　　16.　　**Registration Rights.** No Person has any right to cause Company to effect the registration under the Act of any securities of Company.

　　　　17.　　**Listing and Maintenance Requirements.** The Common Stock is registered pursuant to Section 12 of the Exchange Act, and Company has taken no action designed to, or which to its knowledge is likely to have the effect of, terminating the registration of the Common Stock under the Exchange Act nor has Company received any notification that the Commission is contemplating terminating such registration. Company has not, in the 12

10

months preceding the Effective Date, received notice from any Trading Market on which the Common Stock is or has been listed or quoted to the effect that Company is not in compliance with the listing or maintenance requirements of such Trading Market. Company is, and has no reason to believe that it will not in the foreseeable future continue to be, in compliance with all listing and maintenance requirements of the Trading Market on which the Common Stock is currently quoted.

18.   **Application of Takeover Protections.**  Company and its Board of Directors have taken all necessary action, if any, in order to render inapplicable any control share acquisition, business combination, poison pill (including any distribution under a rights agreement) or other similar anti-takeover provision under Company's Certificate of Incorporation (or similar charter documents) or the laws of its state of incorporation that is or could become applicable to Investor as a result of Investor and Company fulfilling their obligations or exercising their rights under the Transaction Documents, including without limitation Company's issuance of the Shares and Investor's ownership of the Shares.

19.   **Tax Status.**  Company and each of its Subsidiaries has made or filed all federal, state and foreign income and all other tax returns, reports and declarations required by any jurisdiction to which it is subject (unless and only to the extent that Company and each of its Subsidiaries has set aside on its books provisions reasonably adequate for the payment of all unpaid and unreported taxes). Company has not executed a waiver with respect to the statute of limitations relating to the assessment or collection of any foreign, federal, statute or local tax. None of Company's tax returns is presently being audited by any taxing authority. Company would not be classified as a PFIC for its most recently completed taxable year, and does not expect to be classified as a PFIC for its current taxable year.

20.   **Foreign Corrupt Practices.**  Neither Company, nor to the knowledge of Company, any agent or other person acting on behalf of Company, has (a) directly or indirectly, used any corrupt funds for unlawful contributions, gifts, entertainment or other unlawful expenses related to foreign or domestic political activity, (b) made any unlawful payment to foreign or domestic government officials or employees or to any foreign or domestic political parties or campaigns from corporate funds, (c) failed to disclose fully any contribution made by Company, or made by any person acting on its behalf of which Company is aware, which is in violation of law, or (d) violated in any material respect any provision of the Foreign Corrupt Practices Act of 1977, as amended.

21.   **Accountants.**  Company's accountants are set forth in the Public Reports and such accountants are an independent registered public accounting firm.

22.   **No Disagreements with Accountants or Lawyers.**  There are no material disagreements presently existing, or reasonably anticipated by Company to arise, between Company and the accountants or lawyers formerly or presently employed by Company.

23.   **Powers of Attorney.**  There are no outstanding powers of attorney executed on behalf of the Company or any Subsidiary.

24.   **Computer and Technology Security.** Company has taken reasonable steps to safeguard the information technology systems utilized in the operation of the business of Company, including the implementation of procedures designed to minimize the risk that such information technology systems have any disabling codes or instructions, timer, copy protection device, clock, counter or other limiting design or routing and any back door, virus, malicious code or other software routines or hardware components that in each case permit unauthorized access or the unauthorized disablement or unauthorized erasure of data or other software by a third party, and, to Company's knowledge, to date there have been no successful unauthorized intrusions or breaches of the security of its information technology systems.

25.   **Data Privacy.** Company has: (a) complied with, and is presently in compliance in all material respects with, all applicable laws in connection with data privacy, information security, data security and/or personal information; (b) complied in all material respects with, and is presently in material compliance with, its policies and procedures applicable to data privacy, information security, data security, and personal information; (c) not experienced any material incident in which personal information or other sensitive data was or may have been stolen or improperly accessed; and Company is not aware of any facts suggesting the likelihood of the foregoing, including without limitation, any breach of security or receipt of any notices or complaints from any Person regarding personal information or other data.

C.   **Representations and Warranties of Investor.** Investor hereby represents and warrants to Company as of the Closing as follows:

1.   **Organization; Authority.** Investor is an entity validly existing and in good standing under the laws of the jurisdiction of its organization with full right, company power and authority to enter into and to consummate the transactions contemplated by the Transaction Documents and otherwise to carry out its obligations thereunder. The execution, delivery and performance by Investor of the transactions contemplated by this Agreement have been duly authorized by all necessary company or similar action on the part of Investor. Each Transaction Document to which it is a party has been, or will be, duly executed by Investor, and when delivered by Investor in accordance with the terms hereof, will constitute the valid and legally binding obligation of Investor, enforceable against it in accordance with its terms, except (a) as limited by general equitable principles and applicable bankruptcy, insolvency, reorganization, moratorium and other laws of general application affecting enforcement of creditors' rights generally, (b) as limited by laws relating to the availability of specific performance, injunctive relief or other equitable remedies, and (c) insofar as indemnification and contribution provisions may be limited by applicable law.

2.   **Investor Status.** At the time Investor was offered the Shares, it was, and at the Effective Date it is: (a) an accredited investor as defined in Rule 501(a) under the Act; (b) not a registered broker-dealer, member of FINRA, or an affiliate thereof; and (c) not a U.S. Person and not acquiring the Shares for the account or beneficial ownership of any U.S. Person.

3.   **Experience of Investor.** Investor, either alone or together with its representatives, has such knowledge, sophistication and experience in business and financial matters so as to be capable of evaluating the merits and risks of the prospective investment in the Securities, and has so evaluated the merits and risks of such investment. Investor is able to bear

the economic risk of an investment in the Securities and, at the present time, is able to afford a complete loss of such investment.

    **4.**     **Ownership.** Investor is acquiring the Debenture as principal for its own account. Investor will not engage in hedging transactions with regard to the Shares unless in compliance with the Act, and will resell the Shares only pursuant to registration under the Act or an available exemption therefrom.

    **5.**     **No Short Sales.** Neither Investor nor any Affiliate holds any short position in, nor has engaged in any Short Sales of the Common Stock, or engaged in any hedging transactions with regard to the Shares prior to the Effective Date.

    6.     **Access to Information.** Such Investor has had an opportunity to receive all information related to the Company requested by it and to ask questions of and receive answers from the Company regarding the Company, its business and the terms and conditions of the offering of the Securities. Investor acknowledges receipt of copies of the Public Reports. Neither such inquiries nor any other due diligence investigation conducted by such Investor shall modify, limit or otherwise affect such Investor's right to rely on the Company's representations and warranties contained in this Agreement.

    7.     **No General Solicitation.** The Investor did not learn of the investment in the Securities as a result of any general solicitation or general advertising.

**IV.**     **Securities and Other Provisions.**

    **A.**     **Investor Due Diligence.** Investor will have the right and opportunity to conduct customary due diligence with respect to any Registration Statement or Prospectus in which the name of Investor or any Affiliate of Investor appears.

    **B.**     **Furnishing of Information.** As long as Investor owns any Securities, Company will timely file all reports required to be filed by Company after the Effective Date pursuant to the Exchange Act. As long as Investor owns any Securities, Company will prepare and make publicly available such information as is required for Investor to sell its Conversion Shares under Rule 144. Company further covenants that, as long as Investor owns any Securities, Company will take such further action as Investor may reasonably request, all to the extent required from time to time to enable Investor to sell its Conversion Shares without registration under the Act within the limitation of the exemptions provided by Rule 144.

    **C.**     **Integration.** Company will not sell, offer for sale or solicit offers to buy or otherwise negotiate in respect of any security, as defined in Section 2 of the Act, that would be integrated with the offer or sale of the Securities to Investor for purposes of the rules and regulations of any Trading Market such that it would require stockholder approval prior to the closing of such other transaction unless stockholder approval is obtained before the closing of such subsequent transaction.

    **D.**     **Disclosure and Publicity.** Company will provide to Investor for review and approval prior to filing or issuing any current, periodic or public report, registration statement, press release, public statement or communication relating to or referencing Investor, any

13

Transaction Documents or the transactions contemplated thereby, any such approval not to be unreasonably withheld.

**E.**     **Shareholders Rights Plan.** No claim will be made or enforced by Company or, to the knowledge of Company, any other Person that Investor is an "Acquiring Person" under any shareholders rights plan or similar plan or arrangement in effect or hereafter adopted by Company, or that Investor could be deemed to trigger the provisions of any such plan or arrangement, in either such case, by virtue of receiving Shares under the Transaction Documents or under any other agreement between Company and Investor. Company will conduct its business in a manner so that it will not become subject to the Investment Company Act of 1940, as amended.

**F.**     **No Non-Public Information.** Company covenants and agrees that neither it nor any other Person acting on its behalf will, provide Investor or its agents or counsel with any information that Company believes or reasonably should believe will constitute material non-public information after Closing. On and after Closing, neither Investor nor any Affiliate of Investor will have any duty of trust or confidence that is owed directly, indirectly, or derivatively, to Company or the stockholders of Company, or to any other Person who is the source of material non-public information regarding Company. Company understands and confirms that Investor will be relying on the foregoing in effecting transactions in securities of Company, including without limitation sales of the Shares.

**G.**     **Indemnification of Investor.**

1.     **Obligation to Indemnify**. Subject to the provisions of this **Section IV.G**, Company will indemnify and hold Investor, its Affiliates, managers and advisors, and each of their officers, directors, shareholders, partners, employees, representatives, agents and attorneys, and any person who controls Investor within the meaning of Section 15 of the Act or Section 20 of the Exchange Act (collectively, **"Investor Parties"** and each a **"Investor Party"**), harmless from any and all losses, liabilities, obligations, claims, contingencies, damages, reasonable costs and expenses, including all judgments, amounts paid in settlements, court costs and reasonable attorneys' fees and costs of investigation (collectively, **"Losses"**) that any Investor Party may suffer or incur as a result of or relating to (a) any breach of any of the representations, warranties, covenants or agreements made by Company in this Agreement or in the other Transaction Documents, (b) any untrue statement or alleged untrue statement of a material fact contained in the Registration Statement, Prospectus, Prospectus Supplement, or any information incorporated by reference therein, or arising out of or based upon any omission or alleged omission to state a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading, or (c) any action by a creditor or stockholder of Company who is not an Affiliate of an Investor Party, challenging the transactions contemplated by the Transaction Documents; provided, however, that Company will not be obligated to indemnify any Investor Party for any Losses finally adjudicated to be caused solely by (i) a false statement of material fact contained within written information provided by such Investor Party expressly for the purpose of including it in the applicable Registration Statement, Prospectus, Prospectus Supplement, or (ii) such Investor Party's unexcused material breach of an express provision of this Agreement or another Transaction Document willful misconduct or violation of applicable law.

14

2.   **Procedure for Indemnification.**  If any action will be brought against an Investor Party in respect of which indemnity may be sought pursuant to this Agreement, such Investor Party will promptly notify Company in writing, and Company will have the right to assume the defense thereof with counsel of its own choosing.  Investor Parties will have the right to employ separate counsel in any such action and participate in the defense thereof, but the reasonable fees and expenses of such counsel will be at the expense of Investor Parties except to the extent that (a) the employment thereof has been specifically authorized by Company in writing, (b) Company has failed after a reasonable period of time to assume such defense and to employ counsel or (c) in such action there is, in the reasonable opinion of such separate counsel, a material conflict with respect to the dispute in question on any material issue between the position of Company and the position of Investor Parties such that it would be inappropriate for one counsel to represent Company and Investor Parties.  Company will not be liable to Investor Parties under this Agreement (i) for any settlement by an Investor Party effected without Company's prior written consent, which will not be unreasonably withheld or delayed; or (ii) to the extent, but only to the extent that a loss, claim, damage or liability is either attributable to Investor's breach of any of the representations, warranties, covenants or agreements made by Investor in this Agreement or in the other Transaction Documents.  In no event will the Company be liable for the reasonable fees and expenses for more than one separate firm of attorneys (plus local counsel as applicable) to represent all Investor Parties.

3.   Other than the liability of Investor to Company for uncured material breach of the express provisions of this Agreement, no Investor Party will have any liability to Company or any Person asserting claims on behalf of or in right of Company as a result of acquiring the Securities under this Agreement.

**H.   Reservation of Shares.**  Company has reserved from its duly authorized Common Stock for issuance pursuant to the Transaction Documents authorized shares of Common Stock in the amount required by the Transaction Documents, and from and after the Capital Increase Date Company will at all times maintain a reserve equal to 5 times the number of shares sufficient to immediately issue all Conversion Shares potentially issuable at such time, free from preemptive rights (the "**Reserved Amount**").  The Reserved Amount will, if necessary, be increased from time to time in accordance with the Company's obligations hereunder.  In addition, if Company shall issue any securities or make any change to its capital structure which would change the number of shares of Common Stock into which the Debenture shall be convertible at the then current Conversion Price, Company will at the same time make proper provision so that thereafter there shall be a sufficient number of shares of Common Stock authorized and reserved, free from preemptive rights, for conversion of the outstanding Debenture.  Company (i) acknowledges that it has irrevocably instructed its transfer agent to issue certificates for the Common Stock issuable upon conversion of the Debenture, and agrees that its issuance of the Debenture will constitute full authority to its officers and agents who are charged with the duty of executing stock certificates to execute and issue the necessary certificates for shares of Common Stock in accordance with the terms and conditions of the Debenture.

**I.   Activity Restrictions.**  For so long as Investor or any of its Affiliates holds any Shares, neither Investor nor any Affiliate will: (1) vote any shares of Common Stock owned or controlled by it, sign or solicit any proxies, attend or be present at a shareholder meeting for

purposes of determining a quorum, or seek to advise or influence any Person with respect to any voting securities of Company, except in accordance with the recommendation of Company's board of directors; (2) engage or participate in any actions, plans or proposals which relate to or would result in (a) acquiring additional securities of Company, alone or together with any other Person, which would result in beneficially owning or controlling more than 9.99% of the total outstanding Common Stock or other voting securities of Company, (b) an extraordinary corporate transaction, such as a merger, reorganization or liquidation, involving Company or any of its Subsidiaries, (c) a sale or transfer of a material amount of assets of Company or any of its Subsidiaries, (d) any change in the present board of directors or management of Company, including any plans or proposals to change the number or term of directors or to fill any existing vacancies on the board, (e) any material change in the present capitalization or dividend policy of Company, (f) any other material change in Company's business or corporate structure, including but not limited to, if Company is a registered closed-end investment company, any plans or proposals to make any changes in its investment policy for which a vote is required by Section 13 of the Investment Company Act of 1940, (g) changes in Company's charter, bylaws or instruments corresponding thereto or other actions which may impede the acquisition of control of Company by any Person, (h) a class of securities of Company being delisted from a national securities exchange or to cease to be authorized to be quoted in an inter-dealer quotation system of a registered national securities association, (i) a class of equity securities of Company becoming eligible for termination of registration pursuant to Section 12(g)(4) of the Act, or (j) any action, intention, plan or arrangement similar to any of those enumerated above; or (3) request Company or its directors, officers, employees, agents or representatives to amend or waive any provision of this section.

**J.      No Shorting.**  For so long as Investor holds any Securities, neither Investor nor any of its Affiliates will engage in or effect, directly or indirectly, any Short Sale of Common Stock. For the avoidance of doubt, selling against delivery of Conversion Shares after delivery of a Conversion Notice is not a Short Sale.  There will be no restriction or limitation of any kind on Investor's right or ability to sell or transfer any or all of the Conversion Shares at any time, in its sole and absolute discretion.  Investor may not sell, transfer or assign the Debenture or any of its rights under this Agreement.

**K.      Stock Splits.**  If Company at any time on or after the Effective Date subdivides (by any stock split, stock dividend, recapitalization or otherwise) or combines (by combination, reverse stock split or otherwise) one or more classes of its outstanding shares of Common Stock into a greater or lesser number of shares, the share numbers, prices and other amounts set forth in this Agreement, as in effect immediately prior to such subdivision or combination, will be proportionately reduced or increased, as applicable, effective at the close of business on the date the subdivision or combination becomes effective.

**L.      Subsequent Financings.**

         1.      As long as Investor holds any Securities, Company will not enter into any agreement that in any way restricts its ability to enter into any agreement, amendment or waiver with Investor, including without limitation any agreement to offer, sell or issue to Investor any preferred stock, common stock or other securities of Company.

16

**2.**     Until six months after Closing, Company will not enter into any financing that uses a shelf registration, contains registration rights or otherwise provides for the issuance of free trading stock, other than: (a) with Investor, (b) in connection with a strategic transaction, or (c) the sale of restricted Common Stock at a fixed price. For the avoidance of doubt, Company may enter into any unregistered financing of nonconvertible debt or restricted stock with no registration rights.

**3.**     As long as any part of the Debenture is outstanding, Company will not agree or enter into any equity or convertible financing pursuant to which shares of Common Stock or Common Stock equivalents may effectively be issued at a variable price or where the price or number of shares are subject to any type of variability or reset feature. Provided, however, that Company may enter into any transaction: (a) with Investor, (b) for unregistered, non-convertible debt, (c) for restricted stock with no registration rights, (d) for Common Stock at a fixed price above the Market Price, (e) reasonably equivalent value given as consideration for a strategic acquisition, or (f) that includes an immediate, unconditional offer to Investor to purchase the Debenture by wire transfer of immediately available funds in the amount of 125% of the then outstanding Liquidation Value.

**4.**     So long as any part of the Debenture is outstanding, upon any issuance by Company or any of its subsidiaries of any security with any term more favorable to the holder of such security or with a term in favor of the holder of such security that was not similarly provided to Investor, then Company will notify Investor of such additional or more favorable term and such term, at Investor's option, shall become a part of the transaction documents with Investor. The types of terms contained in another security that may be more favorable to the holder of such security include, but are not limited to, terms addressing conversion discounts, prepayment rate, conversion look back periods, interest rates, original issue discounts, stock sale price, private placement price per share, and warrant coverage.

**M.     Right of First Refusal**. If at any time while any Securities are outstanding, Company has a bona fide offer of capital or financing from any person, that Company intends to act upon, then Company must first offer such opportunity to Investor to provide such capital or financing to Company on the same terms as each respective person's terms. Except as otherwise provided in any Transaction Documents, should Investor be unwilling or unable to provide such capital or financing to Company within 10 Trading Days from Investor's receipt of written notice of the offer from Company, then Company may obtain such capital or financing from that respective person upon the exact same terms and conditions offered by Company to Investor, which transaction must be completed within 30 days after the date of the notice. If Company does not receive the capital or financing from the respective person within 30 days after the date of the respective notice, then Company must again offer the capital or financing opportunity to Investor as described above, and the process detailed above shall be repeated.

**N.     No Registration**. The Securities have not been registered under the Act and may not be resold in the United States unless registered or an exemption from registration is available. Company is required to refuse to register any transfer of the Securities not made pursuant to registration under the Act or an available exemption from registration. Upon the issuance thereof, and only until such time as the same is no longer required under the applicable securities

17

laws and regulations, the certificates representing any of the Securities will bear a legend in substantially the following form:

THE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT, OR ANY U.S. STATE SECURITIES LAWS, AND, UNLESS SO REGISTERED, MAY NOT BE OFFERED OR SOLD, DIRECTLY OR INDIRECTLY, IN THE UNITED STATES OR TO U.S. PERSONS EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR AN AVAILABLE EXEMPTION FROM, OR IN A TRANSACTION NOT SUBJECT TO, THE REGISTRATION REQUIREMENTS OF THE ACT. IN ADDITION, HEDGING TRANSACTIONS INVOLVING THE SECURITIES MAY NOT BE CONDUCTED UNLESS IN COMPLIANCE WITH THE ACT.

Share certificates will be issued without such legend or at Investor's option issued via electronic delivery at the applicable balance account at DTC, if either (i) the Shares are registered for resale under the Act, or (ii) Investor provides an opinion of its counsel to the effect that the Shares may be issued without restrictive legend.

O.    **Capital Increase.** Company shall use its best efforts to increase the number of shares of Common Stock Company is authorized to issue in an amount sufficient to permit the full conversion of the Debenture and the exercise in full of the Warrant in accordance with their terms ("**Capital Increase**") as soon as possible after the Effective Date. In connection therewith, Company shall take all corporate action necessary to call a meeting of its stockholders (the "Stockholders Meeting"), which shall occur as soon as practicable and not later than 90 days after the Closing Date, for the purpose of seeking approval of the Company's stockholders for the Capital Increase. Company will as soon as reasonably practicable after the Closing Date file with the SEC proxy materials (including a proxy statement and form of proxy) for use at the Stockholders Meeting and, after receiving and promptly responding to any comments of the SEC thereon, shall as soon as reasonably practicable mail such proxy materials to the stockholders of the Company. The Company will comply with Section 14(a) of the Exchange Act and the rules promulgated thereunder in relation to any proxy statement (as amended or supplemented, the "**Proxy Statement**") and any form of proxy to be sent to the stockholders of the Company in connection with the Stockholders Meeting, and the Proxy Statement shall not, on the date that the Proxy Statement (or any amendment thereof or supplement thereto) is first mailed to stockholders or at the time of the Stockholders Meeting, contain any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made therein not false or misleading, or omit to state any material fact necessary to correct any statement in any earlier communication with respect to the solicitation of proxies or the Stockholders Meeting which has become false or misleading. The Company's Board of Directors shall recommend to the Company's stockholders that the stockholders vote in favor of the Capital Increase Event at the Stockholders Meeting and take all commercially reasonable action (including, without limitation, the hiring of a proxy solicitation firm of nationally recognized standing) to solicit the approval of the stockholders for the Capital Increase Event. No later than two (2) Business Days following stockholder approval of the Capital Increase Event, the Company shall file with the Secretary of State of Delaware a certificate of amendment to the Company's Third Amended and Restated Certificate of Incorporation to affect the Capital Increase Event, which certificate of amendment shall provide that it shall become immediately

18

effective upon filing. The Company shall issue a press release announcing the effectiveness of the Capital Increase Event no later than one (1) Business Day after such filing. The date on which the Capital Increase Event becomes effective is referred to herein as the "**Capital Increase Date**."

**V.**     **Security Agreement.**

    **A.**     **Grant of Security Interest.** To secure the Obligations, Company, as debtor, hereby assigns and grants to Investor, as secured party, a continuing first-position lien on and security interest in, all right, title and interest of the Company, whether now owned or existing or hereafter created, acquired, or arising, in and to all of the Collateral.

    **B.**     **Change in Name or Locations.** Company's legal name and jurisdiction of organization are correctly set forth in the Public Reports. Company has not transacted business at any time during the immediately preceding five-year period, and does not currently transact business, under any other legal names or trade names. Company's chief executive office and principal place of business is at, and the Company keeps and shall keep all of its books and records relating to receivables only at the location identified in the Public Reports, and the Company has no other executive offices or places of business. Company hereby agrees that if the location of the Collateral changes from the locations it is currently located in, or if Company changes its name or form or jurisdiction of organization, or establishes a name in which it may do business, Company will immediately notify Investor in writing of the additions or changes.

    **C.**     **Representations and Warranties.** Company represents, warrants and covenants to Investor that: (a) Company has good, marketable and indefeasible title to the Collateral, except as disclosed in the Disclosure Schedules, has not made any prior sale, pledge, encumbrance, assignment or other disposition of any of the Collateral, and except as disclosed in the Disclosure Schedules, the Collateral is free from all encumbrances and rights of setoff of any kind except the lien in favor of Investor created by this Agreement; (b) except as herein provided, Company will not hereafter without Investor's prior written consent sell, pledge, encumber, assign or otherwise dispose of any of the Collateral or permit any right of setoff, lien or security interest to exist thereon except to Investor, except for dispositions of Collateral in the ordinary course of business; (c) Company will defend the Collateral against all claims and demands of all persons at any time claiming the same or any interest therein; and (d) **Exhibit 9** attached hereto contains a true, complete, and current listing of all patents, trademarks, tradestyles, copyrights, and other intellectual property rights (including all registrations and applications therefor) owned by Company as of the date hereof that are registered with any governmental authority. Company shall promptly notify Investor in writing of any additional intellectual property rights acquired or arising after the date hereof, and shall submit to the Investor a supplement to **Exhibit 9** to reflect such additional rights, provided Company's failure to do so shall not impair the Investor's security interest therein.

    **D.**     **Covenants.** Company covenants that it will:

        (i) from time to time and at all reasonable times allow Investor, by or through any of its officers, agents, attorneys, or accountants, to examine or inspect the Collateral, and obtain valuations and audits of the Collateral, at Company's expense, wherever located. Company shall

do, obtain, make, execute and deliver all such additional and further acts, things, deeds, assurances and instruments as Investor may require to assure to Investor its rights hereunder and in or to the Collateral, and the proceeds thereof, including waivers from landlords, warehousemen and mortgagees;

(ii) keep the Collateral in good order and repair consistent with commercially reasonable past practices at all times and immediately notify Investor of any event causing a material loss or decline in value of the Collateral, whether or not covered by insurance, and the amount of such loss or depreciation;

(iii) only use or permit the Collateral to be used in accordance with all applicable federal, state, county and municipal laws and regulations;

(iv) to the extent applicable, have and maintain insurance at all times with respect to all Collateral against risks of fire (including so called extended coverage), theft, sprinkler leakage, and other risks (including risk of flood if any Collateral is maintained at a location in a flood hazard zone) as Investor may reasonably require, in such form, in the minimum amount of the outstanding principal of the Note and written by such companies as may be reasonably satisfactory to Investor; each such casualty insurance policy shall contain a standard Investor's Loss Payable Clause issued in favor of Investor under which all losses thereunder shall be paid to Investor as Investor's interest may appear; such policies shall expressly provide that the requisite insurance cannot be altered or canceled without at least thirty (30) days prior written notice to Investor and shall insure Investor notwithstanding the act or neglect of Company; upon Investor's demand, Company shall furnish Investor with evidence of insurance as Investor may reasonably require; in the event of failure to provide insurance as herein provided, Investor may, at its option, obtain such insurance and Company shall pay to Investor, on demand, the cost thereof; proceeds of insurance may be applied by Investor to reduce the Obligations or to repair or replace Collateral, all in Investor 's sole discretion;

(v) If any of the Collateral is, at any time, in the possession of a bailee, Company will promptly notify Investor thereof and, if requested by Investor, shall promptly obtain an acknowledgment from the bailee, in form and substance satisfactory to Investor, that the bailee holds such Collateral for the benefit of Investor and shall act upon the instructions of Investor, without the further consent of Company;

(vi) Company will not change its legal name or transact business under any other trade name without first giving 30 days' prior written notice of its intent to do so to the Investor; and

(vii) Company will promptly pay when due all taxes, assessments and governmental charges and levies upon or against Company or any of the Collateral, in each case before the same become delinquent and before penalties accrue thereon, unless and to the extent that the same are being contested in good faith by appropriate proceedings which prevent foreclosure or other realization upon any of the Collateral and preclude interference with the operation of Company's business in the ordinary course, and Company shall have established adequate reserves therefor.

   **E.    Negative Pledge: No Transfer.** Company will not sell or offer to sell or otherwise transfer or grant or allow the imposition of a lien, encumbrance or security interest of any kind upon the Collateral or use any portion thereof in any manner inconsistent with this Agreement or with the terms and conditions of any policy of insurance thereon.  The Company shall warrant and defend the Collateral against any claims and demands of all persons at any time claiming the same or any interest in the Collateral adverse to the Investor.

   **F.    Further Assurances.** Company hereby irrevocably authorizes Investor at any time and from time to time to file in any UCC jurisdiction any initial financing statements and amendments thereto that (a) indicate the Collateral (i) as all assets of Company or words of similar effect, regardless of whether any particular asset comprised in the Collateral falls within the scope of Article 9 of the UCC or such jurisdiction, or (ii) as being of an equal or lesser scope or with greater detail, and (b) contain any other information required by part 5 of Article 9 of the UCC for the sufficiency or filing office acceptance of any financing statement or amendment, including, but not limited to (i) whether Company is an organization, the type of organization and (ii) any organization identification number issued to Company. Company agrees to furnish any such information to Investor promptly upon request. Company also ratifies its authorization for Investor to have filed in any UCC jurisdiction any like initial financing statements or amendments thereto if filed prior to the date hereof.

   **G.    Events of Default.** Company shall, at Investor's option, be in default under this Agreement upon the happening of any of the following events or conditions (each, an "**Event of Default**"): (a) a failure to pay any amount due under the Debenture, this Agreement or any Transaction Document within 5 business days of the date the same is due; (b) the failure by Company to perform any of its other obligations under the Debenture, this Agreement or any Transaction Document within 10 business days of notice from Investor of the same; (c) falsity, inaccuracy or material breach by Company of any written warranty, representation or statement made or furnished to Investor by or on behalf of Company; (d) an uninsured material loss, theft, damage, or destruction to any of the Collateral, or the entry of any judgment against Company or any lien against or the making of any levy, seizure or attachment of or on the Collateral; (e) the failure of Investor to have a perfected first priority security interest in the Collateral; (f) any indication or evidence received by Investor that Company may have directly or indirectly been engaged in any type of activity that might reasonably be expected to result in the forfeiture of any property of Company to any governmental entity, federal, state or local; or (g) the occurrence of any 3 or more Trigger Events under the Debenture.

   **H.    Remedies.** Upon the occurrence of any Event of Default and at any time thereafter, Investor may declare all Obligations secured hereby immediately due and payable and shall have, in addition to any remedies provided herein or by any applicable law or in equity, all the remedies of a secured party under the UCC.  Investor's remedies include, but are not limited to, to the extent permitted by law, the right to (a) peaceably by its own means or with judicial assistance enter Company's premises and take possession of the Collateral without prior notice to Company or the opportunity for a hearing, (b) render the Collateral unusable, (c) dispose of the Collateral on Company's premises, and (d) require Company to assemble the Collateral and make it available to Investor at a place designated by Investor.  Unless the Collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, Investor will give Company reasonable notice of the time and place of any

21

public sale thereof or of the time after which any private sale or any other intended disposition thereof is to be made. The requirements of commercially reasonable notice shall be met if such notice is sent to Company at least 5 business days before the time of the intended sale or disposition. Expenses of retaking, holding, preparing for sale, selling or the like shall include Investor 's reasonable attorney's fees and legal expenses, incurred or expended by Investor to enforce any payment due it under this Agreement either as against Company, or in the prosecution or defense of any action, or concerning any matter growing out of or connection with the subject matter of this Agreement and the Collateral pledged hereunder. Company waives all relief from all appraisement or exemption laws now in force or hereafter enacted.

      **I.**   **Payment of Expenses.** At its option, Investor may, but is not required to: discharge taxes, liens, security interests or such other encumbrances as may attach to the Collateral; pay for required insurance on the Collateral; and pay for the maintenance, appraisal or reappraisal, and preservation of the Collateral, as determined by Investor to be necessary. Company will reimburse Investor on demand for any payment so made or any expense incurred by Investor pursuant to the foregoing authorization, and the Collateral also will secure any advances or payments so made or expenses so incurred by Investor.

      **J.**   **Preservation of Rights.** No delay or omission on Investor's part to exercise any right or power arising hereunder will impair any such right or power or be considered a waiver of any such right or power, nor will Investor's action or inaction impair any such right or power. Investor 's rights and remedies hereunder are cumulative and not exclusive of any other rights or remedies which Investor may have under other agreements, at law or in equity.

**VI.**   **Registration Statement.**

      **A.**   **Filing.**

         **1.**   Company will, at its sole cost and expense, prepare and file with the Commission as promptly as practicable after the Closing Date, and in any event within 30 days of the Closing, a Registration Statement (**"Registration Statement"**) registering the delayed and continuous resale of all Conversion Shares and Warrant Shares pursuant to Rule 415 under the Act, and will use reasonable best efforts to cause such Registration Statement to be declared effective under the Act as promptly as practicable, and to remain continuously effective until all Conversion Shares may be resold by Investor pursuant to Rule 144 without volume restrictions, manner-of-sale restrictions, or Company being in compliance with any current public information requirement (the **"Registration Period"**).

         **2.**   If Company breaches its obligations under the preceding paragraph, and Company is not thereafter eligible to register for resale the Conversion Shares on Form S-3, it shall file a Registration Statement on Form S-1, but such obligation and filing shall not operate to cure or excuse such breach. If at any after the initial registration Statement is filed, the Registration Statement may not remain effective, Company shall use reasonable best efforts to amend the Registration Statement to continue effectiveness uninterrupted.

      **B.**   **Procedures.** In connection with the Registration Statement, Company will, as soon as reasonably practicable:

    **1.**    Prepare and file with the Commission such pre-effective and post-effective amendments and supplements to the Registration Statement and the Prospectus used in connection with the Registration Statement, and file such reports under the Exchange Act, as may be necessary to cause the Registration Statement to become effective, to keep the Registration Statement continuously effective during the Registration Period and not misleading, and as may otherwise be required or applicable under, and to comply with the provisions of, the Act with respect to the disposition of all Conversion Shares covered by the Registration Statement during the Registration Period. Notwithstanding the foregoing, for not more than 5 consecutive days or for a total of not more than 10 days in any 12 month period, the Company may suspend the use of any Prospectus included in any Registration Statement contemplated by this Section in the event that the Company determines in good faith that such suspension is necessary to (A) delay the disclosure of material non-public information concerning the Company, the disclosure of which at the time is not, in the good faith opinion of the Company, in the best interests of the Company or (B) amend or supplement the affected Registration Statement or the related Prospectus so that such Registration Statement or Prospectus shall not include an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein, in the case of the Prospectus in light of the circumstances under which they were made, not misleading (an "Allowed Delay"); provided, that the Company shall promptly (a) notify the Investor in writing of the commencement of an Allowed Delay, but shall not (without the prior written consent of the Investor) disclose to such Investor any material non-public information giving rise to an Allowed Delay, (b) advise the Investor in writing to cease all sales under the Registration Statement until the end of the Allowed Delay and (c) use commercially reasonable efforts to terminate an Allowed Delay as promptly as practicable.

    **2.**    Furnish to Investor such number of copies of the Prospectus, and each amendment or supplement thereto, in conformity with the requirements of the Act, and such other documents as Investor may reasonably request in order to facilitate the disposition of Conversion Shares owned by it.

    **3.**    Notify Investor: (a) when a Prospectus or any Prospectus supplement or post-effective amendment is proposed to be filed and, with respect to any post-effective amendment, when the same has become effective, except for any filing to be made solely to incorporate by reference a Current Report on Form 8-K, Quarterly Report on Form 10-Q or Annual Report on Form 10-K to be filed with the Commission; (b) of any request by the Commission or any other federal or state governmental authority for amendments or supplements to a Registration Statement or a Prospectus or for additional information; (c) of the issuance by the Commission of any stop order suspending the effectiveness of a Registration Statement or the initiation of any proceedings for that purpose; (d) of the receipt by the Company of any notification with respect to the suspension of the qualification or exemption from qualification of any of the Conversion Shares for sale in any jurisdiction, or the initiation or threatening of any proceeding for such purpose, and (e) of the occurrence of any event or circumstance that makes any statement made in the Registration Statement or Prospectus or any document incorporated or deemed to be incorporated therein by reference untrue in any material respect or that requires the making of any changes in the Registration Statement, Prospectus or documents so that, in the case of a Registration Statement or the Prospectus, as the case may be, it will not contain any untrue statement of a material fact or omit to state any material fact required to be stated therein

or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading; provided, however, in no event shall any such notice contain any information which would constitute material, non-public information regarding the Company.

**4.** Use reasonable best efforts to avoid the issuance of, or, if issued, obtain the withdrawal of, any order suspending the effectiveness of the Registration Statement, or the lifting of any suspension of the qualification, or exemption from qualification, of any of the Conversion Shares for sale in any jurisdiction, at the earliest practicable moment.

**5.** Except during an Allowed Delay, incorporate in a Prospectus supplement or post-effective amendment such information as Investor requests be included therein regarding Investor or the plan of distribution of the Conversion Shares; and make all required filings of the Prospectus supplement or such post-effective amendment as soon as practicable after the Company has received notification of such matters to be incorporated in such Prospectus supplement or post-effective amendment; provided, however, that the Company shall not be required to take any action pursuant to this paragraph that would violate applicable law.

**6.** Except during an Allowed Delay, whenever necessary, prepare and deliver to Investor any required supplement or amendment, including a post-effective amendment, to the Registration Statement or a supplement to the Prospectus or any document incorporated or deemed to be incorporated therein by reference, and file any other required document, including such reports as may be required to be filed under the Exchange Act, so that, as thereafter delivered, the Prospectus will not contain an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading.

**7.** Use reasonable best efforts to cause all Conversion Shares to be listed on the Trading Market or such other securities exchange or automated quotation system, if any, as is then the principal securities exchange or automated quotation system on which the Common Stock is then listed.

**8.** Fully cooperate with the Transfer Agent, Investor and its brokers to facilitate the timely clearing and delivery of Conversion Shares to be sold pursuant to the Registration Statement free of any restrictive legends and in such denominations and registered in such names as Investor may reasonably request, including timely completion and delivery of all forms, documents and instruments requested by the Transfer Agent or any broker.

**C.** **Obligations of the Investor.** Investor will furnish in writing to the Company such information regarding itself, the Securities held by it and the intended method of disposition of the Conversion Shares and Warrant Shares held by it, as shall be reasonably required to effect the registration of such Shares. Investor will cooperate with Company as reasonably necessary in connection with the preparation and filing of the Registration Statement. Upon receipt of any notice from the Company of either (i) the commencement of an Allowed Delay or (ii) the happening of an event pursuant to **Section VI(B)(3)** hereof, Investor will discontinue disposition of any Shares pursuant to the Registration Statement, until such dispositions may again be made.

## VII.   **General Provisions.**

**A.**   **Notice.** Unless a different time of day or method of delivery is specifically provided in the Transaction Documents, any and all notices or other communications or deliveries required or permitted to be provided hereunder will be in writing and will be deemed given and effective on the earliest of: (a) the date of transmission, if such notice or communication is delivered via facsimile or electronic mail prior to 5:00 p.m. Eastern time on a Trading Day and an electronic confirmation of delivery is received by the sender, (b) the next Trading Day after the date of transmission, if such notice or communication is delivered later than 5:00 p.m. Eastern time on or on a day that is not a Trading Day, (c) the next Trading Day following the date of mailing, if sent by U.S. nationally recognized overnight courier service, or (d) upon actual receipt by the party to whom such notice is required to be given. The addresses for such notices and communications are such other address as may be designated in writing, in the same manner, by such Person.

**B.**   **Amendments: Waivers.** No provision of this Agreement may be waived or amended except in a written instrument signed, in the case of an amendment, by Company and Investor or, in the case of a waiver, by the party against whom enforcement of any such waiver is sought. No waiver of any default with respect to any provision, condition or requirement of this Agreement will be deemed to be a continuing waiver in the future or a waiver of any subsequent default or a waiver of any other provision, condition or requirement hereof, nor will any delay or omission of either party to exercise any right hereunder in any manner impair the exercise of any such right.

**C.**   **No Third-Party Beneficiaries.** Except as otherwise set forth in **Section IV.G**, this Agreement and the Transaction Documents will inure solely to the benefit of the parties hereto, and is not for the benefit of, nor may any provision hereof be enforced by, any other Person. Other than the Investor Parties described in **Section IV.G**, a Person who is not a party to this Agreement shall not have any rights under the Contracts (Rights of Third Parties) Law, 2014 of the Cayman Islands to enforce any term of this Agreement or any Transaction Document.

**D.**   **Fees and Expenses.** Company has paid a flat rate documentation fee of $2,500 to Investor in connection with drafting this Agreement and the other Transaction Documents. Except as otherwise provided in this Agreement, each party will pay the fees and expenses of its own advisers, counsel, accountants and other experts, if any, and all other expenses incurred by such party incident to the negotiation, preparation, execution, delivery and performance of the Transaction Documents. Company acknowledges and agrees that Investor's counsel solely represents Investor, and does not represent Company or its interests in connection with the Transaction Documents or the transactions contemplated thereby. Company will pay all stamp and other taxes and duties, if any, levied in connection with the sale or issuance of the Shares to Investor.

**E.**   **Severability.** If any provision of this Agreement is held to be invalid or unenforceable in any respect, the validity and enforceability of the remaining terms and provisions of this Agreement will not in any way be affected or impaired thereby and the parties will attempt to agree upon a valid and enforceable provision that is a reasonable substitute therefor, and upon so agreeing, will incorporate such substitute provision in this Agreement.

25

F.     **Replacement of Certificates.** If any certificate or instrument evidencing any Shares is mutilated, lost, stolen or destroyed, Company will issue or cause to be issued in exchange and substitution for and upon cancellation thereof, or in lieu of and substitution therefor, a new certificate or instrument, but only upon receipt of evidence reasonably satisfactory to Company of such loss, theft or destruction and customary and reasonable indemnity, if requested. The applicants for a new certificate or instrument under such circumstances will also pay any reasonable third-party costs associated with the issuance of such replacement certificates.

G.     **Governing Law.** All matters between the parties, including without limitation questions concerning the construction, validity, enforcement and interpretation of the Transaction Documents will be governed by and construed and enforced in accordance with the laws of the U.S. Virgin Islands, without regard to the principles of conflicts of law that would require or permit the application of the laws of any other jurisdiction, except for corporation law matters applicable to Company which will be governed by the corporate law of its jurisdiction of formation. The parties hereby waive all rights to a trial by jury. In any action, arbitration or proceeding, including appeal, arising out of or relating to any of the Transaction Documents or otherwise involving the parties, the prevailing party will be awarded its reasonable attorneys' fees and other costs and expenses reasonably incurred in connection with the investigation, preparation, prosecution or defense of such action or proceeding.

H.     **Arbitration.** Any dispute, controversy, claim or action of any kind arising out of, relating to, or in connection with this Agreement, or in any way involving Company and Investor or their respective Affiliates, including any issues of arbitrability, will be resolved solely by final and binding arbitration in English before a retired judge at JAMS, or its successor, in the Territory of the Virgin Islands, pursuant to the most expedited and Streamlined Arbitration Rules and Procedures available. Any interim or final award may be entered and enforced by any court of competent jurisdiction. The final award will include the prevailing party's reasonable arbitration, expert witness and attorney fees, costs and expenses. Notwithstanding the foregoing, Investor may in its sole discretion bring an action in Delaware or New York in aid of arbitration or for temporary, preliminary or provisional relief pending completion of arbitration.

I.     **Remedies.**

1.     In addition to being entitled to exercise all rights provided herein or granted by law, including recovery of damages, each of Investor and Company will be entitled to specific performance under the Transaction Documents, and equitable and injunctive relief to prevent any actual or threatened breach under the Transaction Documents, to the full extent permitted under applicable laws.

2.     Without limitation of the foregoing, Company acknowledges that the rights and benefits of Investor pursuant to Section I.G.1. of the Debenture are unique and that no adequate remedy exists at law if Company breaches or fails timely perform any of its obligations thereunder, that it would be difficult to determine the amount of damages resulting therefrom, that it would cause irreparable injury to Investor, and that any potential harm to Company would be adequately and fully compensable with monetary damages; accordingly, Investor will be entitled to a compulsory remedy of immediate specific performance, temporary, interim,

26

preliminary and final injunctive relief to enforce the provisions thereof, including without limitation requiring Company and its transfer agent, attorneys, officers and directors to immediately take all actions necessary to issue and deliver the number of Conversion Shares stated by Investor, and prohibiting any Common Stock from being issued or transferred until after all Conversion Shares have been received by Investor in electronic form and fully cleared for trading, which requirements will not be stayed for any reason, without the necessity of posting any bond.  Company hereby absolutely, unconditionally and irrevocably waives all objections and rights to oppose any motion, application or request by Investor to issue any number of Conversion Shares, and all rights to stay or appeal any resulting order, and any appeal filed by Company or on its behalf will be immediately and automatically dismissed.  Company further acknowledges that it has an adequate remedy at law with respect to Section I.G.1. of the Debenture in a claim for money damages; accordingly, Company may not restrain or enjoin its transfer agent, Investor or any brokers from receiving or reselling any Conversion Shares, and any action for temporary, preliminary or final injunctive relief filed by Company or on its behalf will be immediately and automatically dismissed.

    **J.**    **Payment Set Aside.**  To the extent that Company makes a payment or payments to Investor pursuant to any Transaction Document or Investor enforces or exercises its rights thereunder, and such payment or payments or the proceeds of such enforcement or exercise or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside, recovered from, disgorged by or are required to be refunded, repaid or otherwise restored to Company, a trustee, receiver or any other person under any law, including, without limitation, any bankruptcy law, state or federal law, common law or equitable cause of action, then to the extent of any such restoration the obligation or part thereof originally intended to be satisfied will be revived and continued in full force and effect as if such payment had not been made or such enforcement or setoff had not occurred.

    **K.**    **Headings.**  The titles and headings in this Agreement and the Transaction Documents are for convenience only, do not constitute a part of this Agreement and will not be deemed to limit or affect any of the provisions hereof

    **L.**    **Time of the Essence.**  Time is of the essence with respect to all provisions of this Agreement, the Debenture, and all Transaction Documents.

    **M.**    **Survival.**  The representations and warranties contained herein will survive the Closing and the delivery of the Shares until all Debenture issued to Investor have been converted or redeemed.  Neither party will be under any obligation to update or supplement any of its representations or warranties following the Closing due to a change that occurred after the Closing.

    **N.**    **Construction.**  The parties agree that each of them and/or their respective counsel has reviewed and had an opportunity to revise the Transaction Documents and, therefore, the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party will not be employed in the interpretation of the Transaction Documents or any amendments hereto. The language used in this Agreement will be deemed to be the language chosen by the parties to express their mutual intent, and no rules of strict construction will be

27

applied against any party. All currency references in any Transaction Document are to U.S. dollars.

**O.     Further Assurances.** Each party will take all further actions and execute all further documents as may be reasonably necessary to implement the provisions and carry out the intent of this Agreement fully and effectively.

**P.     Execution.** This Agreement may be executed in two or more counterparts, all of which when taken together will be considered one and the same agreement and will become effective when counterparts have been signed by each party and delivered to the other party, it being understood that both parties need not sign the same counterpart. In the event that any signature is delivered by portable document format, facsimile or electronic transmission, such signature will create a valid and binding obligation of the party executing (or on whose behalf such signature is executed) with the same force and effect as if such signature page were an original thereof.

**Q.    Entire Agreement.** This Agreement, including the Exhibits hereto, which are hereby incorporated herein by reference, contains the entire agreement and understanding of the parties, and supersedes all prior and contemporaneous agreements, term sheets, letters, discussions, communications and understandings, both oral and written, which the parties acknowledge have been merged into this Agreement. No party, representative, advisor, attorney or agent has relied upon any collateral contract, agreement, assurance, promise, understanding, statement or representation not expressly set forth herein. The parties hereby absolutely, unconditionally and irrevocably waive all rights and remedies, at law and in equity, directly or indirectly arising out of or relating to, or which may arise as a result of, any Person's reliance on any such statement or assurance.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized signatories on the Effective Date.

**Company:**

IMMUNE PHARMACEUTICALS INC.

By: _____

Name: Anthony "Tony" Fiorino
Title: President and Interim Chief Executive Officer

**Investor:**

_____
Investor Name

By: _____
Name: _____
Title: _____

29

**Q.**   **Entire Agreement.**  This Agreement, including the Exhibits hereto, which are hereby incorporated herein by reference, contains the entire agreement and understanding of the parties, and supersedes all prior and contemporaneous agreements, term sheets, letters, discussions, communications and understandings, both oral and written, which the parties acknowledge have been merged into this Agreement.  No party, representative, advisor, attorney or agent has relied upon any collateral contract, agreement, assurance, promise, understanding, statement or representation not expressly set forth herein.  The parties hereby absolutely, unconditionally and irrevocably waive all rights and remedies, at law and in equity, directly or indirectly arising out of or relating to, or which may arise as a result of, any Person's reliance on any such statement or assurance.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized signatories on the Effective Date.

**Company:**

IMMUNE PHARMACEUTICALS INC.

By: _____
Name: Anthony "Tony" Fiorino
Title: President and Interim Chief Executive Officer

**Investor:**

DISCOVER GROWTH FUND  LLC
Investor Name

By: _____
Name:  John Kirkland
Title:  President of G.P. of Member

**Exhibit 1**

**Glossary of Defined Terms**

"**$**" means the currency of the United States of America, in which all dollar amounts in the Transaction Documents will be expressed.

"**Act**" means the U.S. Securities Act of 1933, as amended, and the rules and regulations promulgated by the Commission thereunder.

"**Action**" has the meaning set forth in **Section III.A.4.**

"**Affiliate**" means any Person that, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with a Person, as such terms are used in and construed under Rule 144 under the Act.

"**Agreement**" means this Securities Purchase Agreement.

"**Capital Increase**" has the meaning set forth in Section IV.N.

"**Capital Increase Date**" has the meaning set forth in Section IV.N.

"**Closing**" has the meaning set forth in **Section II.D**.

"**Collateral**" means all assets of the Company, including without limitation all personal property wherever located, both now owned and hereafter acquired, including, but not limited to, all equipment, fixtures, inventory, goods, documents, general intangibles, accounts, deposit accounts (unless a security interest would render a nontaxable account taxable), receivables, contract rights (including, but not limited to, all of Company's rights in franchise agreements, license agreements and market development agreements), chattel paper, patents, trademarks and copyrights (and the good will associated with and registrations and licensing of them), instruments, letter of credit rights and investment property, capital stock, partnership, membership and equity interests, of any kind or nature, and all additions and accessions to, all spare and repair parts, special tools, equipment and replacements for, software used in, all returned or repossessed goods the sale of which gave rise to, and all accessions, additions, amendments, modifications, replacements, and substitutions to, of or for the foregoing, and all proceeds, supporting obligations and products of the foregoing, except as set forth in the Disclosure Schedules. All terms which are used in this definition which are defined in the UCC shall have the same meanings herein as such terms are defined in the UCC, unless this Agreement shall otherwise specifically provide. Notwithstanding the foregoing, the Ceplene assets (as such term is defined in the Disclosure Schedules) shall not be deemed to constitute "Collateral" unless the Company has not closed a transaction involving the sale, license, divestment or partnering of the Ceplene assets (a "Ceplene Transaction") on or before March 31, 2019 (the "Ceplene Transaction Deadline"). For the avoidance of doubt, in the event that a Ceplene Transaction is not closed by the Ceplene Transaction Deadline, the Ceplene assets shall become and be deemed to be "Collateral" hereunder.

"**Commission**" means the U.S. Securities and Exchange Commission.

1

**"Common Stock"** means the Common Stock of Company and any replacement or substitute thereof, or any share capital into which such Common Stock will have been changed or any share capital resulting from a reclassification of such Common Stock.

**"Company"** has the meaning set forth in the first paragraph of the Agreement.

**"Conversion Shares"** includes all shares of Common Stock potentially issuable in relation to the Debenture, including Common Stock that must be issued upon conversion of the Debenture, and Common Stock that must or may be issued in payment of any Interest or Conversion Premium (as defined in the Debenture).

**"Debenture"** means the Senior Secured Subordinated Debenture issued by Company, in the form attached as **Exhibit 2**.

**"Disclosure Schedules"** means the disclosure schedules of Company delivered concurrently herewith.  The Disclosure Schedules will contain no material non-public information.

**"DTC"** means The Depository Trust Company, or any successor performing substantially the same function for Company.

**"Exchange Act"** means the U.S. Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated by the Commission thereunder.

**"Effective Date"** has the meaning set forth in the first paragraph of the Agreement.

**"Equity Conditions"** has the meaning set forth in the Debenture.

**"GAAP"**      means U.S. generally accepted accounting principles applied on a consistent basis during the periods involved.

**"Indebtedness"** means (a) any liabilities for borrowed money or amounts owed in excess of $250,000, other than trade accounts payable incurred in the ordinary course of business, (b) all guaranties, endorsements and other contingent obligations in respect of Indebtedness of others, whether or not the same are or should be reflected in Company's balance sheet, or the notes thereto, except guaranties by endorsement of negotiable instruments for deposit or collection or similar transactions in the ordinary course of business; and (c) the present value of any lease payments in excess of $250,000 due under leases required to be capitalized in accordance with GAAP.

**"Intellectual Property Rights"** has the meaning set forth in **Section III.B.11**.

**"Investor"** has the meaning set forth in the first paragraph of the Agreement.

**"Legal Opinion"** means an opinion from Company's legal counsel, in the form attached as **Exhibit 4**.

**"Liens"** means a lien, charge, security interest or encumbrance in excess of $250,000, or a right of first refusal, preemptive right or other restriction.

**"Material Adverse Effect"** includes any material adverse effect on (a) the legality, validity or enforceability of any Transaction Document, (b) the results of operations, assets, business, or financial condition of Company and the Subsidiaries, taken as a whole, which is not disclosed in the Public Reports prior to the Effective Date, (c) Company's ability to perform in any material respect on a timely basis its obligations under any Transaction Document, or (d) the sale, issuance, registration, listing, resale and trading on the Trading Market of the Conversion Shares.

**"Material Permits"** has the meaning set forth in **Section III.B.9**.

**"Obligations"** include the full and punctual observance and performance of all present and future duties, covenants, and responsibilities due to Investor by Company under this Agreement, the Debenture and the other Transaction Documents, including without limitation all present and future obligations and liabilities of Company for the payment of money (extending to all principal amounts, interest, late charges, fees, and all other charges and sums, as well as all costs and expenses payable by Company).

**"Officer's Certificate"** means a certificate executed by an authorized officer of Company, in the form attached as **Exhibit 5**.

**"Person"** means an individual or corporation, partnership, trust, incorporated or unincorporated association, joint venture, limited liability company, joint stock company, government, or an agency or subdivision thereof, or other entity of any kind.

**"Prospectus"** means the final prospectus filed for the Registration Statement.

**"Prospectus Supplement"** means the supplement to the Prospectus complying with Rule 424(b) of the Securities Act that is filed with the Commission and delivered by the Company to Investor.

**"Proxy Statement"** has the meaning set forth in Section IV.N. **"Public Reports"** which includes all reports filed by Company under the Act or the Exchange Act, including pursuant to Section 13(a) or 15(d) thereof, for the two full fiscal years preceding the Effective Date and thereafter.

**"Purchase Amount"** has the meaning set forth in **Section II.A.1**.

**"Receivables"** include all accounts receivable and all rights to the payment of a monetary obligation, whether or not earned by performance, and whether evidenced by an account, chattel paper, instrument, general intangible, or otherwise.

**"Registration Statement"** includes a then valid, current and effective Registration Statement registering all Conversion Shares for resale, including the prospectus therein, amendments and supplements to such Registration Statement or prospectus, including pre- and post-effective amendments, all exhibits thereto, and all material incorporated by reference or

deemed to be incorporated by reference in such registration statement, and any information contained or incorporated by reference in a prospectus filed with the Commission in connection with the Registration Statement, to the extent such information is deemed under the Act to be part of any registration statement.

**"Regulation D"** means Regulation D under the Securities Act and the rules promulgated by the Commission thereunder.

**"Regulation S"** means Regulation S under the Securities Act and the rules promulgated by the Commission thereunder.

**"Secretary's Certificate"** means a certificate, in the form attached as **Exhibit 6**, signed by the secretary of Company.

**"Shares"** include the Conversion Shares and the Warrant Shares.

**"Securities"** include the Debenture, the Warrant, the Conversion Shares and the Warrant Shares.

**"Short Sale"** means a "short sale" as defined in Rule 200 of Regulation SHO of the Exchange Act.

**"Stockholders Meeting"** has the meaning set forth in **Section IV.N**.

**"Subsidiary"** means any Person owned or controlled by the Company, or in which Company, directly or indirectly, owns a majority of the capital stock or similar interest that would be disclosable pursuant to Regulation S-K, Item 601(b) (21).

**"Trading Day"** means any day on which the Common Stock is traded on the Trading Market; provided that it will not include any day on which the Common Stock is (a) scheduled to trade for less than 5 hours, or (b) suspended from trading.

**"Trading Market"** has the meaning set forth in the Debenture.

**"Transaction Documents"** means this Agreement, the other agreements, certificates and documents referenced herein or the form of which is attached hereto, and the exhibits, schedules and appendices hereto and thereto.

**"Transfer Agent"** means the transfer agent for Company.

**"Transfer Agent Instructions"** means a letter agreement executed by Company, its current transfer agent, and any successor transfer agent for the Common Stock, in the form attached as **Exhibit 3**.

**"U.S. Person"** has the meaning set forth in Regulation S promulgated under the Act.

**"UCC"** means the Uniform Commercial Code as adopted and applied in any applicable jurisdiction, including without limitation Company's jurisdiction of formation.

4

"**Waiver Agreements**" means the Waiver and Amendment Agreements, dated October 5, 2018, by and between Company and the required number of holders of Company's Original Issuance Discount Debentures.

"**Warrant**" means the Common Stock Purchase Warrant issued by Company, in the form attached hereto as **Exhibit 7**.

# EXHIBIT C

**IP Security Agreement**

## GRANT OF SECURITY INTEREST AGREEMENT
## IN UNITED STATES PATENTS AND TRADEMARKS

FOR GOOD AND VALUABLE CONSIDERATION, the receipt and sufficiency of which are hereby acknowledged, Immune Pharmaceuticals Inc., a Delaware corporation ("**Grantor**"), having its place of business at 1 Bridge Plaza N, Suite 270, Fort Lee, NJ 07024, hereby grants to Discover Growth Fund, LLC, a U.S. Virgin Islands limited liability company ("**Grantee**"), having its place of business at 5330 Yacht Haven Grande, Suite 206, St. Thomas, VI 00802, a security interest in all of the Grantor's right, title and interest in, to and under the following (all of the following items or types of property being herein collectively referred to as the "**Patent and Trademark Collateral**"), whether presently existing or hereafter arising or acquired:

(i) each United States patent and patent application, including each patent and patent application referred to on Schedule A hereto;

(ii) each United States trademark, trademark registration and trademark application, and all of the goodwill of the business connected with the use of, and symbolized by, each trademark, trademark registration and trademark application, including each trademark, trademark registration and trademark application referred to in Schedule B hereto;

(iii) all products and proceeds of the foregoing, including any claim by the Grantor against third parties for past, present or future infringement of any Patent, or past, present or future infringement or dilution of any trademark or trademark registration, including any patent or trademark listed on Schedule A or Schedule B hereto, or for injury to the goodwill associated with any trademark or trademark registration.

THIS GRANT is granted pursuant to the security interests granted to the Grantee in the Securities Purchase Agreement between the Grantor and the Grantee dated October 9, 2018, as amended, modified or supplemented from time to time (the "**Purchase Agreement**").

THIS GRANT has been granted in conjunction with the security interest granted to the Grantee under the Purchase Agreement. The rights and remedies of the Grantee with respect to the security interest granted herein are without prejudice to, and are in addition to those set forth in the Purchase Agreement, all terms and provisions of which are incorporated herein by reference as though set forth in full herein. In the event that any provisions of this Grant of Security Interest Agreement are deemed to conflict with the Purchase Agreement, the provisions of the Purchase Agreement shall govern.

THIS GRANT shall terminate and be of no force and effect immediately upon the complete fulfilment of all of the Obligations (as defined under the Purchase Agreement.

IN WITNESS WHEREOF, the undersigned have executed this Grant of Security Interest Agreement as of the date first above stated.

**Grantor:**

IMMUNE PHARMACEUTICALS INC.

By: _____
Name: Anthony "Tony" Fiorino
Title: President and Interim Chief Executive Officer

**Grantee:**

DISCOVER GROWTH FUND, LLC

By: _____
Name: _____
Title: _____

2

DGF0002261

IN WITNESS WHEREOF, the undersigned have executed this Grant of Security Interest Agreement as of the date first above stated.

**Grantor:**

IMMUNE PHARMACEUTICALS INC.

By: _____
Name: Anthony "Tony" Fiorino
Title: President and Interim Chief Executive Officer

**Grantee:**

DISCOVER GROWTH FUND, LLC

By: _____
Name: John Kirkland
Title: President of G.P. of Member

2

DGF0002262

## Schedule A:  Patents and Patent Applications

**AXIZA PATENT FAMILY**

OWNED BY IMMUNE PHARMA BUT STILL LISTED UNDER MYRIAD
GENETICS/MYREXIS/CYTOVIA

| PC Ref. No. | Title | Patent No. | Filing Date |
|---|---|---|---|
| P-80671-CN 048187/10504:01 | 4-ARYLAMINO-QUINAZOLINES AS ACTIVATORS OF ASPARTIC ACID SPECIFICITY CYSTEINE PROTEASE AND INDUCERS OF APOPTOSIS AND THE USE THEREOF | 1984660 | July 6, 2004 |
| P-80671-US 048187/10501:01 | 4-ARYLAMINO-QUINAZOLINES AS ACTIVATORS OF CASPASES AND INDUCERS OF APOPTOSIS AND THE USE THEREOF | 7618975 | July 6, 2004 |
| P-80671-JP 048187/10508:01 | COMPOUNDS AND THERAPEUTICAL USE THEREOF | 5129957 | July 6, 2004 |
| P-80792-US 48187/10514:01 | METHOD OF TREATING BRAIN CANCER | 8258145 | July 3, 2007 |

**CROLIBULIN PATENT FAMILY**

OWNED BY IMMUNE PHARMA BUT STILL LISTED UNDER CYTOVIA

| PC Ref. No. | Title | Patent/Application No. | Filing Date |
|---|---|---|---|
| P-80715-US | 7,8-FUSED 4H-CHROMENE AND ANALOGS AS ACTIVATORS OF CASPASES AND INDUCERS OF APOPTOSIS AND THE USE THEREOF | 685860 | May 16, 2002 |
| P-80718-US | 4-SUBSTITUTED-1-(ARYLMETHYLIDENE) THIOSEMICARBAZIDE, 4-SUBSTITUTED-1-(ARYLCARBONYL) THIOSEMICARBAZIDE AND ANALOGS AS ACTIVATORS OF CASPASES AND INDUCERS OF APOPTOSIS AND THE USE THEREOF | 67944007 | June 3, 2002 |
| P-77726-CA 1735.104CA01 | SUBSTITUTED 4-ARYL-CHROMENE AS ACTIVATOR | 2656706 | July 6, 2007 |

3

| | OF CASPASES AND INDUCER OF APOPTOSIS AND AS ANTIVASCULAR AGENT AND THE USE THEREOF | | |
|---|---|---|---|
| P-77726-US 1735.1040001 | As above | 7968595 | July 6, 2007 |
| P-77726-CA1 | As above | (App. No. 2,938,241) | August 5, 2016 |
| P-77726-EP 1735.104EP01 | As above | (App. No. 07810283.7) | July 6, 2007 |
| | DIPEPTIDE APOPTOSIS INHIBITORS AND THE USE THEREOF | 6184210 | March 16, 1999 |
| | NOVEL FLUOROGENIC OR FLUORESCENT REPORTER MOLECULES AND THEIR APPLICATIONS FOR WHOLE-CELL FLUORESCENCE SCREENING ASSAYS FOR CASPASES AND OTHER ENZYMES AND THE USE THEREOF | 6335429 | March 8, 2000 |
| | DIPEPTIDE CASPASE INHIBITORS AND THE USE THEREOF | 6153591 | March 16, 1999 |

## ANTI-FERRITIN ANTIBODIES PATENT FAMILY

OWNED BY IMMUNE PHARMA BUT STILL LISTED UNDER MONOCLONAL ANTIBODIES THERAPEUTICS/ MABLIFE

| PC Ref. No. | Title | Patent/Application No. | Filing Date |
|---|---|---|---|
| P-76118-FR | USE OF ANTI-FERRITIN MONOCLONAL ANTIBODIES IN THE TREATMENT OF SOME CANCERS | 1165134 | January 19, 2001 |
| P-76118-DE | As above | 60109359 | January 19, 2001 |
| P-76118-IT | As above | 1165134 | January 19, 2001 |
| P-76118-ES | As above | 1165134 | January 19, 2001 |
| P-76118-CH | As above | 1165134 | January 19, 2001 |
| P-76118-GB | As above | 1165134 | January 19, 2001 |
| P-76118-US | As above | 7153506 | September 13, 2001 |
| P-76118-EP | As above | 1165134 | January 29, 2001 |
| P-76119-CA | MONOCLONAL ANTIBODIES AGAINST HUMAN ACIDIC AND BASIC FERRITINS AND NUCLEOTIDE AND AMINO ACID SEQUENCES THEREOF | (App. No. 2,696,634) | September 19, 2007 |

4

PATENTS AND PATENT APPLICATIONS FILED UNDER IMMUNE PHARMA LTD (OWNER)

| PC Ref. No. | Title | Patent No. | Filing Date |
|---|---|---|---|
| P-76119-BE | NUCLEOTIDE AND PROTEIN SEQUENCES OF AN ANTIBODY DIRECTED AGAINST AN EPITOPE COMMON TO HUMAN ACIDIC AND BASIC FERRITINS, MONOCLONAL ANTIBODIES OR ANTIBODY-LIKE MOLECULES COMPRISING THESE SEQUENCES AND USE THEREOF | 2193147 | September 19, 2007 |
| P-76119-FR | As above | 2193147 | September 19, 2007 |
| P-76119-DE | As above | 602007041013 | September 19, 2007 |
| P-76119-IE | As above | 2193147 | September 19, 2007 |
| P-76119-IT | As above | 502015000031668 | September 19, 2007 |
| P-76119-NL | As above | 2193147 | September 19, 2007 |
| P-76119-ES | As above | 2541907 | September 19, 2007 |
| P-76119-CH | As above | 2193147 | September 19, 2007 |
| P-76119-GB | As above | 2193147 | September 19, 2007 |
| P-76119-EP | As above | 2193147 | September 19, 2007 |

## BERTILIMUMAB PATENT FAMILY

PATENTS AND PATENT APPLICATIONS LICENSED FROM MEDIMMUNE LTD

| PC Ref. No. | Title | Patent/Application No. | Filing Date |
|---|---|---|---|
| P-75623-US | HUMAN ANTIBODIES AGAINST EOTAXIN | 6946546 | March 2, 2001 |
| P-75623-US1 | METHODS OF OBTAINING A SPECIFIC BINDING MEMBER THAT BINDS EOTAXIN | 7323311 | January 9, 2003 |
| P-75623-US2 | As above | 8067564 | December 17, 2007 |
| P-75623-US4 | As above | 9284589 | March 24, 2014 |
| P-75623-US5 | As above | (App. No. 15/014,945) | February 3, 2016 |
| P-75623-CA | HUMAN ANTIBODIES AGAINST EOTAXIN AND THEIR USE | 2401342 | March 2, 2001 |
| P-75623-FR | As above | 1259615 (EP Validation) | March 2, 2001 |
| P-75623-DE | As above | 1259615 (EP Validation) (60136527.5) | March 2, 2001 |
| P-75623-IE | As above | 1259615 (EP Validation) | March 2, 2001 |

5

DGF0002265

| P-75623-IL | As above | 151499 | March 2, 2001 |
| P-75623-CH | As above | 1259615 (EP Validation) | March 2, 2001 |
| P-75623-GB | As above | 1259615 (EP Validation) (2361704) | March 2, 2001 |
| P-75623-EP | As above | 1259615 | March 2, 2001 |

PATENTS AND PATENT APPLICATIONS LICENSED FROM CAMBRIDGE ANTIBODY TECHNOLOGY LIMITED

| PC Ref. No. | Title | Patent No. | Filing Date |
| --- | --- | --- | --- |
| P-75623-AU | HUMAN ANTIBODIES AGAINST EOTAXIN AND THEIR USE | 778392 | March 2, 2001 |
| P-75623-BR | As above | 0108923 A | March 2, 2001 |
| P-75623-JP | As above | 5198704 | March 2, 2001 |
| P-75623-NZ | As above | 521182 | March 2, 2001 |
| P-75623-SG | As above | 91497 | March 2, 2001 |

PATENTS AND PATENT APPLICATIONS LICENSED FROM HADASIT MEDICAL RESEARCH SERVICE AND DEVELOPMENT LTD.

| PC Ref. No. | Title | Application No. | Filing Date |
| --- | --- | --- | --- |
| P-80259-PC | ANTI-EOTAXIN FOR IMMUNOPROTECTION AND HEPATOPROTECTION | PCT/IL2017/050637 | June 6, 2017 |

PATENTS AND PATENT APPLICATIONS FILED UNDER IMMUNE PHARMA LTD (OWNER)

| PC Ref. No. | Title | Application No. | Filing Date |
| --- | --- | --- | --- |
| P-76963-AU | USE OF ANTI-EOTAXIN ANTIBODIES FOR TREATING INFLAMMATORY BOWEL DISEASE | 2014229137 | March 13, 2014 |
| P-76963-CA | As above | 2,923,905 | March 13, 2014 |
| P-76963-CN | As above | 201480028187.4 | March 13, 2014 |
| P-76963-EP | As above | EP14763599.9 | March 13, 2014 |
| P-76963-IL | As above | 242521 | March 13, 2014 |
| P-76963-NZ | As above | 714361 | March 13, 2014 |
| P-76963-US1 | As above | 13/864,387 | March 13, 2014 |
| P-76963-US2 | As above | 15/347,847 | November 10, 2016 |
| P-575761-USP | USE OF ANTI-EOTAXIN ANTIBODIES FOR TREATING BULLOUS PEMPHIGOID | 62/636,170 | February 28, 2018 |

6

PATENTS AND PATENT APPLICATIONS NOT ASSIGNED

| PC Ref. No. | Title | Patent No. | Filing Date |
|---|---|---|---|
| P-75623-US3 | METHODS OF OBTAINING A SPECIFIC BINDING MEMBER THAT BINDS EOTAXIN | 8715961 | October 19, 2011 |

## AMIKET PATENT FAMILY

OWNED BY IMMUNE PHARMA BUT STILL LISTED UNDER EPICEPT CORP.

| PC Ref. No. | Title | Patent No. | Filing Date |
|---|---|---|---|
| P-79887-IL | EMULSIONS COMPRISING AMITRIPTYLINE AND KETAMINE | 160388 | August 14, 2002 |
| P-79879-US 100710051999 | KETAMINE AND N-BUTYL-P-AMINOBEZOATE IN PLO | 6017961 | July 8, 1999 |
| p-79876-IL 100710010158 | METHODS AND COMPOSITIONS FOR TREATING PAIN OF THE MUCOUS MEMBRANE | 153656 | June 26. 2001 |
| P-79887-CA 100710016001 | TOPICAL COMPOSITIONS AND METHODS FOR TREATING PAIN | 2457780 | August 14, 2002 |
| 100710016010 | As above | 45500 | August 12, 2002 |
| P-79887-HK 100710016023 (HKP0420244-CN-2:60411) | As above | HK1089364 | September 1, 2006 |
| P-79887-MX 100710016009 | As above | 255023 | August 14, 2002 |
| 100710053009 | | (App. No. MX/A/2007/013047) | October 19, 2007 |
| P-79887-NZ 100710016008 | As above | 531547 | August 14, 2002 |
| P-79887-US 100710016999 | As above | 6638981 | August 17, 2001 |

CO-OWNED BY IMMUNE PHARMA AND MEMORIAL SLOAN-KETTERING CANCER CENTER

| PC Ref. No. | Title | Patent No. | Filing Date |
|---|---|---|---|
| P-79876-US1 100710026999 | METHODS AND COMPOSITIONS FOR TREATING PAIN OF THE MUCOUS MEMBRANE | 6509028 | June 17, 2002 |

7

**LIDOPAIN PATENT FAMILY**

OWNED BY IMMUNE PHARMA BUT STILL LISTED UNDER EPICEPT CORP.

| PC Ref. No. | Title | Patent No. | Filing Date |
|---|---|---|---|
| P-80796-NZ 100710005117 | INTRADERMAL PENETRATION AGENTS FOR TOPICAL LOCAL ANESTHETIC USING A PATCH | 521470 | March 6, 2001 |
| P-80796-MX 100710052009 | AGENTES DE PENETRACION INTRADERMICA PARA ADMINISTRACION TOPICA DE UN ANESTESICO LOCAL (INTRADERMAL-PENETRATION AGENTS FOR TOPICAL LOCAL ANESTHETIC ADMINISTRATION) | PA02008828 | March 6, 2001 |

8

## Schedule B: Trademarks

| Mark | Assignee | Country | Registration # | Status | Class/Type |
|------|----------|---------|----------------|--------|------------|
| Amiket | Immune Pharmaceuticals, Inc. | United States | | Pending | |
| Epicept | Epicept Corporation | China | 6432338 | Registered | 5 |
| Epicept and design | Epicept Corporation | Germany | 39982506 | Registered | 5 |
| Epicept in chinese characters | Epicept Corporation | China | 6432337 | Registered | 5 |
| Lidopain | Epicept Corporation | Australia | 1039048 | Registered | 5 |
| Lidopain | Epicept Corporation | Canada | TMA725845 | Registered | 5 |
| Lidopain | Epicept Corporation | European Union | 004256699 | Registered | 5 |
| Lidopain | Epicept Corporation | Hong Kong | 300364653 | Registered | 5 |
| Lidopain | Epicept Corporation | Japan | 4985525 | Registered | 5 |
| Lidopain | Epicept Corporation | Mexico | 876244 | Registered | 5 |
| Lidopain in chinese characters | Epicept Corporation | Hong Kong | 300377442 | Registered | 5 |
| Vontiv | Maxim Pharmaceuticals, Inc. | Australia | 858080 | Registered | 5 |
| Vontiv | Maxim Pharmaceuticals, Inc. | Canada | TMA727471 | Registered | 5 |

9

DGF0002269



## UNITED STATES PATENT AND TRADEMARK OFFICE

UNDER SECRETARY OF COMMERCE FOR INTELLECTUAL PROPERTY AND
DIRECTOR OF THE UNITED STATES PATENT AND TRADEMARK OFFICE

OCTOBER 10, 2018

PTAS

ROB NEDERHOOD
FOLEY & LARDNER LLP
500 WOODWARD AVENUE
DETROIT, MI 48226

# 505132699

UNITED STATES PATENT AND TRADEMARK OFFICE
NOTICE OF RECORDATION OF ASSIGNMENT DOCUMENT

THE ENCLOSED DOCUMENT HAS BEEN RECORDED BY THE ASSIGNMENT RECORDATION BRANCH
OF THE U.S. PATENT AND TRADEMARK OFFICE. A COMPLETE COPY IS AVAILABLE AT THE
ASSIGNMENT SEARCH ROOM ON THE REEL AND FRAME NUMBER REFERENCED BELOW.

PLEASE REVIEW ALL INFORMATION CONTAINED ON THIS NOTICE. THE INFORMATION
CONTAINED ON THIS RECORDATION NOTICE REFLECTS THE DATA PRESENT IN THE PATENT
AND TRADEMARK ASSIGNMENT SYSTEM. IF YOU SHOULD FIND ANY ERRORS OR HAVE
QUESTIONS CONCERNING THIS NOTICE, YOU MAY CONTACT THE ASSIGNMENT RECORDATION
BRANCH AT 571-272-3350. PLEASE SEND REQUEST FOR CORRECTION TO: U.S. PATENT
AND TRADEMARK OFFICE, MAIL STOP: ASSIGNMENT RECORDATION BRANCH, P.O. BOX
1450, ALEXANDRIA, VA 22313.

RECORDATION DATE: 10/09/2018          REEL/FRAME: 047107/0116
                                      NUMBER OF PAGES: 12

BRIEF: SECURITY INTEREST (SEE DOCUMENT FOR DETAILS).

ASSIGNOR:
   IMMUNE PHARMACEUTICALS INC.          DOC DATE: 10/09/2018

ASSIGNEE:
   DISCOVER GROWTH FUND, LLC
   5330 YACHT HAVEN GRANDE
   SUITE 206
   ST. THOMAS, VIRGIN ISLANDS, U.S.
      00802

APPLICATION NUMBER: 09270735          FILING DATE: 03/16/1999
PATENT NUMBER: 6153591                ISSUE DATE: 11/28/2000
TITLE: DIPEPTIDE CASPASE INHIBITORS AND THE USE THEREOF

APPLICATION NUMBER: 09270736          FILING DATE: 03/16/1999
PATENT NUMBER: 6184210                ISSUE DATE: 02/06/2001
TITLE: DIPEPTIDE APOPTOSIS INHIBITORS AND THE USE THEREOF

APPLICATION NUMBER: 09350062          FILING DATE: 07/08/1999
PATENT NUMBER: 6017961                ISSUE DATE: 01/25/2000
TITLE: KETAMINE AND N-BUTYL-P-AMINOBEZOATE IN PLO

DGF0002270

047107/0116 PAGE 2

APPLICATION NUMBER: 09521650          FILING DATE: 03/08/2000
PATENT NUMBER: 6335429               ISSUE DATE: 01/01/2002
TITLE:  NOVEL FLUOROGENIC OR FLUORESCENT REPORTER MOLECULES AND THEIR
        APPLICATIONS FOR WHOLE-CELL FLUORESCENCE SCREENING ASSAYS FOR
        CASPASES AND OTHER ENZYMES AND THE USE THEREOF

APPLICATION NUMBER: 09798058          FILING DATE: 03/02/2001
PATENT NUMBER: 6946546               ISSUE DATE: 09/20/2005
TITLE:  HUMAN ANTIBODIES AGAINST EOTAXIN.

APPLICATION NUMBER: 09931293          FILING DATE: 08/17/2001
PATENT NUMBER: 6638981               ISSUE DATE: 10/28/2003
TITLE:  TOPICAL COMPOSITIONS AND METHODS FOR TREATING PAIN

APPLICATION NUMBER: 09952307          FILING DATE: 09/13/2001
PATENT NUMBER: 7153506               ISSUE DATE: 12/26/2006
TITLE:  USE OF ANTI-FERRITIN MONOCLONAL ANTIBODIES IN THE TREATMENT OF
        SOME CANCERS

APPLICATION NUMBER: 10146139          FILING DATE: 05/16/2002
PATENT NUMBER: 6858607               ISSUE DATE: 02/22/2005
TITLE:  7,8-FUSED 4H-CHROMENE AND ANALOGS AS ACTIVATORS OF CASPASES AND
        INDUCERS OF APOPTOSIS AND THE USE THEREOF

APPLICATION NUMBER: 10158827          FILING DATE: 06/03/2002
PATENT NUMBER: 6794400               ISSUE DATE: 09/21/2004
TITLE:  4-SUBSTITUTED-1- (ARYLMETHYLIDENE) THIOSEMICARBAZIDE,
        4-SUBSTITUTED-1- (ARYLCARBONYL) THIOSEMICARBAZIDE AND ANALOGS AS
        ACTIVATORS OF CASPASES AND INDUCERS OF APOPTOSIS AND THE USE
        THEREOF

APPLICATION NUMBER: 10172455          FILING DATE: 06/17/2002
PATENT NUMBER: 6509028               ISSUE DATE: 01/21/2003
TITLE:  METHODS AND COMPOSITIONS FOR TREATING PAIN OF THE MUCOUS
        MEMBRANE

APPLICATION NUMBER: 10220418          FILING DATE: 01/09/2003
PATENT NUMBER: 7323311               ISSUE DATE: 01/29/2008
TITLE:  METHODS OF OBTAINING A SPECIFIC BINDING MEMBER THAT BINDS
        EOTAXIN

APPLICATION NUMBER: 10885903          FILING DATE: 07/06/2004
PATENT NUMBER: 7618975               ISSUE DATE: 11/17/2009
TITLE:  4-ARYLAMINO-QUINAZOLINES AND ANALOGS AS ACTIVATORS OF CASPASES
        AND INDUCERS OF APOPTOSIS AND THE USE THEREOF

APPLICATION NUMBER: 11773285          FILING DATE: 07/03/2007
PATENT NUMBER: 8258145               ISSUE DATE: 09/04/2012
TITLE:  METHOD OF TREATING BRAIN CANCER

APPLICATION NUMBER: 11822535          FILING DATE: 07/06/2007
PATENT NUMBER: 7968595               ISSUE DATE: 06/28/2011
TITLE:  SUBSTITUTED 4-ARYL-CHROMENE AS ACTIVATOR OF CASPASES AND INDUCER
        OF APOPTOSIS AND AS ANTIVASCULAR AGENT AND THE USE THEREOF

APPLICATION NUMBER: 11958210          FILING DATE: 12/17/2007
PATENT NUMBER: 8067564               ISSUE DATE: 11/29/2011
TITLE:  METHODS OF OBTAINING A SPECIFIC BINDING MEMBER THAT BINDS
        EOTAXIN

047107/0116 PAGE 3

```
APPLICATION NUMBER: 13277132        FILING DATE: 10/19/2011
PATENT NUMBER: 8715961              ISSUE DATE: 05/06/2014
TITLE:  METHODS OF OBTAINING A SPECIFIC BINDING MEMBER THAT BINDS
        EOTAXIN

APPLICATION NUMBER: 13864387        FILING DATE: 04/17/2013
PATENT NUMBER:                      ISSUE DATE:
TITLE:  USE OF ANTI-EOTAXIN ANTIBODIES FOR TREATING INFLAMMATORY BOWEL
        DISEASE

APPLICATION NUMBER: 14223561        FILING DATE: 03/24/2014
PATENT NUMBER: 9284589              ISSUE DATE: 03/15/2016
TITLE:  METHODS OF OBTAINING A SPECIFIC BINDING MEMBER THAT BINDS
        EOTAXIN

APPLICATION NUMBER: 15014945        FILING DATE: 02/03/2016
PATENT NUMBER:                      ISSUE DATE:
TITLE:  HUMAN ANTIBODIES AGAINST EOTAXIN AND THEIR USE

APPLICATION NUMBER: 15347847        FILING DATE: 11/10/2016
PATENT NUMBER:                      ISSUE DATE:
TITLE:  USE OF ANTI-EOTAXIN ANTIBODIES FOR TREATING INFLAMMATORY BOWEL
        DISEASE

APPLICATION NUMBER: 62636170        FILING DATE: 02/28/2018
PATENT NUMBER:                      ISSUE DATE:
TITLE:  USE OF ANTI-EOTAXIN ANTIBODIES FOR TREATING BULLOUS PEMPHIGOID

APPLICATION NUMBER:                 FILING DATE:
PATENT NUMBER:                      ISSUE DATE:
PCT NUMBER: IL2017050637
TITLE:
```

ASSIGNMENT RECORDATION BRANCH
PUBLIC RECORDS DIVISION

# EXHIBIT D



### Transfer Agent Instructions

October 8, 2018

V Stock Transfer, LLC
18 Lafayette Place
Woodmere, NY 11598

Re:   Immune Pharmaceuticals Inc.

Ladies and Gentlemen:

In accordance with the Securities Purchase Agreement ("**Agreement**"), dated October 9, 2018, by and between Immune Pharmaceuticals Inc., a Delaware corporation ("**Company**"), and Discover Growth Fund LLC ("**Investor**"), pursuant to which Company is required to reserve, issue and deliver shares ("**Shares**") of Company's Common Stock ("**Common Stock**") upon conversion of the Senior Secured Redeemable Convertible Debenture ("**Debenture**") and exercise of the Common Stock Purchase Warrant ("**Warrant**") purchased by Investor, this will serve as our irrevocable, absolute and unconditional instruction, authorization and direction to you to: (a) immediately reserve 135,000,000 Shares for issuance to Investor, (b) immediately upon an increase in authorized shares, reserve such additional number of shares as Investor may request, (c) upon receipt of written notice, from either Company or from Investor with a copy to Company, reserve any additional Shares requested to be reserved, (d) provide Investor with the then total outstanding number of shares of Common Stock at any time upon request; and (e) whenever either Company or Investor provides you with a Delivery Notice in the form attached hereto as **Appendix I**, immediately issue the Shares requested. Capitalized terms used herein without definition will have the respective meanings ascribed to them in the Agreement.

The Shares will remain in the created reserve until the earlier of their issuance or such date as both Investor and Company provide written instructions that the Shares or any part of them may be taken out of the reserve and will no longer be subject to the terms of these instructions.

Upon your receipt of a Delivery Notice from either Company or Investor, you are to immediately process the notice in accordance with your most-expedited rush procedures which will be requested on submission, and use your commercially reasonable best efforts to issue and deliver to Investor forthwith the number of Shares stated in the Delivery Notice, either: (a) only if you receive written notice that the Registration Statement is not effective and neither Company nor Investor provides an opinion of counsel to the effect that the Shares may be issued without restrictive legend, by delivering by overnight carrier to the address specified in the notice a physical certificate bearing a restrictive legend; (b) only if Company is not approved through DTC, and either Company or Investor provides an opinion of counsel to the effect that the Shares may be issued without restrictive legend, by delivering by overnight carrier to the address specified in the notice a physical certificate bearing no restrictive legend; or (c) if Company is

DTC eligible and either Company or Investor provides an opinion of counsel to the effect that the Shares may be issued without restrictive legend, by issuing pursuant to the DTC Fast Automated Securities Transfer (FAST) Program and crediting to Investor's or its designee's balance account with DTC through its Deposit Withdrawal At Custodian (DWAC) system, and notifying Investor to cause its bank or broker to post the DWAC transaction. You will at all times diligently take or cause to be taken all actions necessary to cause the Shares to be issued immediately.

Company hereby confirms that, unless the Registration Statement is not effective and neither Company nor Investor has provided an opinion of counsel to the effect that the Shares may be issued without restrictive legend, the Shares should not be subject to any stop-transfer restrictions and will otherwise be freely transferable on the books and records of Company, and if the Shares are certificated, the certificates will not bear any legend restricting transfer of the Shares represented thereby, if a legal opinion is provided as set forth in the preceding paragraph.

Company hereby confirms that no instructions other than as contemplated herein will or may be given to you by Company with respect to the Shares. Company may not instruct you to delay or disregard any reserve request or Delivery Notice and you may not do so. You are to comply promptly with any Delivery Notice or share reservation notice received from Investor, notwithstanding any contrary instructions from Company.

Company will not replace you as Company's transfer agent, until a reputable registered transfer agent has agreed in writing to serve as Company's transfer agent and to be bound by all terms and conditions of this letter agreement. In the event that you resign as Company's transfer agent, Company will engage a suitable replacement reputable registered transfer agent that will agree to serve as transfer agent for Company and be bound by the terms and conditions of these irrevocable instructions as soon as practicable and in any event within 2 Trading Days.

Company must keep its bill current with you. If Company is not current and is on suspension, Investor will have the right to pay the amount of your standard fees in order for you to act upon these instructions. If payment for the reservation or issuance is not paid by Company or Investor, you have no obligation to act under instructions until your fees are paid.

Company and you hereby acknowledge and confirm that complying with the terms of these instructions does not and will not prohibit you from satisfying any and all fiduciary responsibilities and duties you may owe to Company.

Company will indemnify you and your officers, directors, principals, partners, advisors, attorneys, agents and representatives, and hold each of them harmless from and against any and all loss, cost, liability, damage, claim or expense (including the reasonable fees and disbursements of attorneys) incurred by or asserted against you or any of them arising out of or in connection with any Delivery Notice or the instructions set forth herein, the performance of your duties hereunder and otherwise in respect hereof, including the costs and expenses of defending yourself or themselves against any claim or liability hereunder, except that Company will not be liable hereunder as to amounts in respect of which it is finally determined by a court of competent jurisdiction to be due solely to your fraud, willful misconduct or gross negligence.

You will be entitled to indemnity and will have no liability to Company in respect of any action taken in compliance with any Delivery Notice or instruction from Investor, notwithstanding any contrary instructions from Company. Accordingly, you shall have no duty or obligation to confirm the accuracy of any calculations or information set forth in any Delivery Notice submitted by the Investor.

Investor is intended to be and is a third party beneficiary hereof, and no amendment or modification to the instructions set forth herein may be made without the prior written consent of Investor. The above instructions cannot be revoked, cancelled or modified without prior written approval of Investor.

The Board of Directors of Company has approved the foregoing irrevocable instructions and does hereby extend Company's irrevocable agreement to indemnify your firm for all loss, liability or expense in carrying out the authority and direction herein contained on the terms herein set forth. You have not previously received contrary instructions from Company or its agents, nor are you aware of any facts or circumstances that would make the transaction improper or illegal under applicable laws or regulations.

The terms of this letter shall be governed by the laws of the State of New York without regard to the conflicts of laws principles thereof, and any action arising out of or relating to these instructions will be filed in the U.S. District Court for the Southern District of New York.

IN WITNESS WHEREOF, the parties have caused this letter agreement regarding Transfer Agent Instructions to be duly executed and delivered as of the date first written above.

IMMUNE PHARMACEUTICALS INC.

By: _____

Name: Anthony "Tony" Fiorino

Title: Interim Chief Executive Officer


**ACCEPTED AND AGREED:**

VSTOCK TRANSFER, LLC

By: _____

Name: _____

Title: _____

**Appendix I**

**Form of Delivery Notice**

**DELIVERY NOTICE**

Reference is made to the Senior Secured Redeemable Convertible Debenture ("**Debenture**") issued by Immune Pharmaceuticals Inc., a Delaware corporation ("**Company**") to the Investor named below pursuant to the Securities Purchase Agreement dated October 9, 2018. In accordance with and pursuant to the Debenture, Investor hereby converts that amount of Face Value of the Debenture stated below into shares of Common Stock ("**Common Stock**") of Company, as of the date and time first stated below.

Notice Time: XX/XX/20XX, XX:XX x.m. Eastern time

Amount of Face Value of Debenture to be converted: $XXX,000.00

Conversion Price: $0.XX

Number of Conversion Shares to be Issued: _____

Relevant Interest Rate: X%

Conversion Premium: _____

Estimated lowest daily VWAPs during Measurement Period, or lowest sales price on last day of Measurement Period: $X.XX

Estimated number of shares of Common Stock to be issued for Conversion Premium: XX,XXX

Estimated number of shares of Common Stock to be issued for Conversion: XX,XXX

Prior Common Stock issuances related to this Delivery Notice: 0

**Shares of Common Stock to be issued now, subject to 4.99% issuance limitation: XX,XXX**

Please issue the Common Stock being converted via DWAC in the following name and to the following broker(s), and notify when Company's transfer agent is ready for broker to initiate

DWAC:

| | |
|---|---|
| Shares: | XX,XXX |
| Issue to: | INVESTOR NAME |
| Broker: | BROKER NAME |
| Address: | BROKER ADDRESS |
| Account #: | XXX-XXX |
| DTC# | XXXX |
| Contact: | NAME AND TELEPHONE |

| | |
|---|---|
| Shares: | XX,XXX |
| Issue to: | INVESTOR NAME |
| Broker: | BROKER NAME |
| Address: | BROKER ADDRESS |
| Account #: | XXX-XXX |
| DTC# | XXXX |
| Contact: | NAME AND TELEPHONE |

# EXHIBIT E

#2270118 v1
099998-00004

**<u>Officer's Certificate</u>**

IMMUNE PHARMACEUTICALS INC.

October 9, 2018

The undersigned hereby certifies that:

The undersigned is the duly appointed Interim Chief Executive Officer of Immune Pharmaceuticals Inc., a Delaware corporation ("**Company**").

This Officer's Certificate ("**Certificate**") is being delivered to Discover Growth Fund LLC ("**Investor**"), by Company, to fulfill the requirement under the Securities Purchase Agreement, dated October 9, 2018, between Investor and Company ("**Agreement**"). Terms used and not defined in this Certificate have the meanings set forth in the Agreement.

The representations and warranties of Company set forth in the Agreement are true and correct in all material respects as if made on the above date (except for any representations and warranties that are expressly made as of a particular date, in which case such representations and warranties will be true and correct as of such particular date), and no default has occurred under the Agreement, or any other agreement with Investor or any Affiliate of Investor.

Company is not, and will not be as a result of the Closing, in default of the Agreement or any other agreement with Investor or any Affiliate of Investor.

All of the conditions to the Closing required to be satisfied by Company prior to the Closing have been satisfied in their entirety.

IN WITNESS WHEREOF, the undersigned has executed this Officer's Certificate as of the date set forth above.

Signed: _____
Name: Anthony "Tony" Fiorino
Title: President and Interim Chief Executive Officer

DGF0002273