**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| DISCOVER GROWTH FUND, LLC,<br><br>        Plaintiff,<br><br>v.<br><br>ANTHONY FIORINO, M.D.; DANIEL KAZADO; DANIEL TEPER, M.D.; JEFFREY PALEY, M.D.; JOHN NECZESNY; THE ESTATE OF GARY H. RABIN; and JOHN DOE 1-10 and JANE DOE 1-10,<br><br>        Defendants. | Civil Action No. 20-00351<br><br><br>**OPINION** |

**CECCHI**, **District Judge.**

### I.        INTRODUCTION

This matter comes before the Court on the motion to dismiss (the "Motion") (ECF No. 10) filed by Defendants Anthony Fiorino, M.D. ("Fiorino"), Daniel Kazado ("Kazado"), Daniel Teper, M.D. ("Teper"), Jeffrey Paley, M.D. ("Paley"), and John Neczesny ("Neczesny") (collectively, "Defendants").[1]  Defendants seek to dismiss Plaintiff Discover Growth Fund's ("Plaintiff") corrected amended complaint (the "CAC") (ECF No. 5) in its entirety.  The Motion is decided without oral argument pursuant to Federal Rule of Civil Procedure 78.[2]  For the reasons set forth below, the Motion is **GRANTED in part** and **DENIED in part**.

---

[1] The Estate of Gary H. Rabin has not yet been served.  *See* ECF No. 10-1 at 1 n.1.  Pursuant to Chief Magistrate Judge Mark Falk's Order, Plaintiff has been granted additional time to serve the Estate of Gary H. Rabin.  *See* ECF No. 19.

[2] The Court considers any new arguments not presented by the parties to be waived.  *See Brenner v. Local 514, United Bhd. of Carpenters & Joiners of Am.*, 927 F.2d 1283, 1298 (3d Cir. 1991).

## II.    BACKGROUND

On October 9, 2018, Plaintiff[3] and Immune[4] entered into a Securities Purchase Agreement ("Agreement").   The Agreement stated that Immune was to issue a Senior Secured Redeemable Convertible Debenture ("Debenture") in the face amount of $5,500,000 to Plaintiff with a base interest rate of ten percent per annum and a maturity period of five years (the Debenture, Agreement, and related documents together are referred to collectively as the "Debt Documents").[5]   ECF No. 5 ¶¶ 19-20.   On October 1, 2018, Plaintiff and Immune also entered into an "IP Security Agreement – Grant of Security Interest in United States Patents and Trademarks" ("IP Security Agreement").   Id. ¶ 22.

In the Agreement, Immune represented that the performance of the Debt Documents would not conflict with any other agreement to which Immune was bound.   *See* id. ¶ 32.   Immune also represented that it "has good, marketable and indefeasible title to the Collateral ["Collateral"]" and that it would defend the Collateral against all adverse claims.   *See* id. ¶ 57.   Lastly, Immune represented that the IP Security Agreement contained an accurate listing of *all* the patents Immune currently owned.   Id.   The "Officer's Certificate," dated October 9, 2018, executed and delivered by Fiorino—the former President, interim CEO, and member of the Board of Directors—on behalf of Immune, reaffirms that these representations "are true and correct in all material respects."   Id. (quoting ECF No. 5-1 at 71). Plaintiff understood these representations to mean that Immune was capable of pledging the Collateral

---

[3] Plaintiff is a limited liability company ("LLC") organized in the Virgin Islands of the United States whose principal place of business is New Jersey.

[4] Immune is a Delaware corporation whose principal place of business is also New Jersey.

[5] When deciding a Rule 12(b)(6) motion to dismiss, it is permissible for the Court to consider "exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010); *see also* 5C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1363 (3d ed. 2008) ("Typically, the only information necessary for a decision on the [12(b)(6)] motion is to be found in the pleading itself or in exhibits accompanying the pleading or items incorporated by reference in the pleading.").   Because Plaintiff explicitly incorporates the Agreement and attaches multiple other exhibits to its CAC, it is permissible for the Court to consider them when deciding the motion to dismiss without converting it into a motion for summary judgment.

without violating any other agreements, especially agreements that concerned an "integral part of the Collateral." Id. ¶¶ 58-59, 78.

Upon issuance of the Debenture, Plaintiff advanced $2,000,000 in cash to Immune, and issued a promissory note for the $3,000,000 balance. Id. ¶ 20. To secure repayment, Immune granted Plaintiff a first lien and security interest in substantially *all* of its assets. Id. ¶ 21. The Agreement defines Plaintiff's Collateral as follows: "Collateral means all assets of [Immune], including without limitation all personal property wherever located, both now owned and hereafter acquired, including, but not limited to, all equipment, fixtures, inventory, goods, documents, general intangibles, accounts, deposit accounts, . . . receivables, contract rights, . . . license agreements, . . . chattel paper, patents, trademarks and copyrights, . . . and all proceeds . . . of the foregoing. . . ." ECF No. 5-1 at 45 (Ex. 1 to the Agreement). The only assets that were not included outright in the Collateral were those associated with Ceplene ("Ceplene Assets"). ECF No. 5 ¶ 21. The Ceplene Assets would only become Collateral if the assets were not disposed of by March 31, 2019. Id. Plaintiff properly perfected its security interest in the Collateral. Id. ¶ 22.

Allegedly included in the Collateral is a Product Sublicense Agreement ("License") between Immune and iCo Therapeutics Inc. ("Licensor"). Id. ¶¶ 30-31. The License includes non-exclusive patent licenses for the intellectual property underlying the drug bertilimumab ("Bert"), a phase two human anti-eotaxin-1 monoclonal antibody. Id. ¶¶ 25, 31. Based upon multiple representations made on behalf of Immune during negotiations, Plaintiff alleges that it believed that all of the Bert assets were included in the Collateral. *See* id. ¶¶ 21-22, 25, 30-33, 55-59, 60, 64-66, 68, 75-78, 83-86. On February 15, 2019, in response to Immune's grant of the security interest to Plaintiff, Licensor served Immune with a termination of the License ("License Termination"). Id. ¶ 30. In it, Licensor stated that it was terminating the License because Immune subjected the License "*to one or more security interests* and/or has *otherwise encumbered* such intellectual property and Information." Id. ¶ 34 (emphasis added). The

License Termination was an Event of Default under Section IV.G(c) of the Agreement because it resulted in a material breach of another agreement Immune was bound by.[6]  Id. ¶ 35.

On February 17, 2019 ("Petition Date"), two days after the License Termination, Immune filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code ("Bankruptcy Code") in the Bankruptcy Court of the District of New Jersey.  Id. ¶ 17.  During the bankruptcy proceedings, Immune agreed to sell the Ceplene Assets to Teper—the founder of Immune who formerly served as President and CEO (but who resigned from those posts in 2017)—and his new company Vector.  Id. ¶¶ 116, 120.  Immune, Teper and Vector allegedly signed an Asset Purchase Agreement with a sale price of $2.25 million, and in March 2019, Immune filed a motion on shortened notice in the Bankruptcy Court seeking authority to close the sale of the Ceplene Assets before March 31, 2019.[7]  Id. ¶ 120.  At the March 29, 2019 hearing to discuss the motion, Teper and Vector appeared and announced that they did not have the funds to close the deal.  Id. ¶ 121.  Instead, the parties agreed to a one-month license for $100,000.  Id.  At the same hearing, Teper and Vector "represented to the Court that they would have the funding to close the sale within that one month."  Id.  However, as of the date of the CAC, the one-month license had long expired, Teper and Vector had not come up with the funding for the sale transaction, "and the [sale] transaction appear[ed] to be dead."  Id. ¶¶ 122-27.  Plaintiff therefore views the one-month license as a "sham" used to destroy Plaintiff's expectancy rights in the Ceplene Assets.  Id.  Nevertheless, the Bankruptcy Court held that the one-month license was valid, which had the effect of excluding the Ceplene Assets from becoming Collateral under the Agreement.  Id. ¶¶ 121-24.  Immune also agreed to sell certain of its Anti-Eotaxin assets ("Sale Assets"), which

---

[6] Plaintiff alleges the License Termination resulted in additional Events of Default under two other provisions of the Agreement; Section IV.G(d), as a material loss of any collateral; and Section IV.G(e), because the License Termination resulted in Plaintiff failing to have a perfected first-priority security interest in the Collateral.  ECF No. 5 ¶ 36.

[7] Plaintiff maintains that Defendants' urgency to close the deal was to prevent the Ceplene Assets from becoming Collateral if they were not disposed of before March 31, 2019, as per the Debt Documents. ECF No. 5 ¶¶ 21, 120.

included the Bert assets (*i.e.*, the License), to Alexion Pharmaceuticals, Inc. ("Alexion"). Id. ¶ 60. The purchase of the Sale Assets by Alexion was approved in October and closed in December of 2019 (over Plaintiff's objections). Id. ¶¶ 62-63.

Plaintiff now claims that as a result of Immune's breach of the Agreement, the base interest rate of the Debenture has increased to twenty percent per annum, and that it is owed an additional fourteen percent due to the triggering of other formulas in the Debt Documents. Id. ¶¶ 51-52. When all of the calculations are completed, Plaintiff asserts it is owed a total of $14,848,569 from this transaction.[8] Id. ¶ 54.

In the CAC, Plaintiff puts forth counts of common law fraud, fraud in the inducement, negligent misrepresentation, breach of fiduciary duty, tortious interference with contract, and/or, in the alternative, securities fraud. Id. ¶¶ 92-141. Defendants respond with this motion to dismiss the CAC in its entirety. *See* ECF No. 10.

## III.    LEGAL STANDARD

Per Federal Rule of Civil Procedure 12(b)(6), a complaint shall be dismissed when it fails "to state a claim upon which relief can be granted." When deciding a motion to dismiss, the Court *must* accept "[a]ll allegations in the complaint . . . as true, and the plaintiff must be given the benefit of every favorable inference to be drawn therefrom." *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011) (quoting *Kulwicki v. Dawson*, 969 F.2d 1454, 1462 (3d Cir. 1992)). "To prevent dismissal, all civil complaints must now set out 'sufficient factual matter' to show that the claim is facially plausible." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009). In *Ashcroft v. Iqbal*, the Supreme Court articulated that "facial plausibility" requires plaintiff to plead enough factual content to allow the court

---

[8] The following are Plaintiff's calculations (ECF No. 5 ¶ 54):
    (1) $5,499,470 Face Value of Debenture * 34% Interest Rate = $1,869,819.80 Annual Interest
    (2) $1,869,819.80 Annual Interest * 5-year term = $9,349,099 Total Interest Owed
    (3) $5,499,470 Face Value of Debenture + $9,349,099 Total Interest Owed = $14,848,569 Total Amount Owed.

to "draw the reasonable inference that defendant is liable for the misconduct alleged." 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). The Court is free to reject "unsupported conclusions and unwarranted inferences, or a legal conclusion couched as a factual allegation." *Morrow v. Balaski*, 719 F.3d 160, 165 (3d Cir. 2013) (quoting *Baraka v. McGreevey*, 481 F.3d 187, 195 (3d Cir. 2007)). Finally, the complaint must consist of more than "[t]hreadbare recitals of the elements of a cause of action." *Iqbal*, 556 U.S. at 678.

## IV.   DISCUSSION

### A. Fraud-Based Claims

#### i.   Reasonable Reliance

Defendants first argue that it was Plaintiff's responsibility to discover that Defendants did not own the Collateral it allegedly pledged. *See* ECF No. 10-1 at 13-16. Accordingly, Defendants contend that Plaintiff could not have *reasonably relied* on any alleged misrepresentations due to its own failure to conduct proper due diligence, especially as a sophisticated investor. *See* id. Defendants conclude that because reliance is a necessary element of a common law fraud claim—as well as fraud in the inducement, negligent misrepresentation, and securities fraud claims—all of the asserted causes of action must be dismissed for failure to state a claim. Id. at 16. Plaintiff argues that had Defendants not represented that Immune owned all of the Collateral various times in the Debt Documents, Plaintiff would not have engaged in the transaction. *See* ECF No. 13 at 15-16. Plaintiff concludes that since it has sufficiently alleged that it reasonably relied on the misrepresentations, its fraud-based claims should survive this Motion. Id. at 16.

Under New Jersey law, "[t]he elements of common-law fraud are (1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages." *Allstate N.J. Ins. Co. v. Lajara*, 222 N.J. 129, 147 (2015) (internal citations omitted). A party will be said to have reasonably relied on a misrepresentation where "the

facts to the contrary were not obvious or did not provide a warning, or where the relying party [reasonably] did not [] pursue further investigation that would have revealed the falsity of the representation." *Arcand v. Brothers Int'l*, 673 F. Supp. 2d 282, 305-06 (D.N.J. 2009) (internal citations and quotation marks omitted).  Moreover, even a "sophisticated investor is not barred by reliance upon the honesty of those with whom he deals in the absence of knowledge that the trust is misplaced. Integrity is still the mainstay of commerce." *EP Medsystems, Inc. v. EchoCath, Inc.*, 235 F.3d 865, 883 (3d Cir. 2000) (quoting *Straub v. Vaisman & Co., Inc.*, 540 F.2d 591, 598 (3d Cir. 1976)).  Ultimately, the question of whether an "investigation [or] reliance was reasonable presents a factual issue that is more properly left to the judgment of the jury." *Angrisani v. Capital Access Network, Inc.*, 175 F. App'x 554, 557 (3d Cir. 2006) (internal citations omitted).

Whether Plaintiff *actually* relied on Defendants' representations in a reasonable manner is not the pertinent inquiry at this juncture.  *See id*.  All that needs to be pleaded to survive this Motion are factual allegations to support Plaintiff's contention that it believed it reasonably relied on Defendants' alleged misrepresentations.  The Court determines that Plaintiff has succeeded in doing so.

In the CAC, Plaintiff presented the "Representations and Warranties" section of the Agreement where Immune represented that it had indefeasible title to all of the Collateral, and that the IP Security Agreement was a complete list of all the patents Immune currently owned.  ECF No. 5 ¶ 57.  These provisions support Plaintiff's position that it believed *all* of the Bert assets were included in the Collateral; all of the Bert assets were listed in the IP Security Agreement, and as such, Plaintiff believed they were all owned by Immune.  ECF No. 5-1 at 33.  Though Defendants point to the IP Security Agreement which explicitly lists Immune Pharmaceuticals, Ltd. ("Ltd.")—one of Immune's subsidiaries—as the owner of nine patents underlying Bert, the Court does not find this fact sufficient to undercut Plaintiff's reasonable reliance allegations given the entirety of Plaintiff's assertions.  *See* ECF No. 10-1 at 15-16 (citing ECF No. 5-1 at 57).  Again, the "Representation and Warranties" section of the Agreement states that the IP Security Agreement is a "current listing of *all patents . . . owned* by

7

[Immune] as of the date hereof." ECF No. 5-1 at 33 (emphasis added). Based on these representations, Plaintiff could have been operating under the reasonable belief that because all of the Bert assets were included in the IP Security Agreement, they were all included in the Collateral. Accordingly, the reliance element of the fraud-based claims was properly pleaded.

        ii.     Federal Rule of Civil Procedure Rule 9(b)

Defendant next argues that the fraud-based claims should be dismissed for failure to plead with particularity as required by Federal Rule of Civil Procedure 9(b), and because Plaintiff improperly pleaded "group conduct without specifying conduct or statements by individual Defendants." ECF No. 10-1 at 16. Plaintiff argues that the CAC "injects sufficient precision and substantiation into its fraud claims to apprise each of the Defendants of the nature of the claims against them." ECF No. 13 at 21. Plaintiff also argues that Defendants "collectively made the decision" to approve Immune's use of misrepresentations in the Debt Documents. Id. at 22. The Court believes Plaintiff has sufficiently met the heightened pleading standards of Rule 9(b).

Federal Rule of Civil Procedure 9(b) states, in part, that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." To satisfy Rule 9(b), a plaintiff "must plead or allege the date, time and place of the alleged fraud *or otherwise* inject precision or some measure of substantiation into a fraud allegation." *Pricaspian Dev. Corp. v. Martucci*, 759 F. App'x 131, 135 (3d Cir. 2019) (emphasis added) (internal citations omitted). However, as Plaintiff contends, a plaintiff need not allege every material detail as long as he pleads the circumstances of the fraud with sufficient particularity "to place defendants on notice of the precise misconduct with which they are charged," thereby injecting precision into the complaint. *Eames v. Nationwide Mut. Ins. Co.*, 2008 WL 4455743, at *13 (D. Del. Sept. 30, 2008), *aff'd*, 346 F. App'x 859 (3d Cir. 2009).

According to Plaintiff, the misrepresentations in question were the various representations and warranties contained in the Debt Documents "concerning Immune's ownership of Bert and that granting [Plaintiff] a security interest in all of Immune[']s assets would not trigger a default under any of

Immune's other agreements." ECF No. 13 at 20.  Plaintiff alleges that when negotiating the transaction,

all Defendants *knew* that Ltd., Immune's subsidiary, owned part of the Collateral.  *See* ECF No. 5 ¶¶

64-66.   Plaintiff also alleges that all Defendants thought it to be permissible to make those

misrepresentations—knowing that they were false—thereby inducing Plaintiff to enter the transaction.

*See* id. ¶ 66-67.  This was allegedly done in reliance on an old email from Teper (who is not a lawyer),

which essentially states that because Immune owned all of the stock of Ltd., "[it] could pledge the Ltd.-

owned Collateral to a secured lender." Id. ¶ 66.  According to Plaintiff, "the fact that the Director and

Officer Defendants cast around looking for some justification [the email] . . . for making a

misrepresentation to [Plaintiff] regarding ownership demonstrates [their] fraudulent intent" because

they were "obviously aware certain of the Bert assets were owned by Ltd. and were concerned about

representations to [Plaintiff] to the contrary." ECF No. 13 at 23.  Whether this theory of fraud is proven

to be correct is for another stage of the proceedings.  The Court finds that these allegations satisfy the

heightened pleading standard of Rule 9(b) because they put all Defendants on notice of the alleged

fraudulent conduct and "inject precision or some measure of substantiation into" Plaintiff's fraud

allegations.  *Martucci*, 759 F. App'x at 135-36 (internal citations omitted).

Further, the CAC sufficiently alleges specific conduct by each of the individual Defendants.[9]

Plaintiff alleges that they all voted to authorize this transaction, and that they all also authorized Fiorino

to execute the "Officer's Certificate"; a document that consisted of additional misrepresentations.  *See*

ECF No. 5 ¶¶ 57, 66-67.  It is permissible for Plaintiff to move forward with its claims against each

Defendant in their personal capacity under the "participation theory" of tortious conduct.  *See Saltiel v.*

*GSI Consultants, Inc.*, 170 N.J. 297, 303 (2002) ("Officers and directors may be held individually liable

for personal participation in tortious acts even though they derived no personal benefit, but acted on

behalf, and in the name of, the corporation, and the corporation alone was enriched by the acts.")

---

[9] Plaintiff does not, however, assert any fraud-based claims against Teper.  Plaintiff asserts only a claim
of tortious interference with contract rights against Teper.  *See* ECF No. 5 ¶¶ 115-30.

(quoting 3A William M. Fletcher, *Fletcher Cyclopedia of the Law of Private Corporations* § 1137 (rev. perm. ed. 1994)).  Accordingly, the fraud-based claims will not be dismissed.

## B.  Breach of Fiduciary Duty

Whether Plaintiff may move forward with its breach of fiduciary duty claim is wholly dependent on the applicable substantive law.  Defendants argue that the internal affairs doctrine requires Delaware law to apply, which holds that fiduciary duties do not exist absent a fiduciary relationship.  ECF No. 10-1 at 21-22.  Plaintiff argues that the internal affairs doctrine is not applicable here, thus New Jersey law should apply, which holds that once a corporation becomes insolvent, it assumes a fiduciary duty to all the corporation's creditors.  ECF No. 13 at 26-28.  Plaintiff concludes that as Immune's largest creditor at a time when Plaintiff alleges Immune was insolvent, Plaintiff was owed a fiduciary duty and can bring a claim against the directors and officers of the corporation.  Id. at 28-29.

"When two states have a connection to a case and an issue arises on which the states' respective laws differ, a choice of law must be made."  *In re PHP Healthcare Corp.*, 128 F. App'x 839, 843 (3d Cir. 2005).  The choice-of-law rules of the forum state (New Jersey here) will guide the analysis.  *See id.*  However, the internal affairs doctrine serves as a "conflict of laws principle which recognizes that only one State should have the authority to regulate a corporation's internal affairs—matters peculiar to the relationships among or between the corporations and its current officers, directors, and shareholders—because otherwise a corporation could be faced with conflicting demands."  *Krys v. Aaron*, 106 F. Supp. 3d 472, 484 (D.N.J. 2015) (quoting *Edgar v. MITE Corp.*, 457 U.S. 624, 645 (1982)).  If the internal affairs doctrine was applicable, Delaware law would control because Immune was incorporated in Delaware.  *See* ECF No. 5 ¶ 14.  However, the "internal affairs doctrine . . . is not without exception."  *Intarome Fragrance & Flavor Corp. v. Zarkades*, 2009 WL 931036, at *14 (D.N.J. Mar. 30, 2009).  As stated in § 302(2) of the Conflict of Laws Restatement discussing the internal affairs doctrine, "[t]he local law of the state of incorporation will be applied to determine such [internal] issues, except in the *unusual case* where, with respect to some particular issue, some other state has a *more*

*significant relationship* to the *occurrence and the parties*, in which event the local law of the other state will be applied." *Id.* (emphasis added) (quoting Restatement (Second) of Conflict of Laws § 302(2) (Am. Law Inst. 1971)).  Since the subject matter of this claim is a breach of a fiduciary duty—a non-contractual duty—§ 145 of the Restatement highlights important contacts to be taken into account when applying the general principles of § 6 of the Restatement.  They include: "a) [t]he place where the injury occurred; b) [t]he place where the conduct causing the injury occurred; c) [t]he domicile, residence, nationality, place of incorporation and place of business of the parties; and d) [t]he place where the relationship if any between the parties is centered."  Restatement (Second) of Conflict of Laws § 145(2) (Am. Law Inst. 1971).

Applying those contacts, this is one of the "unusual cases" where the internal affairs doctrine should be disregarded, and New Jersey law should apply.  According to the CAC, the injury arose and occurred in New Jersey.  *See* ECF No. 5.  At all relevant times, both Plaintiff's and Immune's principal places of business were New Jersey.  Id. ¶¶ 5, 14.  Immune filed its bankruptcy petition in the Bankruptcy Court for the District of New Jersey.  Id. ¶ 17.  Fiorino, the former interim CEO and director, who was responsible for the preparation and execution of the "Officer's Certificate," is a resident of New Jersey.  Id. ¶ 6.  And while it is acknowledged that some of the other Defendants are not citizens of New Jersey (some Defendants are, for example, citizens of Israel, New York, California), the company for which they served and made decisions for operated in New Jersey.  Id. ¶¶ 7-13.  Viewing everything collectively, the Court finds that the relationship which gave rise to this litigation was centered in New Jersey.  The only contact with Delaware is that Immune (which is not a party to this action), is incorporated there.  Id. ¶ 14.  This fact, standing alone, will not override the other contacts, which point to New Jersey substantive law applying.

Accordingly, New Jersey's conception of fiduciary duty controls.  Under New Jersey law, "[o]nce a corporation becomes insolvent . . . the directors assume a fiduciary or 'quasi-trust' duty to the corporation's creditors."  *Bd. of Trs. of Teamsters Local 863 Pension Fund v. Foodtown, Inc.*, 296 F.3d

11

164, 173 (3d Cir. 2002) (citing *AYR Composition, Inc. v. Rosenberg*, 261 N.J. Super. 495, 505 (App. Div. 1993)).  Plaintiff alleges that exchanging the Debenture for $5,000,000 was a debt transaction, thereby making it a creditor of Immune.  ECF No. 5 ¶ 19.  Plaintiff also alleges that "[b]ased upon all available financial information regarding Immune's financial condition in the months before and after the Petition Date, Immune was insolvent and had severely impaired cash flow."  Id. ¶ 69.  Therefore, Plaintiff has sufficiently alleged that as a creditor of an insolvent corporation, it was owed a fiduciary duty at some point.  Id. ¶ 73.  Accordingly, the fiduciary duty claim will not be dismissed at this time.

### C.  Tortious Interference with Contract Rights

Defendants argue that under the doctrines of res judicata and collateral estoppel, the Bankruptcy Court's approval of the Ceplene license transaction should bar Plaintiff from asserting its tortious interference claim because the same subject matter underlies the two actions.  ECF No. 10-1 at 27-28. Plaintiff argues that the Bankruptcy Court's order approving the Ceplene license transaction was without prejudice to Plaintiff's rights in Ceplene, and regardless, that the order does not provide enough detail to assess whether the doctrines are applicable.  *See* ECF No. 13 at 30.

Res judicata is a legal doctrine that "bars litigation of claims that should have been raised in previous proceedings."  *Hogg's v. New Jersey*, 352 F. App'x 625, 629 (3d Cir. 2009).  The doctrine requires the following elements: "(1) the final judgment in the prior action must be valid, final, and on the merits; (2) the parties in the later action must be identical to or in privity with those in the prior action; and (3) the claim in the later action must grow out of the same transaction or occurrence as the claim in the earlier one."  *Id.* (quoting *McNeil v. Legislative Apportionment Comm'n of the State of N.J.*, 177 N.J. 364, 395 (2003)).  Collateral estoppel is a different legal doctrine that "operates to foreclose relitigation of an issue when the party asserting the bar shows that: (1) the issue to be precluded is identical to the issue decided in the prior proceeding; (2) the issue was actually litigated in the prior proceeding; (3) the court in the prior proceeding issued a final judgment on the merits; (4) the determination of the issue was essential to the prior judgment; and (5) the party against whom the

12

doctrine is asserted was a party to or in privity with a party to the earlier proceeding." *Id.* (quoting

*Hennessey v. Winslow Twp.*, 183 N.J. 593, 599 (2005)).  To establish a claim for tortious interference

of contract under New Jersey law, a plaintiff must show "(1) that it had a reasonable expectation of

economic advantage; (2) which was lost as a direct result of [Defendants'] malicious interference; and

(3) that it suffered losses thereby."  *Avaya Inc., RP v. Telecom Labs, Inc.*, 838 F.3d 354, 382 (3d Cir.

2016) (internal citations and quotation marks omitted).

The approval of the Ceplene license transaction alone—expressly ordered without prejudice to

Plaintiff's rights in the Ceplene Assets—does not satisfy either of the preclusion doctrines discussed

above.  The approval order of the transaction—only two pages in length—is silent with regards to

whether there was any "malicious interference" by Teper with respect to Plaintiff's expectation rights

in the Ceplene Assets.  *See* ECF No. 13, Ex. F (the approval order); *see also Avaya*, 838 F.3d at 382.

Further, Defendants provide the Court with little discussion of how the doctrines apply.  *See* ECF No.

10-1 at 27-28.  For example, Defendants do not address how res judicata would operate to bar Plaintiff's

tortious interference claim when the approval order was without prejudice to Plaintiff's rights in the

Ceplene Assets.  *See* id.  Nor do Defendants explain—with any specificity—how the issues in the

bankruptcy proceeding are identical to the "issue to be precluded" here (*i.e.*, Teper's alleged tortious

interference).[10]  *See* id.  Thus, neither doctrine is applicable.

### D.  Securities Fraud Claim

Lastly, Defendants argue that the securities fraud claim should be dismissed for lack of standing

because it is based on contingent future events.  ECF No. 10-1 at 28-29.  Plaintiff argues that it should

---

[10] Defendants analogize this matter to *In re Farmland Indus., Inc.*, 376 B.R. 718 (Bankr. W.D. Mo. 2007), where the Bankruptcy Court for the Western District of Missouri held that an unsuccessful bidder at an auction sale was collaterally estopped from bringing a tortious interference claim against the successful bidder because he was "seeking to undo the economics of the sale." *Id.* at 726.  The facts of the instant dispute are distinguishable; here, Plaintiff's lien was expected to arise before Teper and Vector negotiated what Plaintiff views as a "sham" license, thereby depriving Plaintiff of its lien.  ECF No. 5 ¶¶ 122-27.

be permitted to maintain this cause of action "in the interest of judicial economy." ECF No. 13 at 32.

The Court agrees with the Defendants.

Currently, the Official Committee of Unsecured Creditors and other debtors of Immune are

pursuing a separate bankruptcy case to have Plaintiff's debt claims recharacterized as equity claims,

which would have the effect of subordinating them. ECF No. 5 ¶¶ 133-35. In the CAC, Plaintiff

concedes that "[i]f [Plaintiff's] debt claims against Immune are recharacterized as equity, then [Plaintiff]

will be a purchaser of security and have standing to assert a SEC Rule 10b-5 claim." Id. ¶ 137. To have

standing to bring a securities fraud claim, one must be a purchaser or seller of actual securities (*i.e.*,

equity). *See Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 730 (1975). As of the date hereof,

the transaction has yet to be recharacterized and Plaintiff is still considered a purchaser of debt, not

equity. Thus, since this securities fraud claim rests "upon contingent future events that may not occur

as anticipated, or indeed may not occur at all," the claim is not ripe and must be dismissed for lack of

standing.[11] *See Texas v. United States*, 523 U.S. 296, 300 (1998) (internal citations omitted).

## V.    CONCLUSION

For the reasons above, Defendants' Motion is **GRANTED in part** and **DENIED in part.** An

appropriate order accompanies this opinion.

DATED: January 25, 2021

_____

**CLAIRE C. CECCHI, U.S.D.J.**

---

[11] Should the claims be recharacterized by the Bankruptcy Court, Plaintiff may amend the CAC to include this cause of action.

14